JEFFREY KALIEL (CA 238293)
**TYCKO & ZAVAREEI, LLP**
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
*jkaliel@tzlegal.com*

JEFFREY OSTROW (pro hac vice to be filed)
SCOTT EDELSBERG (pro hac vice to be filed)
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd, 5th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
*ostrow@kolawyers.com*
*edelsberg@kolawyers.com*

***Counsel for Plaintiff and the Proposed Class***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

JAMES WALTERS, *on Behalf of Himself and Those Similarly Situated*     )
                  Plaintiff,     )
vs.     )
TARGET CORP.,     )
                  Defendant.     )

**CLASS ACTION COMPLAINT**

CASE NO. '16CV1678 L     MDD

***Jury Demand Endorsed Hereon***

## CLASS ACTION COMPLAINT

Plaintiff James Walters ("Plaintiff"), individually and on behalf of all others similarly situated, through his undersigned counsel, alleges the following based on personal knowledge as to allegations regarding Plaintiff and on information and belief as to all other allegations.

## INTRODUCTION

1.     This is a proposed class action seeking monetary damages, restitution, injunctive relief, and declaratory relief from Defendant Target Corp., ("Defendant" or "Target"), arising from its deceptive, unfair and unconscionable practice of charging Returned Payment Fees ("RPFs") ranging from $20-$40 in connection with its store-branded Debit RedCard ("Target Debit Card")—which is actually not a debit card at all, and functions nothing like every other debit card on the market.[1]

2.     Target, one of the first major retailers to introduce store-branded "debit" cards (as opposed to store-branded credit cards), entices consumers to sign up for and use the Target Debit Card by offering a 5% savings on all Target purchases. By incentivizing consumers to use a Target Debit Card over other electronic payment forms, Target saves on transaction costs associated with processing credit card or bank-issued debit card transactions.

3.     In addition, Target uses the Target Debit Card as a significant source of revenue by assessing and collecting RPFs directly from consumers who use the card. This revenue is generated by deceptive practices.

4.     As Target is well aware, consumers increasingly prefer to use debit cards for everyday purchases, as debit cards are convenient and allow purchases to

---

[1] Debit cards, as Investopedia.com explains, "deduct money directly from a consumer's checking account" and "do not allow [consumers] to go into debt" since the money is deducted from a consumer's account immediately. *See* http://www.investopedia.com/terms/d/debitcard.asp (last visited June 3, 2016); *see also* https://www.consumer.gov/articles/1004-using-debit-cards (last visited June 3, 2016).

be drawn directly and immediately from checking accounts, do not have associated transaction fees for accessing their own funds, and provide consumers with budgeting control and the peace of mind of making purchases without going into debt.

5.     Consumers similar to Plaintiff expect debit cards to result in an immediate withdrawal from their checking accounts if sufficient funds are available, or to result in a purchase declination at the point of sale if there are insufficient funds to cover the purchase—indeed, these are inherent aspects of debit cards.

6.     True debit cards, unlike the Target Debit Card, come with significant consumer protections with respect to the assessment of overdraft fees.  For true debit cards, banks or other issuers cannot assess overdraft fees on debit card transactions unless consumers affirmatively request that such insufficient funds transactions are paid. This is commonly known as "overdraft protection."  Target Debit Cards have no such protection.

7.     In account documents, employee interactions, public statements and marketing materials, Target bolsters and exploits these consumer perceptions regarding the performance of debit cards.

8.     But because the Target Debit Card works nothing like a true debit card, transactions are processed with a severe lag time and consumers are pummeled with unfair and excessive fees they did not expect.  Indeed, as occurred with Plaintiff Walters, Target's deceptive and undisclosed processing practices often result in a consumer paying nearly *$100 in fees for one supposed insufficient funds event*—a catastrophic penalty unheard of in the banking world for a simple overdraft.

9.     This massive penalty occurs even when consumers, such as Plaintiff Walters, make Target Debit Card transactions when they have sufficient funds in their checking accounts to pay those Target transactions. Because Target delays deducting those transactions from the consumer's checking account, intervening

activity means that often the consumer's checking account no longer has enough funds by the time Target gets around to processing the transaction. Target then assesses a RPF—even though, had Target's Debit Card worked like an actual debit card, or had Target simply acted quicker to process the debits, it could have paid itself for the transaction and the consumer would not have been charged a penalty from either his bank or from Target. At the same time, the consumer's bank sometimes also assesses a Non-Sufficient Funds fee ("NSF Fee") of $29 or more, due to Target's attempted debit, *each time that Target attempts and re-attempts to debit the same amount from an account*.

10. Even if consumers do not have enough funds as they attempt to use their Target Debit Card for a transaction, they expect such a transaction to be declined by Target—exactly how every other debit card in the marketplace operates. Target does not do this either—instead, it lures consumers into making purchases they cannot cover.

11. In both scenarios, consumers simply do not understand that Target's unconventional and unprecedented method of processing "debit card" transactions will result in overdrawn accounts and crippling fees.

12. Because the Target Debit Card is not a true debit card, Target is not authorizing purchases at the point of sale and is neither deducting nor declining transactions immediately. That means that Target builds in a time lag on all Target Debit Card purchases that works to the detriment of consumers.

