JAMES R. McGUIRE (BAR NO. 189275)
Email: JMcGuire@mofo.com
LAUREN WROBLEWSKI (BAR NO. 291019)
Email: LWroblewski@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Attorneys for Defendant
TARGET CORPORATION

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WALTERS, an individual,<br><br>                    Plaintiff,<br><br>        v.<br><br>TARGET CORP.,<br><br>                    Defendant. | Case No.   3:16-cv-1678-L-MDD<br><br>**DEFENDANT TARGET CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT** |

1

## **TABLE OF CONTENTS**

2
**Page**

3   TABLE OF AUTHORITIES .................................................................................. iii

4   I.   INTRODUCTION ..................................................................................... 1

5   II.   FACTUAL BACKGROUND .................................................................... 2

6       A.   The Target Debit Card ................................................................... 2

7       B.   Regulatory Background .................................................................. 3

8       C.   Plaintiff's Allegations ................................................................... 4

9   III.   LEGAL STANDARD ............................................................................... 5

10  IV.   ARGUMENT ............................................................................................ 6

11      A.   Plaintiff's Breach of Contract Claim Fails as a Matter of Law. ........... 6

12          1.   The Complaint Does Not Plead a Breach of the Agreement. ........................................................................ 6

13
14              a.   Target Did Not Breach A Duty to Timely Process Transaction. ....................................................... 7

15              b.   Target May Process EFTs Several Days After a Transaction. ....................................................... 8

16              c.   Target May Charge a RPF for Any EFT Returned Unpaid. .................................................... 10

17          2.   Plaintiff Cannot Use the Implied Covenant to Alter the Terms of the Agreement. ......................................... 11

18
19      B.   The Complaint Fails to State an Unjust Enrichment Claim. .............. 12

20      C.   There Is No Cause of Action for "Unconscionability" Under South Dakota Law And, in Any Event, the TDC is Not Unconscionable. ................................................................... 12

21
22      D.   Plaintiff's Conversion Claim Fails as a Matter of Law. ..................... 15

23      E.   Plaintiff's UCL and CLRA Claims Are Barred by the Safe Harbor Doctrine. .................................................................... 16

24
25      F.   Plaintiff's "Fraudulent" UCL Claim Fails for Additional Reasons. ....................................................................... 18

26          1.   Plaintiff Lacks Statutory Standing. .......................................... 18

27          2.   The FAC Lacks the Required Particularity. ............................. 19

28

3.    Plaintiff Fails to Allege Any Actionable Misrepresentation. ....................................................... 20

4.    Target Had No Obligation to Disclose the NSF Charged by Plaintiff's Bank. ........................................ 21

G.    Plaintiff's "Unfair" UCL Claim Fails for Additional Reasons ........... 22

H.    Plaintiff's "Unlawful" UCL Claim Fails for the Additional Reason that He Does Not Allege a Predicate "Unlawful" Act. ........... 23

I.    Plaintiff's CLRA Claim Is Deficient for Additional Reasons. ........... 24

V.    CONCLUSION ............................................................................. 25

1
2

# <u>TABLE OF AUTHORITIES</u>

3                                                                          **Page(s)**

4

C ASES

5   *Alston v. Wells Fargo Bank, N.A.*,
      No. PJM 16-0004, 2016 WL 4158369 (D. Md. Aug. 5, 2016) ......................... 17
6

7   *Alvarez v. Chevron Corp.*,
      656 F.3d 925 (9th Cir. 2011) .............................................................................. 18
8

9   *Am. State Bank v. Adkins*,
      458 N.W.2d 807 (S.D. 1990) ............................................................................... 8

10  *Ashcroft v. Iqbal*,
11    556 U.S. 662 (2009) ..............................................................................5, 15, 24

12  *Bassam v. Bank of Am.*,
13    No. CV 15-00587 MMM, 2015 WL 4127745 (C.D. Cal. July 8, 2015).............. 6

14  *Bell Atl. Corp. v. Twombly*,
      550 U.S. 544 (2007) .............................................................................................. 5
15

16  *Biesmann v. Black Hills United Mining Co.*,
      264 N.W. 518 (S.D. 1936).................................................................................. 15
17

18  *Boris v. Wal-Mart Stores, Inc.*,
      35 F. Supp. 3d 1163............................................................................................. 5
19

20  *Bourgi v. W. Covina Motors, Inc.*,
      166 Cal. App. 4th 1649 (2008).......................................................................... 16

21  *Burch v. Bricker*,
22    2006 SD 101, 724 N.W.2d 604 .......................................................................... 12

23  *Cahill v. Liberty Mut. Ins. Co.*,
24    80 F.3d 336 (9th Cir. 1996) .................................................................................. 5

25  *Cel-Tech Commc'ns Inc. v. L.A. Cellular Tel. Co.*,
      20 Cal. 4th 163 (1999) ....................................................................................... 16
26

27  *Chavez v. Nestle USA, Inc.*,
      No. CV 09-9192-GW(CWx), 2011 WL 1056797 (C.D. Cal. Jan. 10, 2011) .... 19
28

*Chem-Age Indus., Inc. v. Glover*,
  2002 SD 122, 652 N.W.2d 756 ........................................................... 15

*Coto Settlement v. Eisenberg*,
  593 F.3d 1031 (9th Cir. 2010) ............................................................ 6

*Davis v. HSBC Bank Nev., NA*,
  691 F.3d 1152 (9th Cir. 2012) ............................................. 16, 18, 22

*Ebner v. Fresh, Inc.*,
  818 F.3d 799 (9th Cir. 2016) ............................................................ 21

*Farm Credit Servs. of Am. v. Dougan*,
  2005 SD 94, 704 N.W.2d 24 .............................................................. 11

*Farmers Ins. Exch. v. Super. Ct.*,
  2 Cal. 4th 377 (1992) ........................................................................ 24

*Freeman v. Time, Inc.*,
  68 F.3d 285 (9th Cir. 1995) .............................................................. 20

*Garrett v. BankWest, Inc.*,
  459 N.W.2d 833 (S.D. 1990) ............................................................ 11

*Gray v. Toyota Motor Sales, U.S.A., Inc.*,
  554 F. App'x 608 (9th Cir. 2014) ...................................................... 22

*Guthmiller v. Deloitte & Touche, LLP*,
  2005 SD 77, 699 N.W.2d 493 .............................................................. 6

*Hall v. Sea World Entm't, Inc.*,
  No. 3:15-CV-660-CAB-RBB,
  2015 WL 9659911 (S.D. Cal. Dec. 23, 2015) ............................. 18, 19

*Henderson v. Gruma Corp.*,
  No. CV 10-04173 AHM, 2011 WL 1362188 (C.D. Cal. Apr. 11, 2011) .... 20, 24

*Hofeldt v. Mehling*,
  2003 SD 25, 658 N.W.2d 783 ............................................................ 13

*In re iPhone Application Litig.*,
  6 F. Supp. 3d 1004 (N.D. Cal. 2013) ................................................ 19

*Johnson v. Larson*,
  2010 SD 20, 779 N.W.2d 412 .............................................................................. 13

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) .............................................................................. 5

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) .............................................................................. 6

*Kwikset Corp. v. Super. Ct.*,
  51 Cal. 4th 310 (2011) ....................................................................................... 18

*Laster v. T-Mobile USA, Inc.*,
  407 F. Supp. 2d 1181 (S.D. Cal. 2005) ............................................................. 19

*Loeffler v. Target Corp.*,
  58 Cal. 4th 1081 (2014) ..................................................................................... 16

*Maloney v. Verizon Internet Servs., Inc.*,
  413 F. App'x 997 (9th Cir. 2011) ....................................................................... 12

*McKinnon v. Dollar Thrifty Auto. Grp., Inc.*,
  No. 12-4457 SC, 2013 WL 791457 (N.D. Cal. Mar. 4, 2013) ........................... 14