13. Due to this time lag, consumers are assessed crippling RPFs. These are in addition to NSF Fees consumers receive from their banks when Target belatedly processes a transaction that the bank rejects. Target then continues to attempt to re-debit the checking account repeatedly, until the transaction is successfully completed. Each time, the consumer's bank charges an NSF Fee if the transaction is declined. So, as occurred with Plaintiff Walters, one supposed overdraft on a

Target Debit Card purchase can lead to nearly **$100 or more in fees—something Target never once discloses in the Target Debit Card marketing materials or contract documents.**

14.     What's more, the NSF Fees charged by Banks would be barred by Federal law if the Target Debit Card were a true debit card.  In other words, if consumers such as Plaintiff made the same exact purchases, on the same exact dates, for the same exact Target items, with a true debit card, the consumers' banks would be barred by federal law from charging **any fees whatsoever** for those same transactions.

15.     That difference between $0 dollars in fees for using a true debit card and $100 in fees for using a Target Debit Card is unconscionable, deceptive, and never disclosed by Target.

16.     What's more, Target has virtually no risk from these supposed insufficient funds transactions.   It simply continues to attempt to debit the consumers' checking accounts until enough funds are present. In the vast majority of cases, Target simply pays itself back a few days later—after having started a devastating cascade of fees on consumers' checking accounts.

17.     The potential $100 or more double fee penalty that Target's actions subject its consumers to for supposed insufficient funds events is never disclosed or authorized by the card contracts.    And that double penalty is obscene and unconscionable—especially when, as happens in the vast majority of cases, Target simply re-debits the account a few days later, is fully paid at that point, and thus is unharmed.

## THE PARTIES

18.     Plaintiff James Walters is a citizen of the state of California who resides in San Diego, California.

19.     Defendant Target Corp. is a citizen of the state of Minnesota with

headquarters in Minneapolis, Minnesota.

## JURISDICTION AND VENUE

### Jurisdiction

20.     This Court has original subject matter jurisdiction over this proposed class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of Title 28 of the *United States Code*), under 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal district courts over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). Because Plaintiff is a citizen of the State of California and Defendant is a citizen the State of Minnesota, at least one member of the plaintiff class is a citizen of a State different from Defendant. Further, Plaintiff alleges the matter in controversy is well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs. Finally, Plaintiff alleges "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

21.     This Court has personal jurisdiction over Defendant for reasons including but not limited to the following: Defendant regularly conducts business in this District.

## COMMON FACTUAL ALLEGATIONS

### CONSUMERS REASONABLY UNDERSTAND THAT DEBIT CARDS RESULT IN AN IMMEDIATE DEBIT OR DECLINATION, EVEN IF DEBIT CARD TRANSACTIONS DO NOT "POST" UNTIL DAYS LATER

22.     Debit cards, as Investopedia.com explains, "deduct money directly from a consumer's checking account" and "*do not allow [consumers] to go into debt*" since the money is deducted from a consumer's account immediately. *See* http://www.investopedia.com/terms/d/debitcard.asp (last visited June 3, 2016); *see*

also https://www.consumer.gov/articles/1004-using-debit-cards (last visited June 3, 2016).

23.    This is the widespread, common consumer understanding, including Plaintiff's understanding, of debit cards—since it is how every debit card in the United States works—except, that is, for the Target Debit Card.

24.    Every debit card transaction in the United States, except for Target Debit Card transactions, occurs in two parts, whether it is a one-time transaction for a routine daily purchase or whether it is a recurring debit card transaction for a repeat household expense.  First, authorization for the purchase amount is instantaneously obtained by the merchant.  When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to the customer's bank, which verifies that the customer's account is valid and that sufficient funds are available to cover the transaction's cost.   If not, the transaction is declined.

25.    At this step, for debit card transactions that are approved, U.S. banks immediately reduce the customer's available funds or balance by a corresponding amount, but do not yet transfer the funds to the merchant.

26.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

27.    For transactions attempted on insufficient funds, banks decline those transactions immediately and the transactions are not processed.  Accordingly, consumers who use debit cards reasonably anticipate that funds will be deducted from their account immediately, or that their transaction will be denied if there are insufficient funds in their account.

## TARGET'S MARKETING AND SIGN-UP MATERIALS INTENTIONALLY PLAY OFF CONSUMERS' PREEXISTING UNDERSTANDING OF, AND PREFERENCE FOR, DEBIT CARDS

28.    Target well knows that many consumers prefer debit cards for many

reasons. In fact, in 2012 the Target Debit Card was responsible for $4.2 billion (or 5.7%) of Target's retail sales. Consumer research indicates that consumers prefer debit cards as a budgeting device; because they don't allow debt like credit cards do; and because the money instantly comes directly out of a checking account.

29.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; *the money is immediately deducted from your checking account*. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *See* http://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited June 8, 2016) (emphasis added).

30.     Further, Consumer Action informs consumers that, "[d]ebit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." Consumer Action, Understanding Debit Cards – Plastic with a Difference 3 (2007).

31.     In other words, the key benefits of a debit card are that it allows consumers to control spending and to rest assured that funds are deducted immediately as they are spent.

32.     Unsurprisingly, due to these consumer-friendly benefits, in 2015 consumers in the United States used their debit cards on average 21 times per month, which is a 32% rise in usage over the past ten years. The amount consumers spend with their debit cards is also on the rise. In 2015, Americans spent, on average, $9,291 annually with their debit card, up from $7,807 ten years ago.

33.     According to a 2015 study conducted by Pulse, one of the nation's leading debit/ATM networks:

Consumer use of debit has been nothing short of remarkable…Debit

has steadily gained wallet share as consumers shift their spending to this payment type. The use of debit for small-ticket purchases is particularly noteworthy, where one-third of all debit transaction are for less than $10 – purchases that historically would have been made with cash or not at all."