*Meyer v. Spring Spectrum, L.P.*,
  45 Cal. 4th 634 (2009) ....................................................................................... 24

*N. Truck Equip. Co. v. Omaha Standard, LLC*,
  No. 5:13-CV-04088-KES, 2015 WL 7274357 (D.S.D. Nov. 16, 2015) ............ 12

*Nygaard v. Sioux Valley Hosps. & Health Sys.*,
  2007 SD 34, 731 N.W.2d 184 ....................................................... 9, 10, 14, 15

*Parrino v. FHP, Inc.*,
  146 F.3d 699 (9th Cir. 1998) ................................................................................ 6

*Pirozzi v. Apple Inc.*,
  913 F. Supp. 2d 840 (N.D. Cal. 2012) ............................................................... 20

*Roots Ready Made Garments Co., W.L.L. v. Gap, Inc.*,
  405 F. App'x 120 (9th Cir. 2010) ....................................................................... 23

*Spiegler v. Home Depot U.S.A., Inc.*,
  552 F. Supp. 2d 1036 (C.D. Cal. 2008),
  *aff'd*, 349 F. App'x 174 (9th Cir. 2009) ....................................................... 22, 23

*Steinberg v. Provident Funding Assocs., L.P.*,
  No. 15-cv-03743-JST, 2015 WL 9304023 (N.D. Cal. Dec. 22, 2015) .............. 14

*Taylor Equip., Inc. v. John Deere Co.*,
  98 F.3d 1028 (8th Cir. 1996) .............................................................................. 12

*U.S. ex rel. Ash Equip. Co. v. Morris, Inc.*,
  No. 14-4131, 2015 WL 5725507 (D.S.D. Sept. 29, 2015)................................. 13

*Werbel v. Pepsico, Inc.*,
  No. C 09-04456 SBA, 2010 WL 2673860 (N.D. Cal. July 2, 2010) ................. 20

*Williamson v. Apple, Inc.*,
  No. 5:11-cv-00377 EJD, 2012 WL 3835104 (N.D. Cal. Sept. 4, 2012) ...... 20, 24

*Wilson v. Hewlett-Packard Co.*,
  668 F.3d 1136 (9th Cir. 2012) ............................................................................ 22

*Wirth v. Mars Inc.*,
  No. SA CV 15-1470-DOC, 2016 WL 471234 (C.D. Cal. Feb. 5, 2016) ..... 21, 22

**STATUTES & REGULATIONS**

15 U.S.C.
  § 1693(b)............................................................................................................... 3
  § 1693a(7).............................................................................................................. 3

Cal. Bus. & Prof. Code
  § 17200 *et seq.* ...................................................................................................... 5

Cal. Civ. Code
  § 1750 *et seq.* ........................................................................................................ 5

12 C.F.R.

pt. 205, Supp. I, at § 205.3(b) ........................................................... 4, 17
§ 205.1 ................................................................................................ 3
§ 205.2(a)(1) ........................................................................................ 3
§ 205.3(a) ............................................................................................ 3
§ 205.3(b) ............................................................................................ 3
§ 205.3(b)(3) ...................................................................................... 14
§ 205.3(b)(3)(i) ............................................................................. 4, 17
§ 205.7(b)(5) ................................................................................. 4, 17
§ 205.14(a) ........................................................................................... 3
§ 205.14(b)(1) ........................................................... 4, 15, 17, 22
§ 1030.4(b)(4) .................................................................................... 17

**RULES**

Fed. R. Civ. P.

Rule 8 ................................................................................................. 15
Rule 9(b) ........................................................................... 5, 6, 19, 20
Rule 12(b)(6) ....................................................................................... 5

**OTHER AUTHORITIES**

*Debit*, Merriam-Webster's Dictionary, http://www.merriam-
   webster.com/dictionary/debit (last visited Sept. 13, 2016) .................................. 1

## I.    INTRODUCTION

Plaintiff signed up for and repeatedly used a Target Debit Card ("TDC"), which linked to his bank account and saved him 5% on each purchase from Target. While using the TDC, he incurred several Returned Payment Fees" ("RPF") from Target and non-sufficient funds fees ("NSF") from his bank after having insufficient funds in his account to cover the amounts of his purchases. Unencumbered by the fact that he never alleges to have seen or read any TDC advertising materials, Plaintiff now claims that he was deceived by Target's marketing of the TDC as a "*debit* card."

Plaintiff does not dispute that the TDC *debits* money from his linked bank account.[1]  Instead, he contends that he thought that the TDC would have the same features as a "true debit card," presumably one issued by the bank holding a consumer's account.  According to Plaintiff, such a debit card immediately declines a transaction if there are insufficient funds in the consumer's account or immediately debits the transaction if there are sufficient funds.  Plaintiff claims that if the TDC did this—instead of initiating an electronic funds transfer ("EFT") several days after the in-store transaction—he would have avoided the RPFs and NSFs.

Plaintiff's contention that he was deceived is belied by the unambiguous language of the Target Debit Card Agreement ("Agreement").  The Agreement explains exactly how transactions are processed and when RPFs are imposed. Plaintiff's contention also ignores that the TDC complies with the requirements imposed by federal law for such products.

As a result, Plaintiff cannot state any claim for relief.  His breach of contact claim falters because of Target's compliance with the Agreement.  Because the

---

[1] *See Debit*, Merriam-Webster's Dictionary, http://www.merriam-webster.com/dictionary/debit (last visited Sept. 13, 2016) (defining "debit" as a verb meaning "to take money from (an account)").

sf-3682465

1   facts alleged in the First Amended Complaint ("FAC") are governed by the

2   Agreement, his unjust enrichment, "unconscionability," and conversion claims

3   cannot survive.  Plaintiff's consumer protection claims are barred by the "safe

4   harbor" created by the Electronic Funds Transfer Act ("EFTA") and its

5   implementing regulation, and fail for the additional reasons that Plaintiff has not

6   sufficiently alleged any misleading or unfair conduct.  Plaintiff's FAC should be

7   dismissed.

8   ## II.    FACTUAL BACKGROUND

9   ### A.    The Target Debit Card

10      The TDC allows consumers to make purchases at Target stores, and offers a

11   5% savings on all purchases.  (FAC ¶ 2.)  The Agreement describes how the TDC

12   works.  (Declaration of Cynthia M. Williams, Ex. A.)[2]  It first explains that the

13   TDC "is not issued by the financial institution that maintains the deposit account

14   that" the consumer links to the TDC.  Additionally, "[t]he terms, benefits, and

15   protections associated with [the TDC] may vary from those that apply to a debit

16   card issued by" the consumer's bank.  (Compl. Ex. A, § 1.)

17      Under the Agreement, Target is authorized to initiate EFTs for the full

18   amount of any transaction and related fees.  (Compl. Ex. A, § 1.)  The EFT "may

19   occur several business days after [the] transaction(s) have occurred and after the

20   date shown on [the] transaction receipt(s)."  (*Id.*)  The consumer agrees not to use

21   the TDC to make purchases that exceed the balance in his or bank account.  (*Id.*;

22   *see id.*, § 3.)  If, for any reason, the consumer's bank returns an EFT as unpaid,

23   Target may charge a RPF in an amount that varies by state.  (*Id.*, §§ 4, 6.)  Target

24   may also resubmit the EFT one or more times.  (*Id.*)

25

26   [2] The Agreement attached to Target's Declaration is materially identical to the version attached to Plaintiff's original complaint.  (*See* Complaint ("Compl.") Ex. A, ECF No. 1-2.)  Target respectfully requests that the Court take judicial notice of the Agreement attached to the complaint for the reasons explained below. (*See infra* Section III.)

27

28

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16CV1678

sf-3682465

**B.  Regulatory Background**

The TDC is authorized by and provided in compliance with the EFTA and its implementing regulation, Regulation E.  *See* 12 C.F.R. § 205.1.  The EFTA's stated purpose is to protect consumers by providing "a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems."  15 U.S.C. § 1693(b).  An EFT is defined as "any transfer of funds . . . which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account."  15 U.S.C. § 1693a(7); 12 C.F.R. § 205.3(b).