News Release, Pulse, Debit Industry Changes Markedly in 10 Years of Debit Issuer Study (Aug. 6, 2015) (internal citations omitted).

34.    Fully aware of the rise in consumer preference for debit cards, Target intentionally exploits consumer understandings during the high-pressure, on the spot sales pitches for Target Debit Cards.

35.    Most consumers, such as Plaintiff, sign up for the debit card when asked to do so by a cashier at a Target store, and are enticed with a 5% discount.

36.    During a normal checkout, Target cashiers inform consumers that purchases with the Target Debit Card are deducted directly from, and immediately from, consumer checking accounts.

37.    Target furthers the consumer perception that the Target Debit Card works like a true debit card by requiring consumers to pick a unique personal identification number ("PIN") for use with the Red Card, and requiring use of that PIN for purchases.  It states in the Target Debit Card Agreement (the "Agreement"): "You must present your Card and enter your PIN if you wish to use your Card to pay for goods or services at Target retail stores." Attached as Exhibit A is a copy of the Target Debit Card Agreement.

## THE SO-CALLED TARGET DEBIT CARD ACTUALLY WORKS NOTHING LIKE EVERY OTHER DEBIT CARD

38.    The Target Debit Card, however, is not a debit card at all.

39.    In truth, the Target Debit Card is a shrouded electronic check—one that Target does not process promptly and immediately.  And unlike paper checks or other electronic checks, Target does not instantly verify the presence of sufficient funds in a checking account—though it has the capacity to do so.

40.     Unlike a true debit card transaction, a Target Debit Card transaction occurs over the Automated Clearinghouse ("ACH") network.  ACH transactions occur on an entirely different network and by entirely different processes than debit card transactions.

41.     Moreover, Target intentionally delays processing these ACH debits quickly and immediately.  In order to save on the processing fees it must pay to ACH network participants, Target groups "debit" transactions together over several days, then submits giant batches for processing through the network.

42.     This results often in delays in processing transactions up to ten days—even though most ACH debit transactions in the country settle on the very next business day.

43.     If Target acted more quickly, transactions would often debit while consumers still had funds in their account.  Instead, Target waits days to submit transactions, often in order to group different transactions together and thereby minimize the store's transaction fees.

44.     This processing delay means that funds available in consumer checking accounts at the time they made a Target transaction are often no longer available. That results in RPFs charged by Target plus NSF Fees charged by consumer banks, as described herein.

45.     This need not occur.  Indeed, technology widely exists for the same-day, virtually instantaneous processing of ACH debit transactions.  Had Target truly wanted its Target Debit Card to perform like a true debit card, it could have availed itself of this technology.  It chose not to do so in order to save on its own transaction costs, and to increase its RPF revenue on the backs of its consumers.

46.     Moreover, in the context of paper checks, technology also is widely available and widely used by virtually all major retailers to instantly check consumer checking accounts to make sure that sufficient funds exist to cover a paper check.

Target could easily use such technology here to ensure sufficient funds exist in a checking account for a Target Debit Card transaction.  It chooses not to, in order to save itself transaction costs and to ensnare consumers in RPFs.

47.    Target essentially concedes in the Agreement that it has a duty to process transactions quickly and in a timely fashion, and agrees it is responsible for resulting damages: "If we do not complete an EFT to or from your Deposit Account on time or in the correct amount according to this Agreement, we will be liable for your losses or damages."  Exhibit A p. 2.

48.    However, Target has made the choice not to process Target Debit Card transactions instantly or even quickly. It therefore does not process such transactions "on time," resulting in consumer harm.

## TARGET'S DEBIT CARD AGREEMENT FALSELY IMPLIES THE TARGET DEBIT CARD WORKS LIKE A NORMAL DEBIT CARD, AND SHROUDS THE TRUTH THAT THE TARGET DEBIT CARD IS NOT A DEBIT CARD AT ALL

49.    The Target Debit Card Agreement misconstrues the debit card processing and RPF practices in several ways.  There is a yawning gap between Target's practices as described in the Agreement and Target's practices in reality.

50.    First, Target nowhere discloses that consumers are subject to a double penalty for what it deems to be an insufficient funds event—a double penalty that can be nearly $100 or more, as occurred with Plaintiff Walters.  Target never states that consumers will be charged both an RPF and an NSF fees by his or his bank during such an event—or, indeed, that consumers can be liable for *repeated* NSF Fees each time Target attempts unsuccessfully to debit an account.  Had that disclosure been made clearly, no reasonable consumer would have risked this jeopardy by using a Target Debit Card.

51.    Plaintiff Walters would not have signed up for the Target Debit Card had Target accurately informed him of the possible penalties for merely using the

card.

52.    Overdraft fees are different from NSF Fees at U.S. banks.  Overdraft fees are charged when a banks pays a transaction even though the account lacks sufficient funds.  NSF Fees are charged when a bank rejects an attempted debit transaction.  Plaintiff and similarly situated consumers who experienced Target's RPFs incurred NSF fees in addition, not overdraft fees—and NSF Fees are never once mentioned in the Target Debit Card Agreement.

53.    The contract states that consumers may be charged "overdraft fees" by their bank if they overdraw their consumer checking account, *but never discloses that consumers will receive NSF fees from their bank for declined purchase*s:  "if you use this Card to make a purchase that exceeds the balance in the deposit account that you linked to this Card, that account may become overdrawn even if you chose not to allow overdrafts with respect to a debit card issued by your Depository Bank, and you may incur associated overdraft fees."