The EFTA and Regulation E set forth particular requirements for two types of EFT service providers: (1) financial institutions that hold a consumer's account and (2) any person that "provides an electronic fund transfer service to a consumer but that does not hold the consumer's account."  12 C.F.R. § 205.14(a); *see id.* § 205.3(a).  A person qualifies as the second type of service provider if it (1) issues a debit card or other access card that the consumer can use to access his or her bank account,[3] and (2) has no agreement with the consumer's account-holding institution regarding such access.  *See* 12 C.F.R. § 205.14(a).  Target meets these requirements with the TDC.

There are several key provisions in Regulation E for non-account holding EFT service providers like Target.

**Returned Item Fees.**  Section 205.3 of Regulation E explicitly allows an EFT service provider initiating an EFT to collect a fee for the return of an EFT that is unpaid, including due to insufficient or uncollected funds, so long as the EFT service provider notified the consumer that the fee will be collected by means of

---

[3] An "access device" is defined as "a card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers."  12 C.F.R. § 205.2(a)(1).

sf-3682465

1    EFT and the dollar amount of the fee.  12 C.F.R. § 205.3(b)(3)(i); *see also* 12

2    C.F.R. § 205.7(b)(5).  Target provided such notice here.  (*See* Compl. Ex. A, § 6.)

3         **Disclosures.**  Section 215.14 requires a non-account holding EFT service

4    provider to give consumers certain disclosures and documentation regarding the

5    terms and conditions of EFTs.  Such service providers need only disclose fees that

6    "are *within the purview of [the service provider's] relationship with the consumer*."

7    12 C.F.R. § 205.14(b)(1) (emphasis added).

8         **Automated Clearinghouse Network ("ACH").**  Regulation E specifically

9    contemplates that non-account holding EFT service providers may process EFTs.

10   Under Regulation E, an "EFT" is defined to include "[a] transfer sent via ACH."

11   *See* 12 C.F.R. pt. 205, Supp. I, at § 205.3(b).

12        **Not required.**  There is no requirement in the EFTA or Regulation E that a

13   non-account holding EFT service provider at the time of a transaction:

14   (1) determine whether a consumer's account contains sufficient funds to cover an

15   EFT, or (2) immediately debit the consumer's account for the amount of the EFT.

16       **C.**    **Plaintiff's Allegations**

17        Plaintiff James Walter holds a TDC.  He alleges that on December 1, 2015,

18   he made a purchase of $85.37, which was debited on December 3, 2015.  (FAC

19   ¶¶ 84, 86.)  On that date, Plaintiff did not have sufficient funds in his account to

20   cover the $85.37 transaction, and was charged a $29 NSF by his bank and a $25

21   RPF by Target.  (*Id.* ¶¶ 86-87, 89.)

22        Plaintiff also alleges that he made purchases of $36.89 and $91.79 with his

23   TDC on March 19, 2016, but had insufficient money in his bank account to cover

24   those purchases.  (FAC ¶ 91.)  When Target debited those amounts on March 21,

25   2016, Plaintiff  had insufficient funds in his account to cover the $91.79 transaction.

26   (*Id.* ¶ 94.)  Target again  debited Plaintiff's account on April 4, 2016, but Plaintiff

27   still had insufficient funds.  (*Id.* ¶ 97.)  Plaintiff alleges that he paid $89 in fees for

28   these transactions, and attributes $35 of those fees to Target.  (*Id.* ¶¶ 100-101.)

sf-3682465

1    The crux of Plaintiff's FAC is that unlike a "typical" debit card, the TDC

2    does not immediately decline or debit a transaction, which can result in RPFs and

3    NSFs for consumers who make purchases in amounts exceeding the funds in their

4    accounts at the time the EFT is processed.  Plaintiff brings causes of action on

5    behalf of a putative nationwide class for (1) breach of contract, including breach of

6    the implied covenant of good faith and fair dealing (Count I); (2) unjust enrichment

7    (Count II); (3) unconscionability (Count III); (4) conversion (Count IV);

8    (5) violation of the "unfair" prong of the unfair competition law ("UCL"), Cal. Bus.

9    & Prof. Code § 17200 *et seq.* (Count V); (6) violation of the "fraudulent" prong of

10   the UCL (Count VI); (7) violation of the "unlawful" prong of the UCL (Count VII);

11   and (8) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code

12   § 1750 *et seq.* (Count VIII).

13   **III.   LEGAL STANDARD**

14   A district court must dismiss a complaint under Rule 12(b)(6) for failure to

15   state a claim where the plaintiff fails to set forth "enough facts to state a claim to

16   relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

17   (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In considering a Rule 12(b)(6)

18   motion, the Court must accept all factual allegations pleaded in the complaint as

19   true, *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996), but need

20   not accept unreasonable inferences or legal conclusions cast in the form of factual

21   allegations, *see Iqbal*, 556 U.S. at 681 ("bare assertions . . . amount[ing] to nothing

22   more than a 'formulaic recitation of the elements' of a constitutional discrimination

23   claim" are not entitled to an assumption of truth (quoting *Twombly*, 550 U.S. at

24   555)).  "Factual allegations must be enough to raise a right to relief above the

25   speculative level . . . ."  *Twombly*, 550 U.S. at 555.

26   Additionally, Rule 9(b)'s heightened pleading standards apply to claims for

27   violations of the UCL and CLRA where, as here, such claims are grounded in fraud.

28   *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009); *Boris v. Wal-*

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16CV1678

*Mart Stores, Inc.,* 35 F. Supp. 3d 1163, 1174 (C.D. Cal. Apr. 9, 2014) ("Rule 9(b)

applies to claims under California's consumer protection statutes when such claims

are 'grounded in fraud' or 'sound in fraud.'") (citation omitted).

Finally, in ruling on a motion to dismiss, a court may consider documents

that the complaint refers to or relies upon under the incorporation by reference

doctrine. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010);

*Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998); *see Knievel v. ESPN*,

393 F.3d 1068, 1076 (9th Cir. 2005) (allowing judicial notice of documents

incorporated into a complaint by reference).  The Court may consider the

Agreement because the FAC alleges the content of the Agreement, but fails to

attach it, (*see* FAC ¶ 39 (alleging that the TDC is attached as Exhibit A to the FAC,

but failing to attach), and because the Agreement was attached to the original

Complaint, (*see* ECF No. 1-2); *Bassam v. Bank of Am.*, No. CV 15-00587 MMM

(FFMx), 2015 WL 4127745, at *5 n.37 (C.D. Cal. July 8, 2015) (considering

document attached to original, but not amended complaint, under incorporation by

reference doctrine).

## IV.  ARGUMENT

### A.  Plaintiff's Breach of Contract Claim Fails as a Matter of Law.

#### 1.  The Complaint Does Not Plead a Breach of the Agreement.

The Agreement has a choice-of-law provision selecting South Dakota law.[4]

(*See* Compl. Ex. A, § 17.)  To state a claim for breach of contract under South

Dakota law, a plaintiff must allege (1) an enforceable promise, (2) a breach of the

promise; and (3) resulting damages.  *Guthmiller v. Deloitte & Touche, LLP*, 2005

SD 77, ¶ 14, 699 N.W.2d 493, 498.  Here, it is undisputed that a valid contractual

relationship exists between Target and Plaintiff, and that this relationship is

---

[4] Plaintiff's breach of contract, unjust enrichment, unconscionability, and
conversion causes of action would fail for similar reasons under California law as
they do under South Dakota law.

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16CV1678

sf-3682465

governed by the terms of Agreement.  (*See, e.g.*, FAC ¶¶ 39, 51.)