54.    In other words, the double jeopardy fee scenario described above occurs when a bank *declines* a Target Debit Card transaction, not when a bank pays such a transaction into overdraft.  But Target never discloses this.  It never once discloses the possibility of NSF Fees from a consumer's bank.  Target's agreement also affirmatively misstates the operation of its Target Debit Card in order to exploit the consumer perception of debit cards by touting the key benefit of normal debit cards: that you can't spend what you don't have.  As Target states in the Agreement: "When you use your Card, *you will be limited by the amount of funds in your Deposit Account and any available overdraft line of credit that you may have in connection with your Deposit Account (if applicable),* as of the date the Depository Bank receives and processes an EFT."

55.    This is an affirmative promise to decline transactions for which insufficient funds exist.  But Target does not do this—indeed, it does not even check

to see if there are sufficient funds in the account, as described above.

56.    Other Agreement provisions promise that RPFs will *only* be charged when Target is ultimately not paid for a transaction—but in fact, Target charges such fees even when it repays itself just days later:  "The Depository Bank may return as unpaid an EFT if, for example, your Deposit Account does not have sufficient available funds in it to cover the full amount of the EFT, or your Deposit Account is closed, or for other reasons…*In the event an EFT is returned or deemed unpaid, the funds owed to us will become immediately due and payable to us.* You agree to pay in United States dollars the full amount of the unpaid EFT and any applicable Returned Payment Fees."

57.    The provision quoted above indicates that a RPF is assessed only if the transaction is permanently returned or "deemed unpaid."

58.    Similarly: "If the Depository Bank returns an EFT unpaid for any reason, you agree to pay a 'Returned Payment Fee.'"

59.    But as occurred with Plaintiff, the transactions aren't "unpaid" at all—they are simply paid with a slight delay—after Target itself already built in its own delay to the process.

60.    Moreover, at every possible turn, the Agreement shrouds the differences between the Target Debit Card and all other debit cards in the United States. The Agreement misdescribes and shrouds the true nature of the Target Debit Card, in order to falsely promise the benefits of a normal debit card without adequately disclosing the uniquely harmful and risky aspects of the Target Debit Card.

61.    For example, the Agreement states that "[y]ou agree that any EFT may occur several business days after your transaction(s) have occurred and after the date shown on your transaction receipt(s)." Of course, *that is also the case for true debit cards as* well, as described above.  But unlike with all other debit cards, Target

neither immediately debits nor rejects Target Debit Card transactions—and it never informs consumers of that key difference.  This is just the first example of where Target intentionally chose not to be clear about the important differences between the Target Debit Card and every other debit card in the country.

62.   Target's contract provision is especially inaccurate and deceptive because Target's online account activity screens show Target Debit Card transactions "posting" to an account the same day or the very next day—again, just as a normal debit card often would:

Important Messages
Transaction Detail

| Transaction Date | Post Date | Merchant or Purchase Description | Amount |
|---|---|---|---|
| 10/20/2015 | 10/20/2015 | TARGET DEBIT CARD ACH PAY MENT | -$102.17 |
| 10/20/2015 | 10/20/2015 | TARGET  NATIONAL CITY, CA | $102.17 |
| 10/26/2015 | 10/27/2015 | TARGET  CHICAGO, IL<br>INCLUDES $20 CASH | $57.82 |
| 10/27/2015 | 10/27/2015 | TARGET DEBIT CARD ACH PAY MENT | -$57.82 |
| 10/29/2015 | 10/30/2015 | TARGET  PEACHTREE CIT, GA | $15.16 |
| 10/30/2015 | 10/30/2015 | TARGET DEBIT CARD ACH PAY MENT | -$15.16 |
| 11/4/2015 | 11/4/2015 | TARGET DEBIT CARD ACH PAY MENT | -$10.25 |
| 11/4/2015 | 11/4/2015 | TARGET  SAN DIEGO, CA | $10.25 |
| 11/5/2015 | 11/6/2015 | TARGET.COM 800-591-3869 | $7.17 |
| 11/6/2015 | 11/6/2015 | TARGET DEBIT CARD ACH PAY MENT | -$7.17 |

63.   But that is totally inaccurate:  the "post" date listed on Target's online account activity report is always many days before the funds are deducted from a consumer's checking account.

64.   Another time Target fails to make clear the massive differences between the Target Debit Card and true debit cards is with this provision: "You agree that you will not use your Card to make purchases for amounts in excess of available funds you have in your Deposit Account as determined by the financial institution holding your Deposit Account ('Depository Bank') as of the date the Depository Bank processes the EFT."  Again, with a normal debit card, balance sufficiency is "determined" immediately by the financial institution, and the transaction is "processed" immediately, at the point of sale—either resulting in a withdrawal or a declination.  Again, that does not occur here.

65.    But Target does not stop there.  It actually promises that the Target Debit Card will be *even more strict than a normal debit card* in terms of rejecting transactions for which there are insufficient funds at the time of purchase: "You agree that the dollar amount limitation on your Card may be less than the dollar amount of available funds in your Deposit Account and that such dollar amount and transaction limitations may change from time to time without any notice to you." But again, Target does nothing to ensure that insufficient funds transactions are rejected—thus luring consumers into the double jeopardy, one-two punch of RPF and NSF Fees.

66.    For a consumer with a basic understanding of a debit card, the following provision is yet another promise to reject insufficient funds transactions at the point of sale:  "The Depository Bank may return as unpaid an EFT if, for example, your Deposit Account does not have sufficient available funds in it to cover the full amount of the EFT, or your Deposit Account is closed, or for other reasons." This is yet another attempt by Target to lure consumers into believing its debit card functions like a normal one.