Plaintiff's breach of contract claim is fatally flawed because he fails to allege any conduct by Target that breached the Agreement.  Plaintiff contends that Target "breached its express contracts with Plaintiff and members of the Class by not processing transactions made with the Target Debit Card like typical debit cards and charging RPFs as a result."  (FAC ¶ 114.)  But Target never promised to process TDC transactions exactly like Plaintiff's lawyers contend transactions for a "typical" debit card are processed.  Instead, Target explained that "[t]he terms, benefits, and protections associated with your [TDC] may vary from those that apply to a debit card issued by your Depository Bank."  (*See* Compl. Ex. A, § 1.)

Target also described exactly how the TDC actually works.  The Agreement provides that Target will "initiate an electronic funds transfer ("EFT") for the full amount of the transaction," and that the EFT "may occur several business days after [the] transaction(s) have occurred."  (Compl. Ex. A, § 1.)  The FAC lacks any allegations that Target failed to do this.  Accordingly, Plaintiff fails to plead a breach of the Agreement and Plaintiff's breach of contract claim fails as a matter of law.

### a.    Target Did Not Breach A Duty to Timely Process Transaction.

Plaintiff's theories that Target nonetheless broke a promise to operate the TDC like a "typical" debit card are unavailing.  Plaintiff's first theory that Target breached a duty to process transactions quickly and in a timely fashion is contradicted by Plaintiff's allegations.  Plaintiff bases the alleged duty on an Agreement provision stating, "If we do not complete an EFT to or from your Deposit Account on time or in the correct amount *according to this Agreement*, we will be liable for your losses or damages."  (Compl. Ex. A, § 9 (emphasis added); *see* FAC ¶¶ 49, 50.)  Plaintiff, however, does not allege that any initial EFT

sf-3682465

occurred more than several business days after he completed a transaction.[5]  Thus, Target processed TDC transactions quickly and timely.

If Plaintiff means to argue that the same Agreement provision creates a duty for Target to immediately decline or debit a transaction, he fares no better.  As the Agreement explains, any EFT may occur several days after the transaction. (Compl. Ex. A, § 1.)  The provision Plaintiff identifies merely shifts liability to Target for losses or damages incurred when any EFT is not processed within several business days after a transaction.

### b. Target May Process EFTs Several Days After a Transaction.

Plaintiff's second theory that Target promises to immediately decline transactions for which a guest has insufficient funds has no leg to stand on.  (*See* FAC ¶¶ 56-57, 67-68.)  None of the three contractual provisions Plaintiff cites reasonably supports this interpretation of the Agreement—indeed, the provisions are inconsistent with Plaintiff's theory.  *See Am. State Bank v. Adkins*, 458 N.W.2d 807, 809 (S.D. 1990) (unless contractual language is "ambiguous," court must give language "its plain and ordinary meaning"; contractual language is only ambiguous "when a genuine uncertainty exists as to which of two or more meanings is correct").  Moreover, the Agreement contradicts Plaintiff's tortured construction.  It makes clear that the *consumer* has the obligation to ensure that he or she has sufficient funds to cover a purchase at the time the EFT is processed.

The first provision Plaintiff points to provides, "When you use your Card, you will be limited by the amount of funds in your Deposit Account and any available overdraft line of credit that you may have in connection with your Deposit Account (if applicable), *as of the date the Depository Bank receives and processes*

---

[5] The provision Plaintiff identifies specifically excludes liability for Target for losses or damages for untimely EFTs because the customer has insufficient funds in his or her account to process the EFT.  (Compl. Ex. A, § 9.)

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16cv1678

sf-3682465

*an EFT.*" (Compl. Ex. A, § 3 (emphasis added); *see* FAC ¶¶ 56-57.)  A plain reading of the contractual language shows that it does not create any obligation for Target to "decline transactions for which insufficient funds exist."  (FAC ¶ 57.)  Instead, it explains to the consumer that the TDC is not like a credit card, and the consumer can only make purchases for which there are sufficient funds in his or her bank account.  Plaintiff's interpretation only works if you add words that are not there.

The next provision Plaintiff relies on states, "You agree that the dollar amount limitation on your Card may be less than the dollar amount of available funds in your Deposit Account and that such dollar amount and transaction limitations may change from time to time without any notice to you."  (Compl. Ex. A, § 3; *see* FAC ¶ 67.)  Plaintiff claims that this provision means that Target "will be even more strict than a normal debit card in terms of rejecting transactions for which there are insufficient funds at the time of purchase . . . ."  (FAC ¶ 67 (emphasis omitted).)  Not so.  The contractual language simply states that Target may impose dollar limitations on the TDC that are lower than the amount of funds that a consumer has in his or her bank account.

The final provision Plaintiff identifies states, "The Depository Bank may return as unpaid an EFT if, for example, your Deposit Account does not have sufficient available funds in it to cover the full amount of the EFT, or your Deposit Account is closed, or for other reasons."  (Compl. Ex. A, § 4; *see* FAC ¶ 68.)  Far from supporting Plaintiff's theory, this provision shows why Plaintiff is wrong.  Because Target does *not*—and never promised to—immediately decline or debit a transaction, the Agreement contains this provision, which explains the circumstances when an EFT *may* be returned unpaid.

Additional provisions in the Agreement support the conclusion that Plaintiff's interpretation makes no sense.  *See Nygaard v. Sioux Valley Hosps. & Health Sys.*, 2007 SD 34, ¶ 13, 731 N.W.2d 184, 191 (contract must be examined as

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16CV1678

sf-3682465

a whole).  The Agreement puts the onus on the consumer who controls the account to which the TDC is linked, not Target, to ensure that he or she has sufficient funds to cover a transaction on the date the EFT is processed.  (*See* Compl. Ex. A, § 1 (consumer agrees that he or she "will not use [the TDC] to make purchases for amounts in excess of available funds you have in your Deposit Account as determined by the financial institution holding your Deposit Account ("Depository Bank") as of the date the Depository Bank processes the EFT")).)  Another provision explains that if the TDC is used to "make a purchase that exceeds the balance in the deposit account that" the customer linked to the TDC, "that account may become overdrawn."  (*Id.*)  As explained above, if Target were immediately declining or debiting a transaction, the consumer would never overdraw his or her account due to a TDC transaction.  Plaintiff's second theory is groundless.

### c.     Target May Charge a RPF for Any EFT Returned Unpaid.

Plaintiff's third theory that Target will only charge RPFs if "Target is ultimately not paid for a transaction," not merely if there is a delay in payment, is similarly adrift.  (*See* FAC ¶ 58.)  Plaintiff claims that Target promises this in the Agreement provision stating: "If the Depository Bank returns an EFT unpaid for any reason, you agree to pay a 'Returned Payment Fee' . . . ."  (*Id.* ¶ 60.)  Nothing in this provision, however, supports a reasonable interpretation that Target will only charge a RPF when it is ultimately not paid.  Plaintiff also ignores the Agreement's explanation of when an EFT is returned as unpaid, which is whenever a consumer "does not have sufficient available funds in [his or her account] to cover the full amount of the EFT."  (Compl. Ex. A, § 4.)  The two provisions must be read together, and a plain reading of the contractual language shows that Target may charge a RPF each time an EFT is returned unpaid, not only if Target is ultimately unpaid.  *See Nygaard*, 2007 SD at ¶ 13, 731 N.W.2d at 191.  Plaintiff's limitation is imagined.

sf-3682465

Plaintiff has not established that Target breached any provision of the Agreement under any theory.  His breach of contract claim thus fails.

### 2.       Plaintiff Cannot Use the Implied Covenant to Alter the Terms of the Agreement.

Plaintiff cannot circumvent the clear terms of his Agreement with Target by relying on the implied covenant of good faith and fair dealing.  Plaintiff complains that Target breached the implied covenant of good faith and fair dealing because the Agreement provides that (1) an EFT "may" occur several days after a transaction, but the EFT always occurs several days later; and (2) the RPF will be "up to" a certain amount, but Target always charges the maximum fee.  (*See* FAC ¶¶ 71, 73.) Plaintiff cannot use the implied covenant to change the terms of the Agreement.