67.    All in all, the Agreement is riddled with inaccuracies and omissions regarding the true operation of the Target Debit Card.

## **TARGET ABUSES CONTRACTUAL DISCRETION**

68.    To the extent the account documents do not explicitly bar the policies described above, Target exploits contractual discretion to the detriment of accountholders when it uses these policies.

69.    For example, the Agreement states, "You agree that any EFT <u>may</u> occur several business days after your transaction(s) have occurred and after the date shown on your transaction receipt(s)." *See* Exhibit A p.1 (emphasis added). What the Agreement fails to inform consumers is that, as a matter of fact, <u>every</u> EFT that Target processes occurs several days later—and Target's definition of "process" is

far different from the processing of true debit card transactions.

70.     If the Agreement told consumers the truth about the time lag associated with every transaction made the Target Debit Card, consumers like Plaintiff would understand that their Target Debit Card operates nothing like their other debit cards.

71.     Additionally, the Agreement states that in the event it charges an RPF, the amount will be "up to," depending on what state the consumer is in, $20, $25, $30, $35, or $40. Again, what the Agreement fails to inform consumers is that as a matter of fact, Target always charges the *maximum amount* allowed under the Agreement for every RPF. This is true even when Target continues to debit a consumers account and pays itself just 1 or 2 days later.   Any good faith understanding of the "up to" promise would require Target not to charge the maximum RPF on a transaction for which it was paid with just a short delay—especially if, as occurred with Plaintiff Walters, sufficient funds existed at the time Target Debit Card transaction was initiated.

72.     Target uses all of these contractual discretion points to extract RPF on transactions that no reasonable consumer would believe could cause such fees.

**MYRIAD CONSUMER COMPLAINTS INDICATE THAT CONSUMERS DO NOT UNDERSTAND THE RED CARD IS NOT A TRUE DEBIT CARD—AND TARGET KNOWS THIS**

73.     Plaintiff is not the only reasonable consumer deceived by Target's deceptive, unfair and unconscionable practice of charging RPFs in connection with the Target Debit Card.

74.     Online complaints indicate that numerous consumers were duped into paying the deceptive RPFs. To demonstrate, one consumer describing the Target Debit Card explains: "My primary complaint, however, is that Target advertises this card as being 'just exactly like your bank debit card, accept that you also receive 5% off!' The actual situation is that the charges are treated as electronic checks. I was told this today by Target's debit card department. To advertise the

debit card as a 'debit card' rather than as a quicker means to make an electronic check is misleading. Considering that this is happening in different Targets in different parts of the country indicates that the company has used this tactic to encourage customers to sign up for a debit with them. That's misleading, plain and simple. It's bad business. In a day and age of questionable banking techniques by companies, this is pretty poor means of advertising their product."
http://www.complaintsboard.com/complaints/target-corporation-jacksonville-north-carolina-c389290.html?page=4 (last visited June 28, 2016).

75.     Another consumer complains that she "was under the impression that the debit card worked like a debit card because it says it's a DEBIT card." She also understood that his Target Debit Card would function like all of her other debit cards and deduct funds immediately and deny transactions if there were insufficient funds in the linked bank account. However, much to her surprise, the transaction was processed a number of days later at a time when her linked bank account no longer had sufficient funds. The result was a $30 RPF charge from Target. *See* http://blog.credit.com/2012/08/what-you-should-know-about-store-brand-debit-cards-61250/ (last visited June 8, 2016).

76.     Reasonable consumers like Plaintiff, are routinely deceived by Target's deceptive, unfair and unconscionable practice of charging RPF's in connection with the Target Debit Card.

## HOW CONSUMERS ARE HARMED

77.     The Target Debit Card's failure to operate like every other debit card in the United States by: (1) confirming that a consumer's account has sufficient funds at the time of purchase; and/or (2) instantly deducting the transaction amount from consumers' accounts results in consumers such as Plaintiff routinely being charged expensive and unfair RPFs, and additional NSF charges.

78.     For instance, if a consumer that uses his Target Debit Card has

sufficient funds in the linked account to cover the transaction on the transaction date, but, by day 4, when Target finally attempts to debit the transaction amount, the account has insufficient funds, the consumer is charged an RPF from Target and an NSF Fee from his bank.

79.    Likewise, if a consumer that uses his Target Debit Card has insufficient funds in the linked account to cover the transaction on day 1, Target will still approve the transaction and eventually charge the consumer an RPF, with the consumer's bank also assessing an NSF Fee.

80.    Making matters worse, after Target charges an RPF, it keeps attempting to debit the consumer's account until it gets paid. Thus, Target almost always gets paid a few days later, but charges the unreasonable RPF regardless of whether it is successful or not in collecting the transaction amount.   Moreover, the consumer's bank charges repeated NSF Fees each time Target attempts and re-attempts to deduct the same transaction amount when there are insufficient funds.

81.    Accordingly, Target's unreasonable delay in processing transactions and failure to verify that accounts have sufficient funds to cover transactions results in consumers paying deceptive and expensive RPFs, in addition to bank-imposed NSF Fees.

82.    For example, Plaintiff Walters used his Target Debit Card to make a purchase at a Target in San Diego, California on December 1, 2015, in the amount of $85.37.   Plaintiff had sufficient funds in his checking account to pay for that transaction on that day.

83.    Plaintiff would not have made the transaction using his Target Debit Card if he had known he would be assessed fees as described below.