Under South Dakota law, "[e]very contract contains an implied covenant of good faith and fair dealing which prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 841 (S.D. 1990).  However, "[t]he covenant of good faith does not create an amorphous companion contract with latent provisions to stand at odds with or in modification of the express language of the parties' agreement."  *Farm Credit Servs. of Am. v. Dougan*, 2005 SD 94, ¶ 9, 704 N.W.2d 24, 28.  "If the express language of a contract addresses an issue, then there is no need to construe intent or supply implied terms."  *Id.* at ¶ 10, 28.

Plaintiff's implied covenant claim is barred by the express language of the Agreement.  In *Dougan*, for example, the court rejected the claim that a lender was required to extend credit where the contract provided that the "[l]ender, at its option, *may* advance sums to Maker(s) as a revolving line of credit []."  2005 SD 94 at ¶ 13, 704 N.W.2d at 29-30 (emphasis in original).  The court reasoned that "discretion was vested in the express terms of the contract" and in declining to extend credit, the bank "was acting within the terms of the contract."  *Id.*  Likewise, here the contract explicitly allows an EFT to be processed several days after the

TARGET CORP.'S MEM. OF P. & A. CASE NO. 16CV1678

sf-3682465

transaction and permits Target to charge the maximum RPF.  (*See* Compl. Ex. A, §§ 1, 6.)  Plaintiff's implied covenant claim should be rejected.

Plaintiff offers no reason otherwise.  He fails to explain why Target's processing of EFTs after several days is in bad faith.  (*See* FAC ¶ 71.)  And his claim that "[a]ny good faith understanding of the 'up to' promise would require Target not to charge the maximum RPF on a transaction for which it was paid with just a short delay" would stand at odds with and modify the contracted for terms in the Agreement.  As courts have consistently held, however, the implied covenant "cannot 'block use of terms that actually appear in the contract.'"  *Taylor Equip., Inc. v. John Deere Co.*, 98 F.3d 1028, 1032 (8th Cir. 1996) (quoting *Cont'l Bank, N.A. v. Everett,* 964 F.2d 701, 705 (7th Cir. 1992)); *see Maloney v. Verizon Internet Servs., Inc.*, 413 F. App'x 997, 1000 (9th Cir. 2011) (defendant did not breach implied covenant where contract provided that internet speed would be "up to 3 Mbps," but speed never exceed 1.792 Mbps "because the contract was not silent or ambiguous on the question of maximum speed").  Accordingly, the implied covenant cannot support Plaintiff's breach of contract claim.

### B.    The Complaint Fails to State an Unjust Enrichment Claim.

Plaintiff next alleges that Target's collection of RPFs unjustly enriched Target.  (FAC ¶¶ 121-127.)  "A claim for unjust enrichment seeks equitable relief . . . [and] '[a]n essential element to equitable relief is the lack of an adequate remedy at law.'"  *N. Truck Equip. Co. v. Omaha Standard, LLC*, No. 5:13-CV-04088-KES, 2015 WL 7274357, at *5 (D.S.D. Nov. 16, 2015) (quoting *Rindal v. Sohler*, 2003 SD 24, ¶ 12, 658 N.W.2d 769, 772).  Plaintiff's unjust enrichment claim fails for two reasons: (1) unjust enrichment does not apply where, as here, the parties have an actual, express contract governing the subject matter of the claim; and (2) Plaintiff fails to allege any enrichment that was unjust.

Under South Dakota law, a plaintiff cannot maintain a claim for unjust enrichment where the parties have a written agreement.  *See Burch v. Bricker*,

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16CV1678

sf-3682465

1  2006 SD 101, ¶ 18, 724 N.W.2d 604, 609 ("[Unjust enrichment] remedy is

2  unavailable when the rights of the parties are fixed by the terms of a written

3  contract . . . ."); *Johnson v. Larson*, 2010 SD 20, ¶ 8, 779 N.W.2d 412, 416

4  ("[U]njust enrichment is unwarranted when the rights of the parties are controlled

5  by an express contract.").  Here, Plaintiff has a direct contractual relationship with

6  Target that is governed by the express terms of the Agreement.  Therefore,

7  Plaintiff's unjust enrichment claim should be dismissed.  *See U.S. ex rel. Ash*

8  *Equip. Co. v. Morris, Inc.*, No. 14-4131, 2015 WL 5725507, at *4 (D.S.D. Sept. 29,

9  2015) (dismissing unjust enrichment claim because express contract governs the

10  obligations rights of the parties).

11       Even if the Agreement did not preclude Plaintiff's unjust enrichment claim,

12  the FAC fails to allege that Target was unjustly enriched by Plaintiff's RPFs.  To

13  plead a claim for unjust enrichment under South Dakota law, Plaintiff must allege

14  that: (1) a benefit was received; (2) the recipient was cognizant of that benefit; and

15  (3) the retention of the benefit without reimbursement would unjustly enrich the

16  recipient.  *Hofeldt v. Mehling*, 2003 SD 25, ¶ 16, 658 N.W.2d 783, 788.  Although

17  Plaintiff contends that Target unjustly charged him RPFs, Target had the right

18  under the Agreement to charge the RPFs after Plaintiff's bank returned EFTs

19  unpaid.  (*See* Compl. Ex. A, § 6 ("If the Depository Bank returns an EFT unpaid for

20  any reason, you agree to pay a 'Returned Payment Fee' . . . .")  Because Target had

21  this contractual right to receive the benefit of its agreement with Plaintiff, Target

22  was not unjustly enriched.  *See Johnson*, 2010 SD at ¶ 10, 779 N.W.2d at 416

23  (holding that lower court erred in allowing unjust enrichment damages where the

24  benefit conferred on defendant was specified as part of the contract, and defendant

25  had adequate remedy at law).

26       **C.    There Is No Cause of Action for "Unconscionability" Under South**
              **Dakota Law And, in Any Event, the TDC is Not Unconscionable.**
27

28       Plaintiff's attempt to twist his allegations into a claim of "unconscionability"

13

1   fares no better.  There is no cause of action for "unconscionability" under South

2   Dakota law.  Further, there is nothing unconscionable about the terms and

3   conditions in the Agreement.

4       The Supreme Court of South Dakota has concluded that there is no cause of

5   action for unconscionability.  *See Nygaard*, 2007 SD at ¶ 29, 731 N.W.2d at 195.

6   In *Nygaard*, the plaintiffs alleged that they entered into unconscionable contracts

7   with their medical providers, but the court concluded that they had "no right to

8   recover damages simply because they *entered into* an unconscionable contract."  *Id.*

9   The court reasoned that while unconscionability may be used as a defense to

10  invalidate an unconscionable contract provision, it may not be "used as a sword to

11  recover damages."  *Id.* at ¶ 30, 196; *see, e.g.*, *McKinnon v. Dollar Thrifty Auto.*

12  *Grp., Inc.*, No. 12-4457 SC, 2013 WL 791457, at *9 (N.D. Cal. Mar. 4, 2013)

13  (dismissing unconscionability claim with prejudice because unconscionability is a

14  defense, not an independent cause of action).

15      In any event, Plaintiff fails to identify any unconscionable provision in the

16  Agreement.  Plaintiff frames his unconscionability claim as predicated on Target's

17  "overdraft policies and practices," and focuses his objections on allegedly

18  inaccurate disclosures, fees imposed by the consumer's bank, and Target's activity

19  reports.  (*See* FAC ¶ 129(b), (c), (e), and (g).)  These objections cannot establish

20  any unconscionability in the Agreement.  *See Steinberg v. Provident Funding*

21  *Assocs., L.P.*, No. 15-cv-03743-JST, 2015 WL 9304023, at *5 (N.D. Cal. Dec. 22,

22  2015) (plaintiff could not challenge late fee policies and procedures rather than an

23  outrageously unfair contract term under unconscionability claim).