84.    Target did not attempt to debit the transaction amount until December 3, 2015, at which point Plaintiff no longer had sufficient funds in his account.  The reason Plaintiff Walters did not have sufficient funds in his checking account at this

point was because on December 1, 2015, Target had finally gotten around to debiting *different* Target Debit Card transactions that Plaintiff had made nearly a week earlier. Specifically, Target Debit Card transactions in the amounts of $101.90 and $115.08—transactions Plaintiff had made on November 26 and November 27 respectively—were not debited until December 1.  In other words, this is another example of the devastating impact that Target's time-lag for processing Target Debit Card transactions has on consumers.

85.     Because Plaintiff had insufficient funds in his account at the time Target finally attempted to debit $85.37 for his December 1 purchase, Plaintiff's bank charged him a $29 NSF Fee on December 4.

86.     Target then attempted to re-debit the account on December 10, 2015, and the transaction was successfully completed on that day.

87.     Nonetheless, on January 7, 2016, Target charged Plaintiff an RPF for the December 1, 2015 transaction in the amount of $25.

88.     Accordingly, Plaintiff paid $54 in fees (a $25 RPF plus a $29 NSF fee) for one purported insufficient funds event—even though he had sufficient funds in his checking account to pay the transaction at the time it was made.

89.     Plaintiff Walters also made two Target Debit Card purchases at a Target in San Diego on March 19, 2016 in the amounts of $36.89 and $91.79, respectively. Unbeknownst to Plaintiff, Target approved these transactions even though Plaintiff did not have sufficient funds in his checking account at this time.

90.     Plaintiff would not have made the transactions using his Target Debit Card if he had known he would be assessed fees as described below.

91.     According to Plaintiff's Target Debit Card activity report provided by online by Target, Target "posted" the transactions as a group—in the amount of $128.68—on the very next day, March 20.

92.     That was not true.  In actuality, Target did not even attempt to debit

Plaintiff's checking account until March 21.  At that time, there were not sufficient funds to pay the $91.79 transaction, and that transaction was declined by Plaintiff's bank.  The $36.89 transaction was successfully completed on that day.

93.   Target's online account activity report shows that, eleven days later, on March 31, 2016, Target again attempted to debit Plaintiff's checking account for March 19, 2016 transaction of $91.79.

94.   But again, that was not true.

95.   In actuality, Target did not attempt to re-debit the transaction amount until April 4, 2016—two full weeks after the initial purchase. By the end of the banking day on April 4, 2016, Plaintiff again did not have sufficient funds in his account to complete the transaction successfully. But for the entire period between March 25 and April 3—a time period in which Target could have debited the transaction amount—Plaintiff had an average of $350 in his account, which easily would have allowed the transaction to be completed during that period.

96.   Yet, Target inexplicably did not debit the funds then, but waited nearly two weeks to do so.

97.   Target then attempted to debit the account on April 18 and the transaction was successfully completed at that time.

98.   On May 17, 2016—or about one month after the transaction was finally paid—Target charged Plaintiff a $35 RPF.

99.   Accordingly, Plaintiff paid a total of $89 in fees for one purported insufficient funds event.

## CLASS ALLEGATIONS

100.   Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf of himself and a class of similarly situated persons defined as follows:

All Consumers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class

certification, incurred Returned Payment Fees in connection with their Target Debit Cards ("Class")

101.   Excluded from the Class is Defendant, any entities in which it has a controlling interest, any of its parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, and the presiding judge(s) in this case, their staff, and his, her, or their immediate family.

**The Proposed Class and Subclass Satisfy the Rule 23(a) Prerequisites**

102.   **Numerosity**:  At this time, Plaintiff does not know the exact size of the Class; however, due to the nature of the trade and commerce involved, Plaintiff believes that the Class members are well into the thousands, possibly millions, and thus are so numerous that joinder of all members is impractical.  The number and identities of Class members is administratively feasible and can be determined through appropriate discovery in the possession of the Defendant.

103.   **Commonality**: There are questions of law or fact common to the Class, which include but are not limited to the following:

    a.  Whether Defendant misrepresented to Plaintiff and the Class how Target Debit Card transactions were processed;

    b.  Whether Plaintiff and members of the Class and Subclass were harmed by Defendant's misrepresentations;

    c.  Whether Defendant's conduct violated California and/or South Dakota law; and

    d.  Whether Plaintiff and the Class have been damaged, and if so, the proper measure of damages.

104.   **Typicality**: Like Plaintiff, many other consumers used the Target Debit Card and believed it functioned like a typical debit card.  Plaintiff's claims are typical of the claims of the Class because Plaintiff and each Class member were injured by Defendant's false representations about the Target Debit Card.  Plaintiff and the Class have suffered the same or similar injury as a result of Defendant's false,

deceptive and misleading representations. Plaintiff's claims and the claims of members of the Class emanate from the same legal theory, Plaintiff's claims are typical of the claims of the Class, and, therefore, class treatment is appropriate.

105.   **Adequacy of Representation**: Plaintiff is committed to pursuing this action and has retained counsel competent and experienced in prosecuting and resolving consumer class actions. Plaintiff will fairly and adequately represent the interests of the Class and does not have any interests adverse to those of the Class.

**The Proposed Class and Subclass Satisfy the Rule 23(b)(2) Prerequisites for Injunctive Relief**

106.   Defendant has acted or refused to act on grounds generally applicable to the Class thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole. Plaintiff remains interested in using his Target Debit Card; there is no way for them to know when or if Defendant will cease deceptively charging RPFs.