24      Plaintiff's few objections to specific Agreement provisions are equally

25  unavailing.  First, Plaintiff contends that Target's charging of RPFs is

26  unconscionable, (FAC ¶ 129(a)), but Regulation E explicitly allows for an EFT

27  service provider like Target to impose a returned item fee.  *See* 12 C.F.R.

28  § 205.3(b)(3).  Second, Plaintiff objects that the Agreement is an adhesion contract,

14

1   but unconscionability under South Dakota law requires both procedural and

2   substantive elements, and Plaintiff has not alleged the latter.  *See Nygaard*,

3   2007 SD at ¶ 25, 731 N.W.2d at 194-95.  Third, Plaintiff's bald contention that the

4   Agreement is ineffective, ambiguous, deceptive, unfair, and misleading because of

5   its (1) inadequate disclosure of RPFs and NSFs, and (2) failure to state that the

6   TDC is not a debit card, (FAC ¶ 129(e), (f)), is inadequate under Rule 8.  *See Iqbal*,

7   556 U.S. at 687 ("Nor does a complaint suffice if it tenders naked assertion[s]

8   devoid of further factual enhancement." (citation omitted)).

9       It is also wrong.  Target discloses exactly when a RPF will be imposed, and

10  the maximum amount that fee may be.  (*See* Compl. Ex. A, §§ 4, 5.)  In accordance

11  with Regulation E, Target is not required to disclose fees charged by Plaintiff's

12  bank.  *See* 12 C.F.R. § 205.14(b)(1).  Thus, even if South Dakota recognized a

13  cause of action for unconscionability, Plaintiff failed to allege that the Agreement is

14  unconscionable.

### D.     Plaintiff's Conversion Claim Fails as a Matter of Law.

16      Plaintiff next alleges that the RPFs he incurred amount to conversion.  Under

17  South Dakota law, "[c]onversion is the *unauthorized* exercise of control or

18  dominion over personal property in a way that repudiates an owner's right in the

19  property or in a manner inconsistent with such right."  *Chem-Age Indus., Inc. v.*

20  *Glover*, 2002 SD 122, ¶ 20, 652 N.W.2d 756, 766 (emphasis added).  "To constitute

21  conversion, nonconsent to the possession and disposition of the property by the one

22  entitled to the possession thereof is indispensable."  *Biesmann v. Black Hills United*

23  *Mining Co.*, 264 N.W. 518, 520 (S.D. 1936).  The Complaint fails to state a claim

24  for conversion because Plaintiff consented to Target's actions.

25      Plaintiff agreed that Target could charge a RPF if his bank "returns an EFT

26  unpaid for any reason."  (Compl. Ex. A, § 6.)  Here, Plaintiff alleges that Target did

27  exactly that—Target attempted to debit Plaintiff's account for the amount of his

28  purchases, but Plaintiff had insufficient funds in his account to cover those

15

1   amounts.  (*See* FAC ¶¶ 87, 94.)  As a result, Target charged a RPF.  (*Id.*)  Plaintiff's

2   consent to the charging of RPFs therefore bars his conversion claim.

3       **E.    Plaintiff's UCL and CLRA Claims Are Barred by the Safe Harbor**
        **Doctrine.**

4

5       Plaintiff's consumer protection claims are no more successful.  A defendant

6   cannot be subject to liability under the UCL or CLRA for engaging in conduct

7   authorized by another statute or a regulation.  *Cel-Tech Commc'ns Inc. v. L.A.*

8   *Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999) ("When specific legislation provides

9   a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault

10  that harbor."); *see Bourgi v. W. Covina Motors, Inc.*, 166 Cal. App. 4th 1649, 1660

11  (2008) ("safe harbor" defense applies to CLRA claims).  A "safe harbor" arises

12  when legislation or a regulation "has permitted certain conduct or considered a

13  situation and concluded no action should lie . . . ."  *Loeffler v. Target Corp.*, 58 Cal.

14  4th 1081, 1125 (2014) (citation omitted); *see Davis v. HSBC Bank Nev., NA*,

15  691 F.3d 1152, 1165-66 (9th Cir. 2012) (regulations can create safe harbor).

16  Plaintiff's UCL and CLRA claims are barred by the "safe harbor" doctrine because

17  the TDC is authorized by and provided in compliance with the EFTA and

18  Regulation E.

19      Plaintiff's UCL and CLRA claims challenge four aspects of the TDC.  Each

20  aspect, however, is sanctioned by the EFTA or Regulation E:

21  • Plaintiff complains that, unlike a "typical" debit card, the TDC does not

22      immediately decline or debit a transaction at the time of purchase, (FAC

23      ¶¶ 10-13, 48, 56-57, 79):  Section 205.14 of Regulation E enumerates the

24      requirements with which a non-account holding EFT service provider must

25      comply in order to provide EFT services.  There is *no* requirement to

26      immediately decline or debit an EFT.  Plaintiff cannot use his UCL and

27      CLRA claims to impose requirements that the legislature concluded were

28      unnecessary.

16

sf-3682465

1   • Plaintiff objects that Target's processing of transactions may result in a RPF
2       and a NSF when the consumer has insufficient funds to cover an EFT, (FAC
3       ¶¶ 1, 8):  As just explained, Regulation E does not require Target to
4       immediately decline or debit a transaction.  Rather, the regulation specifically
5       allows a service provider initiating an EFT to collect a fee for a returned
6       EFT.  *See* 12 C.F.R. § 205.3(b)(3)(i).  As to NSFs, Plaintiff concedes that
7       Target has no control over those fees, which are assessed by a consumer's
8       bank.  (*See* FAC ¶ 54.)

9   • Plaintiff also objects that Target does not disclose the potential NSF, (FAC
10      ¶¶ 52-56):  Under Regulation E, a non-account holding EFT service provider
11      is only required disclose fees "within the purview of its relationship with the
12      consumer."  12 C.F.R. § 205.14(b)(1); *see id.* § 205.7(b)(5) (requiring
13      disclosure of fees).  Any NSFs issued by a consumer's bank are not "within
14      the purview" of Target's relationship with the consumer.[6]  Indeed, courts
15      have interpreted a similar provision in the EFTA that requires a non-account
16      holding institution ATM operator to disclose any fee it imposes to not also
17      require the disclosure of fees imposed by the consumer's account-holding
18      institution.  *See Alston v. Wells Fargo Bank, N.A.*, No. PJM 16-0004,
19      2016 WL 4158369, at *4-5 (D. Md. Aug. 5, 2016).

20  • Finally, Plaintiff complains that Target use of the ACH Network to process
21      TDC transactions results in a delay, (FAC ¶¶ 42-48): As explained,
22      Regulation E specifically allows non-account holding institutions, like
23      Target, to process EFTs.  An "EFT" is defined to include "[a] transfer sent
24      via ACH."  *See* 12 C.F.R. pt. 205, Supp. I, at § 205.3(b).  Thus, Regulation E
25      specifically contemplates Target's use of ACH to process TDC transactions.

26

27      [6] In any event, a consumer's bank would be obligated to disclose those fees
    under Regulation DD.  *See* 12 C.F.R. § 1030.4(b)(4).

28

1    Plaintiff may not use the general provisions of the UCL to trump the specific

2    requirements for non-account holding EFT service providers set forth in a federal

3    regulatory framework.  Because the TDC complies with these requirements in

4    every respect, Plaintiff's UCL and CLRA claims should be dismissed.  *See Davis*,

5    691 F.3d at 1164-67 (holding that a credit card issuer's compliance with TILA and

6    Regulation Z's disclosure requirements provides a safe harbor such that its conduct

7    cannot give rise to UCL liability); *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933-34

8    (9th Cir. 2011) (concluding that plaintiff's UCL and CLRA claims challenging the

9    design of a fuel dispenser in compliance with California regulatory requirements

10   were barred by the safe harbor doctrine).