107.   Specifically, Defendant should be ordered to cease from further charging RPFs.

108.   Defendant's ongoing and systematic practices make declaratory relief with respect to the Class appropriate.

**The Proposed Class Satisfies the Rule 23(b)(3) Prerequisites for Damages**

109.   The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Class will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, especially when compared to the relatively modest amount of monetary, injunctive, and equitable relief at issue for each individual Class member.

# CAUSES OF ACTION

## COUNT I
## Breach of Contract including the Implied Covenant of Good Faith and Fair Dealing

110. Plaintiff incorporates and realleges by reference each and every allegation contained in paragraphs 1-109 as if fully set forth herein.

111. Plaintiff and Target have contracted for debit card services, as embodied in the Target Red Card and related documentation.

112. Defendant breached its express contracts with Plaintiff and members of the Class by not processing transactions made with the Target Debit Card like typical debit cards and charging RPFs as a result, along with the other contract breaches described herein.

113. Under the laws of the states where Target does business, good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

114. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

115.   Target has breached the covenant of good faith and fair dealing in the Agreement through its policies and practices as alleged herein.

116.   Plaintiff and the Class have performed all, or substantially all, of the obligations imposed on them under the Agreement.

117.   As a Direct result of Defendant's breach of contract, Plaintiff and members of the Class have sustained economic losses and are entitled to compensatory damages in an amount to be proven at trial.

118.   Plaintiff and members of the Class have sustained damages as a result of Target's breach of the covenant of good faith and fair dealing.

## COUNT II
## Unjust Enrichment (In the Alternative)

119.   Plaintiff incorporates and realleges by reference each and every allegation contained in paragraphs 1-109 as if fully set forth herein, with the exception of Count I.

120.   As described herein, Defendant knowingly misrepresented the nature and way transactions are processed with the Target Debit Card intending that consumers would rely on those misrepresentations and use the Target Debit Card and eventually pay RPF's.

121.   Had Defendant disclosed the truth about the Target Debit Card—that it does not function like a typical debit card—Plaintiff and members of the Class would not have used the Target Debit Card and incurred RPFs.

122.   Defendant generated profits from misleading Plaintiff and members of the Class into using the Target Debit Card and paying RPFs.

123.   Defendant has been knowingly and unjustly enriched itself at the expense of and to the detriment of Plaintiff and the members of the Class by collecting excess profits to which Defendant is not entitled.

124. Defendant's actions were unjust because, absent the material misrepresentations about the nature and way transactions are processed with the Target Debit Card, they would not have been able to receive profits derived from the RPFs.

125. Defendant has unjustly retained those ill-gotten profits and should be required to disgorge this unjust enrichment.

## COUNT III
## Unconscionability

126. Plaintiff incorporates and realleges by reference each and every allegation contained in paragraphs 1-109 as if fully set forth herein.

127. Target's overdraft policies and practices are or were substantively and procedurally unconscionable in the following respects, among others:

a. Charging RPFs between $20-40, even when Target is paid for the transaction at issue;

b. Allowing combined penalties of $50 to over $100 for a single insufficient funds event;

c. Target does not alert its customers that a Target Debit Card transaction will trigger an insufficient funds event, and does not provide the customer the opportunity to cancel that transaction, before assessing an RPF;

d. The Agreement and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by Target, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e. RPF and NSF fees are disclosed in an ineffective, ambiguous, misleading, and unfair manner;

f.  The Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Target Debit Card is not actually a debit card;

g.  The account activity reports provided to customers are deceptive and misleading in that they do not provide a reasonable method for customers to follow the daily activity in their accounts as used by Target for applying fees.  Target thus prevents its customers from determining the cause of fees and deceptively and misleadingly hides that the Target Debit Card is not a debit card.

128.   Considering the great business acumen and experience of Target in relation to Plaintiff and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

129.   Plaintiff and members of the Class have sustained damages as a result of Target's unconscionable policies and practices alleged herein.

**COUNT IV**
**Conversion**

130.   Plaintiff incorporates and realleges by reference each and every allegation contained in paragraphs 1-109 as if fully set forth herein.

131.   Target provided itself with direct access to Target Debit Cardholders' checking accounts.

132.   Target had and continues to have a duty to maintain and preserve its customers' funds and to prevent their diminishment through its own wrongful acts.

133.   Target has wrongfully collected RPFs from Plaintiff and the members of the Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

134.   Target has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the Class, without legal justification.

135.   Target continues to retain these funds unlawfully without the consent of Plaintiff or members of the Class.

136.   Target intends to permanently deprive Plaintiff and the members of the Class of these funds.

137.   Plaintiff and the members of the National Class are entitled to the immediate possession of these funds.

138.   Target's wrongful conduct is continuing.

139.   As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the Class have suffered and continue to suffer damages.

140.   By reason of the foregoing, Plaintiff and the members of the Class are entitled to recover from Target all damages and costs permitted by law, including all amounts that Target has wrongfully converted.

## COUNT V
### Violation of the "Unfair" Prong of the UCL

141.   Plaintiff incorporates and realleges by reference each and every allegation contained in paragraphs 1-109 as if fully set forth herein.

142.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Pro. Code § 17200.

143.   A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity

of the harm to the alleged victims. Target has violated the "unfair" prong of the UCL by engaging in the conduct described herein.

144.    The gravity of the harm to members of the Class resulting from these unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Target for engaging in such deceptive acts and practices.  By committing the acts and practices alleged above, Target engages in unfair business practices within the meaning of California Business & Professions Code § 17200, *et seq*.