11       **F.    Plaintiff's "Fraudulent" UCL Claim Fails for Additional Reasons.**

12       The "safe harbor" doctrine is not the only obstacle for Plaintiff's "fraudulent"

13   UCL claim, which is based both on Target's alleged misrepresentations regarding

14   the features of the TDC, (*see* FAC ¶¶ 51-56), as well as Target's alleged failure to

15   disclose NSFs that could be imposed by a consumer's bank, (*see id.* ¶¶ 52-56).

16   Neither theory successfully states a claim because Plaintiff fails to allege statutory

17   standing, plead with the required specificity, point to an actionable

18   misrepresentation, or establish a duty to disclose.

19       **1.    Plaintiff Lacks Statutory Standing.**

20       Plaintiff lacks standing to challenge Target's alleged misrepresentations and

21   omission regarding the TDC under the fraudulent prong of the UCL.  To establish

22   statutory standing under the UCL, Plaintiff must plead *actual* reliance on an

23   allegedly deceptive or misleading statement.  *Kwikset Corp. v. Super. Ct.*, 51 Cal.

24   4th 310, 326 (2011).  As with misrepresentations, to establish reliance on an

25   omission, "a plaintiff must show that had the omitted information been disclosed,

26   one would have been aware of it and behaved differently."  *Hall v. Sea World*

27   *Entm't, Inc.*, No. 3:15-CV-660-CAB-RBB, 2015 WL 9659911, at *5 (S.D. Cal.

28   Dec. 23, 2015) (citation omitted).

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16CV1678

sf-3682465

1   Plaintiff complains that the Agreement, Target's advertising, and the TDC

2   account activity screen misled consumers into believing the TDC has the features of

3   a debit card issued by a bank holding the consumer's account.  (FAC ¶¶ 7, 34, 38,

4   64-65, 151.)  Plaintiff fails, however, to allege that *he* reviewed the Agreement or

5   any TDC advertisements and then signed up for and used the TDC as a result.

6   There are no allegations that he relied on the allegedly misleading TDC account

7   activity screen or how it caused him injury.  Nor does Plaintiff allege how, if NSFs

8   had been disclosed, *he* would have been aware of them and acted differently.  He

9   thus lacks standing to assert his "fraudulent" UCL claim.  *See Hall*, 2015 WL

10   9659911, at *6 (dismissing omission claim for failure to allege reliance); *In re*

11   *iPhone Application Litig.*, 6 F. Supp. 3d 1004, 1015 (N.D. Cal. 2013) (actual

12   reliance is "essential element" for standing under the CLRA and UCL); *Laster v. T-*

13   *Mobile USA, Inc.*, 407 F. Supp. 2d 1181, 1194 (S.D. Cal. 2005) (dismissing UCL

14   claim where "none of the named Plaintiffs allege that they saw, read, or in any way

15   relied on the advertisements; nor do they allege that they entered into the

16   transaction *as a result* of those advertisements").

17   ## 2.   The FAC Lacks the Required Particularity.

18   Plaintiff cannot challenge Target's alleged misrepresentations and omission

19   for another reason—his claim fails to meet the more stringent requirements

20   imposed by Rule 9(b).  Plaintiff points to the Agreement as misleading, but he does

21   not allege when Plaintiff read the Agreement or what he thought it meant.  His

22   lawyer's *ex post facto* interpretation of the Agreement does not suffice.  *Compare*

23   *Chavez v. Nestle USA, Inc.*, No. CV 09-9192-GW(CWx), 2011 WL 1056797, at *8

24   (C.D. Cal. Jan. 10, 2011) (dismissing fraud-based claims where complaint did not

25   identify "what specific misrepresentations [plaintiffs] allegedly saw, when they

26   viewed them, or how they relied upon them").  Plaintiff also objects to Target's

27   "advertising materials," (FAC ¶ 151), but does not allege the content of those

28   advertisements, where they were located, when he saw them, or what he found to be

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16CV1678

sf-3682465

1  misleading about them.  Thus, Plaintiff's "fraudulent" UCL claim must be

2  dismissed for failure to comply with Rule 9(b).  *See Pirozzi v. Apple Inc.*, 913 F.

3  Supp. 2d 840, 850 (N.D. Cal. 2012) (dismissing UCL and CLRA claims where the

4  plaintiff failed "to provide the particulars of her own experience reviewing or

5  relying upon any of those statements").

6           **3.      Plaintiff Fails to Allege Any Actionable Misrepresentation.**

7           The third hurdle Plaintiff faces is that he fails to allege an actionable

8  misrepresentation.  Plaintiff claims that Target misrepresents the features of the

9  TDC in the Agreement, purportedly leading consumers to believe that, like a "true

10 debit card," the TDC immediately declines or debits a transaction.  (FAC ¶ 8; *see*

11 *id.* ¶¶ 51-63.)  No reasonable consumer would come to this conclusion.

12          "[S]tatements are only actionable under [the UCL] if they are likely to

13 deceive a reasonable consumer," and under this standard, "the plaintiff must 'show

14 that members of the public are likely to be deceived.'"  *Henderson v. Gruma Corp.*,

15 No. CV 10-04173 AHM (AJWx), 2011 WL 1362188, at *10 (C.D. Cal. Apr. 11,

16 2011) (citing *Freeman v. Time*, *Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)).  "[W]here a

17 court can conclude as a matter of law that members of the public are not likely to be

18 deceived" by allegedly misleading statements, dismissal is proper.  *Werbel v.*

19 *Pepsico, Inc.*, No. C 09-04456 SBA, 2010 WL 2673860, at *3 (N.D. Cal. July 2,

20 2010); *see, e.g.*, *Williamson v. Apple, Inc.*, No. 5:11-cv-00377 EJD, 2012 WL

21 3835104, at *5-6 (N.D. Cal. Sept. 4, 2012).

22          Plaintiff's claim that Target misled consumers into believing that the TDC

23 has the features that Plaintiff attributes to a bank-issued debit card is belied by the

24 language of the Agreement.  In fact, the Agreement could not be clearer about the

25 differences.  It states that "[t]he terms, benefits, and protections associated with [the

26 TDC] may vary from those that apply to a debit card issued by your Depository

27 Bank."  (*See* Compl. Ex. A, § 1.)  Moreover, as described above, the Agreement

28 transparently explains how Target processes transactions and when a RPF may be

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16CV1678

sf-3682465

charged.  (*See supra* at Section IV.A.1.)  None of the provisions identified by Plaintiff even *suggest* that Target immediately declines or debits a transaction; instead they clearly describe how EFTs are processed, which the Agreement states may occur several days after the transaction.  (*See id.*)  Plaintiff's understanding of the TDC only makes sense if whole sections of the Agreement are ignored and words are given meanings they do not have.

Plaintiff also objects that the online account activity screen for TDC users is misleading because it shows transactions "posting" to an account earlier than the associated EFTs are processed.  (*See* FAC ¶¶ 64-65.)  Plaintiff does not allege that the account activity screen states that the fact that a transaction is "posted" to a TDC account also means that the transaction was debited by the consumer's bank.

Regardless of any preconceived understanding of a bank-issued, "traditional" debit card, given the clear disclosures in the Agreement, no reasonable consumer would conflate that understanding with the actual terms of the TDC.  Therefore, Plaintiff's "fraudulent" UCL claim cannot be based on an alleged misrepresentation.  *See Ebner v. Fresh, Inc.*, 818 F.3d 799, 806 (9th Cir. 2016) (affirming dismissal of misrepresentation claims where product label would only be "unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons [] that may purchase the product") (citation omitted).