145.    Through its unfair acts and practices, Target has improperly obtained money from Plaintiff and the Class.  As such, Plaintiff requests that this court cause Target to restore this money to Plaintiff and all Class members, and to enjoin Target from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Plaintiff and the Classes may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## COUNT VI
### Violation of the "Fraudulent" Prong of the UCL

146.    Plaintiff incorporates and realleges by reference each and every allegation contained in paragraphs 1-109 as if fully set forth herein.

147.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Pro. Code § 17200.

148.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

149.    Target's Agreement and advertising materials regarding the Target Debit Card are fraudulent within the meaning of the UCL because they deceived

Plaintiff and reasonable consumers like him into believing that the Target Debit Card was actually a debit card.

150.   Target's acts and practices as described herein have deceived Plaintiff and are highly likely to deceive reasonable members of the consuming public. Plaintiff relied on Target's misleading and deceptive representations, and would not have signed up for the Target Debit Card or made purchases with the Target Debit Card had he known that it was not actually a debit card.  Plaintiff suffered monetary loss as a direct result of Target's practices described herein.

151.   As a result of the conduct described above, Target has been unjustly enriched at the expense of Plaintiff and members of the proposed Class. Specifically, Target has been unjustly enriched by obtaining revenues and profits that it would not otherwise have obtained absent its false, misleading and deceptive conduct.

152.   Through its fraudulent acts and practices, Target has improperly obtained money from Plaintiff and the Class.  As such, Plaintiff requests that this court cause Target to restore this money to Plaintiff and all Class members, and to enjoin Target from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Plaintiff and the Classes may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## COUNT VII
### Violation of the "Unlawful" Prong of the UCL

153.   Plaintiff incorporates and realleges by reference each and every allegation contained in paragraphs 1-109 as if fully set forth herein.

154.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Pro. Code § 17200.

155.   Target's practices relating to the imposition of RPFs violate California Civil Code sections 1770(a)(5), (14) and (1), and, as a result, constitute unlawful business acts or practices within the meaning of the UCL.

156.   As a result of the conduct described above, Target has been unjustly enriched at the expense of Plaintiff and members of the proposed Class. Specifically, Target has been unjustly enriched by obtaining revenues and profits that it would not otherwise have obtained absent its false, misleading and deceptive conduct.

157.   Through its unlawful acts and practices, Target has improperly obtained money from Plaintiff and the Class. As such, Plaintiff requests that this court cause Target to restore this money to Plaintiff and all Class members, and to enjoin Target from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Plaintiff and the Classes may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## COUNT VIII
**(Violation of the Consumers Legal Remedies Act,
California Civil Code Section 1750, *et seq.*)**

158.   Plaintiff incorporates and realleges by reference each and every allegation contained in paragraphs 1-109 as if fully set forth herein.

159.   Plaintiff and each member of the proposed class are "consumers" within the meaning of California Civil Code § 1761(d) and 1770.

160.   Target's provision of Target Debit Cards were "transactions" within the meaning of Cal. Civ. Code § 1761(e).

161.   The Target Debit Cards use by Plaintiff and the Class are "services" within the meaning of California Civil Code §1761(a), (b) and 1770.

162.   As described herein, Target violated the CLRA by making deceptive representations in connection with the services in question (1770(a)(5)); by

representing that their services have characteristics which they do not have (1770)(a)(5) and (14)); by inserting an unconscionable provision in a contract (1770)(a)(19).

163.   Plaintiff relied on Target's false representations.

164.   Counsel for Plaintiff will provide proper notice of their intent to pursue claims under the CLRA and an opportunity to cure to Target via certified mail.

165.   Plaintiff requests this Court enjoin Target from continuing to violate the CLRA as discussed herein and/or from violating the UCL in the future and to order restitution to Plaintiff and each member of the proposed class. Otherwise, Plaintiff, the Classes and members of the general public may be irreparably harmed and/or denied effective and complete remedy if such an order is not granted.

166.   If Target declines to address the CLRA violations and associated harm Plaintiff outlines in his notice letter within 30 days, Plaintiff will amend his complaint pursuant to Cal. Civ. Code § 1782(b) and (d) to seek actual and punitive damages, in addition to restitution, injunctive relief, and any other relief the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, request relief as follows:

1. Certification of the Class and Subclass as defined herein pursuant to Fed. R. Civ. P. 23(a) and 23(b)(1), (b)(2), (b)(3), or a combination of subsections;

2. Appointment of Plaintiff as Class Representative and their undersigned counsel as Class Counsel;

3. Restitution of all charges paid by Plaintiff and members of the Class because of Defendants' deceptive business practices as described herein;

4. Disgorgement and restitution to Plaintiff and to members of the Class and Subclass of all monies wrongfully obtained and retained by Defendant;

5. Compensatory and actual damages in an amount according to proof at trial;

6. Statutory damages and penalties, as provided by law;

7. Prejudgment interest commencing on the date of payment of the charges and continuing through the date of entry of judgment in this action;

8. Costs and fees incurred in connection with this action, including attorneys' fees, expert witness fees, and other costs, as provided by law; and

9. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 29, 2016

            /s/ Jeffrey D. Kaliel
JEFFREY KALIEL (CA 238293)
**TYCKO & ZAVAREEI, LLP**
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
*jkaliel@tzlegal.com*

JEFFREY OSTROW
SCOTT EDELSBERG
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG**
**GILBERT**
1 West Las Olas Blvd, 5th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
*ostrow@kolawyers.com*
edelsberg@kolawyers.com
(to be admitted pro hac vice)

*Counsel for Plaintiff*