### 4. Target Had No Obligation to Disclose the NSF Charged by Plaintiff's Bank.

Plaintiff's omission theory is also flawed.  An omissions theory requires that the defendant owed a duty of disclosure.  *Wirth v. Mars Inc.*, No. SA CV 15-1470-DOC (KESx), 2016 WL 471234, at *3 (C.D. Cal. Feb. 5, 2016).  "[T]he 'failure to disclose a fact one has no affirmative duty to disclose is [not] "likely to deceive" anyone within the meaning of the UCL.'"  *Id.* (alteration in original) (quoting *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 838 (2006)).  Furthermore, "California courts have generally rejected a broad obligation to

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16CV1678

sf-3682465

1  disclose," and instead conclude the only duty to disclose information to consumers

2  relates to a manufacturer's duty to disclose safety issues. *Wilson v. Hewlett-*

3  *Packard Co.*, 668 F.3d 1136, 1141 (9th Cir. 2012); *see, e.g.*, *Gray v. Toyota Motor*

4  *Sales, U.S.A., Inc.*, 554 F. App'x 608, 609 (9th Cir. 2014)*; Wirth*, 2016 WL

5  471234, at *3-6. Since there are no allegations of safety issues here, Target had no

6  duty to disclose.

7  Moreover, as explained above, Regulation E explicitly exempts Target from

8  disclosing the NSFs because they are not "within the purview of its relationship

9  with the consumer." 12 C.F.R. § 205.14(b)(1); *see id.* § 205.7(b)(5) (requiring

10  disclosure of fees). Thus, Target had no obligation to disclose that Plaintiff's bank

11  could charge him a NSF.

12  **G.  Plaintiff's "Unfair" UCL Claim Fails for Additional Reasons.**

13  Plaintiff's "unfair" UCL claim fares no better than his "fraudulent" UCL

14  claim. An "unfair" practice under the UCL is one that "offends an established

15  public policy" or "is immoral, unethical, oppressive, unscrupulous or substantially

16  injurious to consumers." *Davis*, 691 F.3d at 1169 (citation omitted). To the extent

17  Plaintiff's "unfair" UCL claim is predicated upon Target's alleged

18  misrepresentations, (*see* FAC ¶¶ 7, 143), it should be dismissed for the same

19  reasons as Plaintiff's "fraudulent" UCL claim. (*See supra* at Section IV.F.) To the

20  extent the claim is predicated on Target's processing of EFTs and assessment of

21  RPFs, (FAC ¶¶ 12, 79, 142), it fails because Target acted in compliance with the

22  Agreement.

23  Conduct that is consistent with clear contractual language is not "unfair"

24  within the meaning of the UCL. *See, e.g.*, *Spiegler v. Home Depot U.S.A., Inc.*,

25  552 F. Supp. 2d 1036, 1045-46 (C.D. Cal. 2008), *aff'd*, 349 F. App'x 174 (9th Cir.

26  2009). Plaintiff claims that Target acted unfairly by not immediately declining or

27  debiting a transaction and assessing RPFs when a consumer has insufficient funds

28  in his or her account at the time an EFT is processed. (*See* FAC ¶¶ 12, 79-84.)

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16CV1678

1   Again, the Agreement *nowhere* provides for Target's immediate processing of a
2   transaction and instead explains that the TDC may take several business days to
3   process transactions, and has different features from a debit card issued by the
4   customer's bank.  (*See supra* at Section IV.A.1.)  Plaintiff alleges nothing more
5   than that Target has failed to comply with the terms of the agreement he *wished* he
6   had entered into, rather than the agreement he made.  Target's compliance with the
7   plain terms of the Agreement is not unfair.  *See, e.g.*, *Roots Ready Made Garments
8   Co., W.L.L. v. Gap, Inc.*, 405 F. App'x 120, 122-23 (9th Cir. 2010) (affirming
9   dismissal of the plaintiff's claim that the defendant unfairly terminated contract
10  before it could recoup its investment because contract gave the defendant the right
11  to terminate); *Spiegler*, 552 F. Supp. 2d at 1045-46 (dismissing "unfair" UCL claim
12  where the plaintiff claimed that the defendant overcharged for a service by not
13  using an internal pricing formula, but the defendant complied the express pricing
14  terms of the contract).

15       Plaintiff also contends that Target unfairly delays processing ACH
16  transactions for the TDC to save on processing fees.  (FAC ¶¶ 43-46.)  As
17  explained, however, the Agreement explicitly informs the consumer that the EFT
18  may occur several business days after the transaction.  (*See* Compl. Ex. A, § 1.)
19  Plaintiff does not allege that any transaction he made was processed outside of the
20  stated window and thus not in incompliance with the terms to which he agreed.
21  "The 'unfairness' prong of the UCL 'does not give the courts a general license to
22  review the fairness of contracts.'"  *Spiegler*, 552 F. Supp. 2d at 1046 (quoting
23  *Samura v. Kaiser Found. Health Plan,* 17 Cal. App. 4th 1284, 1299 & n.6 (1993)).
24  Target complied with the Agreement, regardless of whether Plaintiff feels those
25  terms were fair.  Accordingly, Plaintiff's "unfair" UCL claim should be dismissed.

26       **H.    Plaintiff's "Unlawful" UCL Claim Fails for the Additional Reason
              that He Does Not Allege a Predicate "Unlawful" Act.**

27

28       Under its "unlawful" prong, the UCL "borrows" violations of other laws and

23

sf-3682465

1   treats them as unlawful practices that are independently actionable under the

2   statute. *Farmers Ins. Exch. v. Super. Ct.*, 2 Cal. 4th 377, 383 (1992).  Courts

3   routinely dismiss "unlawful" UCL claims where the plaintiff has not established a

4   predicate violation of underlying law.  *See*, *e.g.*, *Williamson*, 2012 WL 3835104, at

5   \*9.  Plaintiff's "unlawful" UCL claim is predicated upon Target's alleged violation

6   of the CLRA.  For the reasons explained below, (*see infra* at Section IV.I), the FAC

7   does not state a CLRA claim.  Accordingly, Plaintiff's "unlawful" UCL claim

8   should be dismissed.

9          **I.      Plaintiff's CLRA Claim Is Deficient for Additional Reasons.**

10          Even if the safe harbor doctrine did not preclude Plaintiff's CLRA claim, it

11   would nonetheless fail.  Plaintiff alleges that Target violates various provisions of

12   the CLRA that pertain to alleged misrepresentations in connection with the sale of

13   goods.  (FAC ¶ 163.)  But his CLRA claim shares his UCL claims' flaws.  First,

14   Plaintiff fails to establish standing to challenge any alleged misrepresentations.  *See*

15   *Meyer v. Spring Spectrum, L.P.*, 45 Cal. 4th 634, 641 (2009) (CLRA requires that a

16   violation "cause[] or result[] in some sort of damage"); (*supra at* Section IV.F.1).

17   Second, Plaintiff does not plead his CLRA claim with the required particularity.

18   (*See supra* at Section IV.F.2.)  Third, Plaintiff has not identified any actionable

19   misrepresentation.  *See Henderson*, 2011 WL 1362188, at \*10 (CLRA claim

20   requires actionable misrepresentation likely to deceive a reasonable consumer);

21   (*supra* at Section IV.F.3).

22          Plaintiff also contends that Target violates the CLRA by inserting an

23   unconscionable provision in a contract, (FAC ¶ 163), but fails to identify the

24   allegedly unconscionable provision or explain why it is unconscionable.  His bare

25   allegation is insufficient to support a CLRA claim under any pleading standard.

26   *See Iqbal*, 556 U.S. at 687.  Accordingly, Plaintiff's CLRA claim should be

27   dismissed.

28

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16CV1678

sf-3682465

1    **V.    CONCLUSION**

2          For the foregoing reasons, Target respectfully requests that the Court dismiss

3    the FAC.

4

5    Dated:  September 14, 2016                MORRISON & FOERSTER LLP

6                                             By:  ___/s/  James R. McGuire___

7                                                  James R. McGuire

8                                             Attorneys for Defendant
                                              TARGET CORPORATION

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TARGET CORP.'S MEM. OF P. & A.
CASE NO. 16CV1678

sf-3682465