JEFFREY KALIEL (CA 238293)
**TYCKO & ZAVAREEI, LLP**
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
*jkaliel@tzlegal.com*

JEFFREY OSTROW (pro hac vice to be filed)
SCOTT EDELSBERG (pro hac vice to be filed)
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd, 5th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
*ostrow@kolawyers.com*
*edelsberg@kolawyers.com*

***Counsel for Plaintiff and the Proposed Class***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WALTERS, *on Behalf of Himself and Those Similarly Situated*<br><br>Plaintiff,<br><br>vs.<br><br>TARGET CORP.,<br><br>Defendant. | CASE NO. 3:16-CV-01678-L-MDD<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Hon. M. James Lorenz |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................... 1

II.   BACKGROUND ........................................................................... 1

III.  ARGUMENT ................................................................................. 3

    A.    LEGAL STANDARD .......................................................... 3

    B.    PLAINTIFF STATES A CLAIM FOR BREACH OF CONTRACT 4

        1.    Target Breached the Contract ................................... 6

    C.    TARGET VIOLATED THE COVENANT OF GOOD FAITH AND FAIR DEALING ............................................................... 10

    D.    THE UCL AND CLRA CLAIMS ARE PROPERLY PLEADED .. 14

        1.    Plaintiff's UCL And CLRA Claims Are Not Subject To A Safe Harbor. ............................................................ 14

        2.    Plaintiff's Fraudulent UCL Claim Is Properly Pleaded. ........ 17

            i.    Plaintiff Has Standing to Assert His UCL Claims ....... 17

            ii.   Target's Debit Card Misleads Reasonable Consumers and Target Had a Duty to Disclose ............................. 18

            iii.  Plaintiff's Allegations Satisfy Rule 9(b) ...................... 21

        3.    Plaintiff's Unlawful UCL Claim And CLRA Claim Are Properly Pleaded. ................................................... 22

    E.    PLAINTIFF PROPERLY ALLEGES UNJUST ENRICHMENT ... 23

    F.    PLAINTIFF PROPERLY ALLEGES UNCONSCIONABILITY .. 24

    G.    PLAINTIFF PROPERLY ALLEGES CONVERSION ................... 24

IV.   CONCLUSION ........................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Acree v. Gen. Motors Acceptance Corp.*,
   92 Cal. App. 4th 385 (2001) ................................................................... 11

4

*Aguiar v. Merisant Co.*,
5   No. 14-00670-RGK-AGRx, 2014 WL 6492220 (C.D. Cal. Mar. 24, 2014) ............... 20

6   *Alvarez v. Chevron Corp.*,
7   656 F.3d 925 (9th Cir. 2011) ................................................................... 17

8   *Baker v. Aegis Wholesale Corp.*,
   No. C 09-5280 PJH, 2010 WL 2853915 (N.D. Cal. July 21, 2010) ........................ 15

9   *Bias v. Wells Fargo & Co.*,
10   942 F. Supp. 2d 915 (N.D. Cal. 2013) ......................................................... 4

11   *Biesmann v. Black Hills United Min. Co.*,
   64 S.D. 82 (1936) ................................................................................ 25

12

13   *Brown v. Hain Celestial Group, Inc.*,
   913 F. Supp. 2d 881, 899 (N.D. Cal. 2012) .................................................... 2

14   *Burch v. Bricker*,
15   2006 S.D. 101 (2006) ............................................................................ 23

16   *Cargile v. JP Morgan Chase & Co.*,
   No. 09-14317, 2010 WL 5491200 (E.D. Mich. Nov. 23, 2010) ............................. 8

17   *Cel-Tech Commc'ns, Inc.*,
18   20 Cal. 4th 163 (1999) ..................................................................... 14, 22

19   *Chavez v. Nestle USA, Inc.*,
   No. CV 09-9192-GW(CWx), 2011 WL 1056797 (C.D. Cal. Jan. 10, 2011) ............. 22

20   *Chem-Age Indus., Inc. v. Glover*,
21   2002 S.D. 122 (2002) ............................................................................ 25

22   *Cowger v. Cherry Hill Mitsubishi, Inc.*,
23   No. A-3408-09T4, 2011 WL 848133 (N.J. Super. Ct. App. Div. Mar. 14, 2011) ...... 19

24   *Daly v. United Healthcare Ins. Co.*,
   No. 10-CV-03032-LHK, 2010 WL 4510911 (N.D. Cal. Nov. 1, 2010) ................... 11

25   *Davis v. HSBC Bank Nevada*,
26   691 F.3d 1152 (9th Cir. 2012) ................................................................ 16

27   *Delacruz v. Cytosport, Inc.*,
   No. C11-3532-CW, 2012 WL 1215243 (N.D. Cal. Apr. 11, 2012) ...................... 18

28

*Delino v. Platinum Cmty. Bank*,
  628 F. Supp. 2d 1226 (S.D. Cal. 2009) .................................................................... 3

*Duran v. Hampton Creek*,
  No. 3:15-cv-05497-LB, 2016 WL 1191685 (N.D. Cal. Mar. 28, 2016) .............. 18, 20

*Ebner v. Fresh, Inc.*,
  818 F.3d 799 (9th Cir. 2016) .................................................................................. 21

*Eva v. Midwest Nat'l Mortg. Banc, Inc.*,
  143 F. Supp. 2d 862 (N.D. Ohio 2001) .................................................................. 24

*Ford v. Moore*,
  1996 S.D. 112 (1996) ............................................................................................. 10

*Fridman v. NYCB Mortg. Co.*,
  780 F.3d 773 (7th Cir. 2015) .................................................................................. 19

*Gutierrez v. Wells Fargo Bank, N.A.*,
  730 F. Supp. 2d 1080 (N.D. Cal. 2010) .................................................................. 12

*Henderson v. Gruma Corp.*,
  No. CV 10-04173 AHM (AJWx), 2011 WL 1362188 (C.D. Cal. Apr. 11, 2011) ....... 2

*Herron v. Best Buy Co.*,
  924 F. Supp. 2d 1161 (E.D. Cal. 2013) .................................................................. 19

*Hesano v. Iovate Health Scis., Inc.*,
  No. 13cv1960-WQH-JMA, 2014 WL 197719 (S.D. Cal. Jan. 15, 2014) .................. 18

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (2013) ............................................................................................. 17

*Hofmann v. Fifth Generation, Inc.*,
  No. 14-cv-2569 JM (JLB), 2015 WL 5440330 (S.D. Cal. Mar. 18, 2015) ................ 16

*Holt v. Foodstate, Inc.*,
  No. 3:15-cv-00078-L-JMA 2016 WL 4625550 (S.D. Cal. Sept. 6, 2016) .................. 16

*In re Checking Account Overdraft Litig.*,
  694 F. Supp. 2d 1302 (S.D. Fla. 2010) .................................................................. 24

*In re Ferrero Litig.*,
  794 F. Supp. 2d 1107 (S.D. Cal. 2011) .................................................................. 17

*In re Mattel, Inc., Toy Lead Paint Prods. Liab. Litig.*,
  588 F. Supp. 2d 1111 (C.D. Cal. 2008) .................................................................. 21

*In re TD Bank, N.A.*,
  150 F. Supp. 3d 593 (D.S.C. 2015) .......................................................................... 8

iv

*In re Vioxx Class Cases,*
    180 Cal. App. 4th 116, 129 (2009) ................................................................ 23

*Johns v. Bayer Corp.,*
    No. 09CV1935 DMS (JMA), 2010 U.S. Dist. LEXIS 10926
    (S.D. Cal. Feb. 9, 2010) ............................................................................... 21

*Johnson v. Larson,*
    2010 S.D. 20 (2010) ..................................................................................... 23

*Kozlowski v. Palmquist,*
    No. 4:12-CV-04174-KES, 2016 WL 1255711 (D.S.D. Mar. 29, 2016) ...................... 5

*Lavarias v. Toyota Motor Credit Corp.,*
    No. D041665, 2004 WL 1194664 (Cal. Ct. App. June 1, 2004) ............................. 15

*Leghorn v. Wells Fargo Bank, N.A.,*
    950 F. Supp. 2d 1093 (N.D. Cal. 2013) ......................................................... 11

*Linear Technology Corp. v. Applied Materials, Inc.,*
    152 Cal. App. 4th 115 (2007) ...................................................................... 18

*MacKinnon v. Truck Ins. Exchange,*
    31 Cal. 4th 635 (2003) .................................................................................. 5

*Makaeff v. Trump Univ., LLC,*
    No. 10-CV-940-IEG (WVG), 2010 WL 3988684 (S.D. Cal. Oct. 12, 2010) .............. 3

*Minnesota Life Ins. Co. v. Philpot,*
    No. 11cv00812 BTM (POR), 2013 WL 100947 (S.D. Cal. Jan. 7, 2013 .................... 23

*Morgan v. AT & T Wireless Servs., Inc.,*
    177 Cal. App. 4th 1235 (2009) ..................................................................... 20

*Nedlloyd Lines B.V. v. Superior Court,*
    3 Cal. 4th 459 (1992) ..................................................................................... 5

*Parks Sch. of Bus., Inc. v. Symington,*
    51 F.3d 1480 (9th Cir. 1995) .......................................................................... 3

*Pirozzi v. Apple Inc.,*
    913 F. Supp. 2d 840 (N.D. Cal. 2010) ........................................................... 22

*Pope v. EZ Card & Kiosk LLC,*
    No. 15-61046-CIV-MARRA, 2015 WL 5308852 (S.D. Fla. Sept. 11, 2015) ........... 19

*Reed v. Dynamic Pet Prods.,*
    No. 15cv0987-WQH-DHB, 2015 WL 4742202 (S.D. Cal. July 30, 2015) ................ 20

*Schnall v. Hertz Corp.,*
    78 Cal. App. 4th 1144 (2000) ....................................................................... 15

*Soto v. Bank of Lancaster Cty.*,
No. 08-CV-1907, 2011 WL 1050213 (E.D. Pa. Mar. 23, 2011) ................................... 8

*Torres v. JC Penney Corp.*,
12-cv-01105-JST, 2013 WL 191568 (N.D. Cal. May 8, 2013)................................... 16

*Travelers Cas. Ins. Co. of Am. v. Hirsh*,
___ F.3d ____, 2016 WL 4120689 (3d Cir. Aug. 3, 2016) ......................................... 24

*Verdiner v. Pep Boys*,
No. B165747, 2004 WL 1146705 (Cal. Ct. App. May 24, 2004) .............................. 15

*Vess v. Ciba-Geigy Corp.*,
317 F.3d 1097 (9th Cir. 2003) ................................................................................... 21

*Williams v. Gerber Prods. Co.*,
552 F.3d 934 (9th Cir. 2008) ................................................................................ 3, 19

**Statutes**

Cal. Civil Code § 1770................................................................................................ 23

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................................. 3

Fed. R. Civ. P. 15(a) ..................................................................................................... 3

## I.   INTRODUCTION

Target's Motion to Dismiss ignores the two main questions posed by Plaintiff's First Amended Complaint ("FAC"): First, why call the Target Debit Card a "debit card" if it does not function like every other debit card in the country? Second, why not warn consumers that by using the Target Debit Card they risk liability for crippling penalties for supposed overdraft events—sometimes of $100 or more—precisely because the card failed to function like every other debit card? Instead, Target bases its Motion to Dismiss ("Mot." or "Motion") on contract language that fails to answer either question.

## II.   BACKGROUND

In 2010, Target introduced a *new,* unique payment product and lured consumers like Plaintiff Walters into signing up for it by using an *old*, well-understood name— "debit card." FAC, ¶¶ 23, 28-39. Target called it the Target *Debit Card* even though Target knew that it did not work like a true debit card. *Id.* at ¶¶ 1, 40-50. Target misrepresented and/or omitted this fact every time it referred to the Target Debit Card in marketing, sign-up materials, and scripts provided to cashiers and other store employees, giving reasonable consumers like Plaintiff Walters the false impression that the Target Debit Card was in fact a true debit card and would operate like one. *E.g.*, *id.* at ¶¶ 75-78. But Target's Debit Card differs from a true debit card in at least four material ways, imposing unique risks for consumers:

| Normal Debit Card | Target Debit Card |
|---|---|
| Immediate withdrawal or hold for all transactions at the moment a card is swiped (FAC ¶ 1 n.1, 4, 22) | Up to 10-day delay after card is swiped before Target even communicates with bank about the transaction (*Id.* ¶¶ 43-44) |
| Immediate declination if insufficient funds in checking account (*Id.* ¶¶ 24, 66, 27) | Authorization without any assessment as to whether there are sufficient funds in account (*Id.* ¶¶ 41, 66, 83) |
| No overdraft fee unless consumer gives specific permission (*Id.* ¶ 6) | Returned Payment Fee ("RPF"), even if sufficient funds were in the checking account at the time of purchase (*Id.* ¶¶ 9, 13, 46-48) |

| Transaction with insufficient funds liable for **one** overdraft fee at most, for a maximum risk of $35 dollars | One transaction can cause **three or more** combined fees from both Target and consumer's bank, for a risk of potentially $100 or more (*Id.* ¶¶ 8, 13, 15, 17, 52, 56, 67) |

Target exploited consumer expectations by branding its payment product the Target Debit Card. Indeed, research shows that consumers prefer debit cards for various, well known, reasons, none of which were provided by the Target Debit Card. First, consumers prefer *immediate*, "cash-like" deductions from their checking account; second, debit cards provide the convenience of using a plastic card without the risk of spending money on credit; and, third, debit cards allow consumers to avoid finance charges and debt. FAC, ¶¶ 28-39. And consumers reasonably rely on the *name* of a product (Target Debit Card) to broadcast the *characteristics* of product. *E.g.*, *Henderson v. Gruma Corp.*, No. CV 10-04173 AHM (AJWx), 2011 WL 1362188 at *12 (C.D. Cal. Apr. 11, 2011) (denying a motion to dismiss a UCL, FAL, and CLRA claims for labeling a product "Guacamole" that contained virtually no avocado); *Brown v. Hain Celestial Group, Inc.*, 913 F. Supp. 2d 881, 899 (N.D. Cal. 2012) (denying a motion to dismiss where misrepresentation was in the product name itself).

Target's entire defense—that the Debit Card Agreement explains that the Target Debit Card is not intended to function like a true debit card—fails.[1] Target does not (because it cannot) contend that a $60 or $100 penalty for one supposed overdraft event is fair or that it informed consumers of the risk of this unfair penalty. Rather, Target wrongly argues that the contract (if read in Target's favor) does not prohibit this gouging. It does not.

First, a contract's fine-print cannot disclaim what is expressed by a product's

---

[1] Plaintiff does not concede that the Agreement attached to Target's MTD is the controlling agreement for the entirety of the time Plaintiff had a Target Debit Card. Indeed, Plaintiff has information that material changes were made to the Agreement recently. The Williams Declaration states simply that the Agreement is the "current Target Debit Card Agreement." But Plaintiff Walters has had a Target Debit Card since the middle of 2014.

OPPOSITION TO MOTION TO DISMISS
3:16-CV-01678

name—here, that the Target Debit Card is a debit card. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 937-38 (9th Cir. 2008) (reasonable consumers are not expected to look beyond a product label's misleading representations to discover their inaccuracy); *Makaeff v. Trump Univ., LLC*, No. 10-CV-940-IEG (WVG), 2010 WL 3988684, at *3-4, 6-7 (S.D. Cal. Oct. 12, 2010) (denying motion to dismiss because the name "Trump University" implied that the school was accredited and connected to Donald Trump). Second, even if it could, any reading of Target's contract fails to explain to customers the unique risks of the Target Debit Card, or how the Target Debit Card differs from an actual debit card. To the contrary, it actually uses language that mimics the language banks use to describe true debit cards. FAC ¶¶ 51-69.

In short, Target's contract describes a typical debit card, and Target breached its provisions when the Target Debit Card did not function as one. *At the very least*, Target was required to exercise its discretion under the contract fairly and in compliance with reasonable consumer expectations, but did the opposite; for example, choosing to intentionally delay processing Target Debit Card transactions to financially penalize and profit from accountholders. *Id.* at ¶¶ 43-46. Because the Target Debit Card did not actually function like a true debit card, Plaintiff incurred obscene double and triple penalties from *both* Target and his bank for the same transactions.

## III.   ARGUMENT

### A. LEGAL STANDARD

"A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint." *Delino v. Platinum Cmty. Bank*, 628 F. Supp. 2d 1226, 1230 (S.D. Cal. 2009). The court must accept as true all material allegations and reasonable inferences to be drawn from them, and must construe the complaint in the light most favorable to plaintiffs. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). As a general rule, leave to amend a complaint, which has been dismissed, should be freely granted. Fed. R. Civ. P. 15(a).

## B. PLAINTIFF STATES A CLAIM FOR BREACH OF CONTRACT

Contrary to Target's argument, the Debit Card Agreement (Doc. 8-3) fails to "explain . . . exactly how [Target Debit Card] transactions are processed and when RPFs are imposed." *See* Mot. at 1. Rather, it makes promises that Target breaches.

Every debit card transaction in the United States, except for Target Debit Card transactions, occurs the same way: the merchant instantaneously obtains authorization for the purchase amount from the consumer's bank before completing the sale to the consumer. FAC, ¶ 24. By "swiping" a customer's debit card, a merchant verifies that the customer's account is valid and that sufficient funds are available to cover the transaction's cost. *Id.* If not, the transaction is declined (or authorized into overdraft if the consumer has specifically opted into that functionality with its bank). *Id.* At this step, for transactions that are approved, banks immediately debit the transactions and reduce the customer's available funds by a corresponding amount. *Id.* at ¶ 25. Transfer of funds to the merchant occurs later. But this is not how the Target Debit Card works.

Unlike a normal debit card transaction, a Target Debit Card transaction occurs over the entirely different Automated Clearinghouse ("ACH") network, which in effect is more like writing a paper check than using a debit card. *Id.* ¶ 42. Target never told consumers that their transactions would be processed over the ACH network, nor that they would be processed in an entirely different, non-immediate manner. *Id.* ¶¶ 28-39.

Any reasonable contract interpretation must start with common understandings of terms and meanings.[2] *Kozlowski v. Palmquist*, No. 4:12-CV-04174-KES, 2016 WL

---

[2] Target references a contractual choice-of-law provision to claim that Plaintiff's common law claims should be decided pursuant to South Dakota law. Mot. at 6. However, it is premature and unnecessary to make such a determination at this stage. *See, e.g.*, *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 928 (N.D. Cal. 2013) (reserving question of applicability of Louisiana choice-of-law clause because "the choice of law determination in this case is better suited for the class certification stage because the record with respect to balancing the competing states' interests is not sufficiently developed").

There are no relevant differences between California and South Dakota law in the

1255711, at *10 (D.S.D. Mar. 29, 2016) ("The language in a contract is given its 'plain and ordinary meaning.') (quoting *Am. State Bank v. Adkins*, 458 N.W.2d 807, 809 (S.D. 1990)). Here, the pre-existing market understanding of what "debit card" means—and what common terms associated with debit card transactions mean—is the subject of detailed allegations in the complaint. *E.g.*, FAC ¶¶ 22-27, 29-30. That common understanding is also evidenced in part by bank contracts describing the operation of true debit cards. Indeed, despite the inherent differences between the Target Debit Card and true debit cards, Target's contract provisions are eerily close to those that regularly appear in true debit card agreements at national banking institutions. In other words, Target not only used the name "debit card" to describe a payment technology that was nothing like a true debit card—it also borrowed *contractual* descriptions and phrases from true debit cards as well. Target must be bound by the descriptions and phrases that indicate to consumers that the Target Debit Card is, in fact, a debit card. *See, e.g.*, *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 650 (2003).

For example, the very first provision of Target Debit Card Agreement states that "[b]y using your card, you authorize us to initiate an electronic fund transfer ('EFT') for the full amount of the transaction," Doc. 8-3, at p. 21, then later states that "[y]ou agree that any EFT *may occur* several business days *after your transaction(s) have occurred and after the date shown on your transaction receipt(s)*" (emphasis added).[3] *Id.* These provisions, reasonably read, indicate that the use of the Target Debit Card is a two-step process: in the first provision, "using" (when a consumer swipes his card at a Target

context of Plaintiff's claims. And Target concedes that California law applies to some of Plaintiff's claims. Moreover, in California courts, a choice-of-law clause will not be followed if "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 464-65 (1992).

[3] Indeed, the Electronic Funds Transfer Act defines "EFT" to include both true debit card transactions and other types of electronic funds transfers, *see* 15 U.S.C. § 1693a(7).

store) and "initiating" the funds transfer to the merchant occurs at the same time; in the second provision, the "transaction occur[s]," then the "EFT occur[s]" at a later time. Of course, *that perfectly describes the two-step operation of true debit cards as well*. That is why, for example, two of the largest consumer banks in the country, Bank of America and Capital One, describe their debit card transactions with the same two-step process:

> **Capital One**: "If we authorize the [ATM/Debit Card] transaction, the funds will be debited from your primary checking account immediately or a hold may be placed on your account for up to several days after the purchase transaction has occurred, depending upon the promptness with which the merchant processes your transaction." *See Roberts v. Capital One, N.A.*, No. 16-cv-04841-LGS, Doc. 20-1 at 3 (filed September 2, 2016).

> **Bank of America**: "When we approve a request from a merchant or other financial institution to authorize a transaction you conduct with your Card, we may place a hold on your account. The hold reduces the available balance in your account by the amount listed in the request. . . . In most cases the hold expires when the transaction posts to your account or three business days after the request, whichever occurs first." *See Bodnar v. Bank of America, N.A.*, No. 14-cv-3224-EGS, Doc. 51-7 at 3 (filed Aug. 24, 2015).

In short, by borrowing descriptions of true debit cards, the Target Debit Card Agreement shrouds the differences between the Target Debit Card and true debit cards.

### 1. Target Breached the Contract

Target breaches the contract repeatedly as the Target Debit Card fails to perform like a true debit card. First, the aforementioned first provision of the Agreement states that "[b]y using your card, you authorize us to initiate an electronic fund transfer 'EFT' for the full amount of the transaction." Doc. 8-3, at p. 21. By linking the terms "using" and "initiate," the sentence makes clear that use of the card has immediate effects, *viz.*, "initiating" the funds transfer to the merchant. The provision thus means: the transfer is initiated (though not completed) when the card is "used," just as it is with a true debit card. As described above, that is not how the Target Debit Card actually works; this flawed description alone results in repeated contract breaches by Target when Target

OPPOSITION TO MOTION TO DISMISS
3:16-CV-01678

waits days to even *begin* processing Target Debit Card transactions.

Another contract provision states that "[y]ou agree that you will not use your Card to make purchases for amounts in excess of available funds you have in your Deposit Account as determined by the financial institution holding your Deposit Account ('Depository Bank') as of the date the Depository Bank processes the EFT." *Id.* This provision indicates that with a Target Debit Card, as with a true debit card, balance sufficiency is "determined" immediately by the financial institution, and the transaction is begun to be processed immediately, at the point of sale—either resulting in an immediate withdrawal or an immediate declination (both of which would prevent the obscene cascading effect of $100 in fees experienced by Plaintiff). Target's reading is that the clause tells consumers that determination of account balance sufficiency occurs several days later, when (it argues) the bank "processes" the transaction. That is nonsensical: if balance determination is not performed immediately, Target would be asking the consumer to make a promise based on a future event it does not control.[4]

The somewhat similar provision, "when you use your Card, *you will be limited by the amount of funds in your Deposit Account . . . as of the date the Depository Bank receives and processes an EFT*," *id.* at 22, is also an affirmative promise that Target will limit use of the Target Debit Card when insufficient funds exist. The *only* way this can occur is to reject insufficient funds transactions at the point of sale. Again, such a limitation only makes sense at the immediate moment the transaction is actually initiated. That is because after that time, the purchase is already final—there is no going back to "limit" a purchase when, days later, Target apparently gets around to requesting an actual transfer of funds. If the limitation does not occur until much later, it is not a limitation at all. In short, in each of the three provisions discussed so far, Target's

---

[4] Target argues that this clause alerts consumers that withdrawal does not occur immediately, when it refers to the date the bank "processes" the transaction. But the term "process" is nowhere defined in the Agreement. In context, the only reasonable meaning is that "processing" occurs instantly, and is coeval with so-called "initiation."

OPPOSITION TO MOTION TO DISMISS
3:16-CV-01678

contract misstates how its card actually works.

Remarkably, Target also expressly misrepresents and conceals the possibility that use of the Target Debit Card can create nonsufficient funds fees ("NSF Fees") from consumers' banks—which, with Target's RPFs, is the source of the crushing double- or triple-penalty experienced by Plaintiff. Target promises that:

> if you use this Card to make a purchase that exceeds the balance in the deposit account that you linked to this Card, *that account* may become overdrawn even if you chose not to allow overdrafts with respect to a debit card issued by your Depository Bank, and you *may incur associated overdraft fees* [on that account].

*Id.* at 21 (emphasis added). Target never states the true problem that is at the heart of this lawsuit: not that the bank account will become "overdrawn," leading to an *overdraft fee*, but that the bank will initially *reject* the Target Debit Card transaction, leading to an *NSF Fee*. In short, the only non-Target-assessed fee discussed in the contract is "overdraft fees," which are distinct from NSF Fees at United States banks. Overdraft fees are charged when a banks *pays* a transaction even though the consumer's account lacks sufficient funds.[5] Whether by oversight or intent to deceive, this is a major lapse. Consumers are never once informed that use of the Target Debit Card can cause NSF Fees from their banks—much less that consumers can incur <u>both</u> an NSF Fee from their banks and a Returned Payment Fee ("RPF") from Target for the same transaction.

In the context of the Target Debit Card, an overdraft fee would only be charged if the transaction were paid by the bank—meaning the Target transaction was fully paid to Target, and, thus, Target could not *also* charge an RPF. That has nothing to do with Plaintiff Walters' Complaint here. NSF Fees are charged when a bank *rejects* an

---

[5] *E.g., In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 640 (D.S.C. 2015) (differentiating overdraft and NSF fees); *Soto v. Bank of Lancaster Cty.*, No. 08-CV-1907, 2011 WL 1050213, at *8 (E.D. Pa. Mar. 23, 2011) (same); *Cargile v. JP Morgan Chase & Co.*, No. 09-14317, 2010 WL 5491200, at *3 (E.D. Mich. Nov. 23, 2010) (same); FAC ¶ 54.

attempted debit transaction—leading to the unconscionable double or triple penalty experienced by Walters, when both a bank NSF Fee and a Target RPF are charged. The contract *never discloses that consumers will receive NSF fees from their bank for declined purchase*s, *much less that they would receive these for the same transaction on which Target charges an RPF*. By warning only that customers could receive *overdraft* fees from their bank when a transaction was paid (or RPF fees from Target when declined), Target actually promised that consumers would not receive *both* at the same time.

Moreover, this failure to even mention NSF Fees from banks furthers the perception that the Target Debit Card is like a true debit card, and supports the common sense interpretation that a consumer cannot be subject to the absurd, Kafka-esque situation of being charged *both* NSF and RPF fees for the same transaction. It is remarkable that Target claims that this "you may incur overdraft fees" provision supports its position, when "overdraft fees" have nothing to do with the case at bar.

Target also argues that a few other provisions excuse its conduct. But again, read reasonably, those provisions do no such thing. The clause Target highlights in its Motion, stating that "[t]he terms, benefits, and protections associated with your [Target Debit Card] may vary from those that apply to a debit card issued by your Depository Bank," *id.* at 21, is itself misleading. It is not true that the card "may vary" from a true debit card, because in fact the card *definitely* was designed *not* to work like a true debit card. There was no reason for Target to "beat around the bush" on this simple, unimpeachable fact. Further, this case is not about "terms, benefits or protections" of the Target Debit Card; rather, it is about how the Target Debit Card actually *functions*— so the provision would not help Target even if the "may vary" representation were not a lie. In any case, Target never once explains to its consumers *how* the Target Debit Card "may vary." That is likely because the differences were too numerous to list, at least without scaring away consumers.

Target argues that the provision that it will "initiate an electronic funds transfer ('EFT') for the full amount of the transaction," and that the EFT "may occur several business days after [the] transaction(s) have occurred,"[6] *id.*, informs consumers about the unique functionality of the Target Debit Card. But, as discussed above, every true debit card in the market functions just like this: initiation "occurs" instantly, and posting "occurs" several days later. The provision does not show how the Target Debit Card is unique; to the contrary, it makes it seem like the Target Debit Card is like every other debit card. Just like a true debit card, the contract promises a two-step process here: transaction, then payment. Target thus promises to "initiate" the transaction when it "occurs," even if it pays that transaction later. But it fails to deliver this functionality. In short, Target's supposed warning to consumers that the EFT occurs "several days later" does nothing to distinguish the Target Debit Card from a true debit card.

In sum, Target breached the contract and the provisions Target relies upon are not exonerating. At the very least, this muddled, ambiguous, unclear contract language is for a jury to parse. "When there is an ambiguous contract, evidence may be introduced to determine the intention of the parties, which is a question of fact to be resolved by the fact finder." *Ford v. Moore*, 1996 S.D. 112, ¶ 10 (1996).

## C. TARGET VIOLATED THE COVENANT OF GOOD FAITH AND FAIR DEALING

Even if the Court determines Target did not breach an express contract term, Target has violated the covenant of good faith and fair dealing. There is no express authorization in the contract that allows Target to cause the imposition of multiple fees for a single supposed "overdraft" event. In fact, the contract does not even hint that this could happen. In order to manufacture this absurd, counterintuitive result, Target abused discretion it gave itself in the contract.

The implied covenant of good faith and fair dealing "particularly applies where . .

---

[6] Target uses "occur" twice in the same provision, apparently to mean different things, and it never defines "occur."

. the contract gives one party a discretionary power affecting the rights of the other." *E.g.*, *Acree v. Gen. Motors Acceptance Corp.*, 92 Cal. App. 4th 385, 393 (Cal App. 2001) (citation omitted). The party holding the discretion must exercise it in a manner consistent with the parties' reasonable expectations. *E.g.*, *Leghorn v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 1093, 1120 (N.D. Cal. 2013) (citations omitted).[7] Here, as in *Acree*, Target maintained power over executing the terms of the contract; therefore, the implied covenant requires it to perform in a reasonable manner, which, here, would be to administer the Target Debit Card in a manner consistent with how consumers expect debit cards to function. *See Daly v. United Healthcare Ins. Co.*, No. 10-CV-03032-LHK, 2010 WL 4510911, at *4 (N.D. Cal. Nov. 1, 2010) (implied covenant a factual inquiry based on reasonable expectations of parties). As discussed below, Target's contract provided it the discretion to make its Debit Card at least simulate the performance of a true debit card. It repeatedly did the opposite.

Unlike a true debit card transaction, a Target Debit Card transaction occurs over the Automated Clearinghouse ("ACH") network. Plaintiff alleges that in order to save on the processing fees it must pay to ACH network participants, Target groups "debit card" transactions together over several days, then submits giant batches for processing through the network. FAC, ¶¶ 43, 47-48. This often results in delays in processing transactions of up to ten days—even though most ACH debit transactions in the country settle on the very next business day, and even though the technology exists to process them within the *same day. Id*. In short, rather than processing ACH debits quickly in order to mimic the performance of a true debit card, Target choose to exacerbate the differences between a true debit card and the Target Debit Card.

Moreover, Target promised that it would be liable for not completing an EFT "on

---

[7] Under South Dakota law, likewise, "every contract contains an implied covenant of good faith and fair dealing." *Table Steaks v. First Premier Bank, N.A.*, 2002 S.D. 105, ¶ 16 (2002). This requires the holder of contractual power to exercise such power "reasonably" and consistent with "the intention of the parties." *Id.* at ¶¶ 16-17.

time," except "[i]f, *through no fault of ours*, you do not have enough money in your Deposit Account." Doc. 8-3, at p. 24. Target did *not* complete the EFTs on time because it chose, in its discretion, to prioritize its own interests over its consumers'. The EFTs were not completed on time due to Target's "fault," and the delay meant funds in consumers' deposit accounts were depleted by the time the transaction was processed. Target is thus liable for the resulting NSF fees and RPFs. Target was obligated to exercise its "timing" discretion to bring the Target Debit Card's key attributes in line with a true debit card. Instead, it did the opposite, and chose intentional delay. This is not "good faith."

Target's practices abuse contractual discretion and violate reasonable consumer expectations in at least three other places. The Debit Card Agreement states, "You agree that any EFT *may occur* several business days after your transaction(s) have occurred and after the date shown on your transaction receipt(s)." *Id.* at 21. The "may occur" is crucial, since when read alongside the "process on time" promise described immediately above, the only good faith reading of the contract is that Target will at least do its level-headed best to process promptly. But Target used that discretion to always and every time *delay* processing. In other words, what the Agreement fails to inform consumers is that, as a matter of fact, *every* EFT that Target processes *necessarily* occurs days later.

Courts routinely find that the contract term "may" is a lie when a contracting party actually *knows* an event will take place. In a case involving the manipulation of debit card transaction posting order, a bank used the phrase "may" to describe a posting order it had *already adopted*. Judge Alsup of the Northern District of California forcefully rejected the bank's defense:

> While [the contract] "[w]e *may choose* to pay Items in the order of highest dollar amount to lowest dollar amount[,]" it is undisputed that Wells Fargo was then *actually* posting cash withdrawals, debit-card, check, and ACH transactions from highest-to-lowest dollar amount. The phrasing "[w]e may choose" suggested to customers that the bank would either exercise

discretion or that it had not yet chosen to go to a high-to-low scheme. **In fact, the bank knew good and well that it was already imposing and would continue to impose high-to-low bookkeeping—the worst possible system from the customer's perspective.**

*Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1113 (N.D. Cal. 2010), *aff'd in part, rev'd in part and remanded sub nom. Gutierrez v. Wells Fargo Bank, NA,* 704 F.3d 712 (9th Cir. 2012) (emphasis added). On this basis, the court entered judgment in favor of plaintiff and a class on a covenant of good faith and fair dealing claim and others. The same result should apply here.

Further, Target unfairly used its discretion to "deem unpaid" transactions that it maintained continuing authorization to debit, that it in fact continued to try to debit, and that it successfully debited after very short delays. The contract states:

> "The Depository Bank may return as unpaid an EFT if, for example, your Deposit Account does not have sufficient available funds in it to cover the full amount of the EFT, or your Deposit Account is closed, or for other reasons . . . *In the event an EFT is returned or deemed unpaid, the funds owed to us will become immediately due and payable to us."*

Doc. 8-3, at p. 22 (emphasis added). The only reasonable understanding of these provisions indicates that a RPF is assessed only if the transaction is *permanently* returned or "deemed unpaid." In any event, the moment of "deeming" is left to Target's discretion. But, as occurred with Plaintiff, the transactions are not "unpaid" at all—they are simply paid with a slight delay. Indeed, Target's contract makes it clear that it views itself as having continuing authorization from a consumer to attempt and re-attempt to receive payment from the Bank: "Your authorization will remain in effect until we have received notification from you of your termination[.]" *Id.* at 21. Such continuing authorization is flatly inconsistent with any good faith "deeming" by Target of a transaction as "unpaid": *if authorization "remain[s] in effect" in perpetuity, then a transaction cannot finally be "deemed unpaid."* The only reason to "deem unpaid," while simultaneously trying to debit and re-debit, is to punish consumers with RPFs. That too is not "good faith."

Lastly, the Agreement states that in the event it charges an RPF, the amount will be "up to," depending on what state the consumer is in, $20, $25, $30, $35, or $40. *Id.* at 23. This is another discretion point. The "up to" has to have some meaning— otherwise Target's contract would just state the flat amount that it actually does, in all cases, charge that amount. Again, what the Agreement fails to inform consumers is that as a matter of fact, Target always charges the *maximum amount* allowed under the Agreement for every RPF. This is true even when Target continues to debit a consumers account and pays itself just 1 or 2 days later. "Up to" must mean that Target will exercise discretion to only charge the maximum amount when the circumstances call for it. Any good faith understanding of the "up to" promise would require Target not to charge the maximum RPF on a transaction for which it was paid with just a short delay—especially if sufficient funds existed at the time the transaction was initiated.

**D. THE UCL AND CLRA CLAIMS ARE PROPERLY PLEADED**

**1. Plaintiff's UCL And CLRA Claims Are Not Subject To A Safe Harbor.**

Plaintiff's claims concern Target's marketing and other representations about the Target Debit Card, not Target's mechanical processing of electronic funds transfers alone. Plaintiff's complaint has nothing to do with the latter subject, nothing to do with EFTA, and thus is in no way subject to a "safe harbor" under the EFTA or Regulation E. Under the safe harbor doctrine, "[t]o forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct." *Cel-Tech Comms. Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999). "Acts that the Legislature has determined to be lawful may not form the basis for an action under the unfair competition law, but acts may, if otherwise unfair, be challenged under the unfair competition law even if the Legislature failed to proscribe them in some other provision." *Id.* at 563. Target argues that it is entitled to safe harbor protection because the Target Debit Card is "authorized by and provided in compliance with the EFTA and Regulation E." Mot. at 16-18. Even if that were true, EFTA in no way "authorizes" or

guides Target's marketing, naming, and contract drafting choices with respect to the Target Debit Card. EFTA is silent on all these.

Target's argument here resembles the defendant's flawed argument in *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144 (2000). There, in response to the plaintiff's allegations that the advertisements and contract associated with Hertz's fuel service charges were misleading, *id.* at 1149, Hertz argued that a safe harbor applied because Civ. Code, § 1836, subd. (m)(2), permitted it to impose additional charges for optional services, such as fuel service charges, if the renter knows that the charges are avoidable. *Id.* at 1157. The court found that although Hertz's imposition of a fuel service charge was authorized by law, the "confusing and misleading portions of the rental agreement and rental record which purport[ed] to disclose and explain the charge" could be considered deceptive. *Id.* at 1163. The court concluded that "***[a]uthorization of avoidable charges for optional services hardly amounts to permission to mislead customers about such charges." Id.*** (emphasis added). Thus, the court of appeals reversed the dismissal of the plaintiff's complaint, holding that "[s]ince subdivision (m)(2) of Civil Code section 1936 ***does not provide Hertz a safe harbor against the allegations that it confuses and misleads customers*** in violation of the "unfair" and "fraud" prongs of the UCL, these allegations sufficiently state a claim under the UCL." *Id.* at 1170 (emphasis added); *see also, e.g.*, *Baker v. Aegis Wholesale Corp.*, No. C 09-5280 PJH, 2010 WL 2853915, at *6 (N.D. Cal. July 21, 2010); *Lavarias v. Toyota Motor Credit Corp.*, No. D041665, 2004 WL 1194664, at *5 (Cal. Ct. App. June 1, 2004) (reversing dismissal of UCL claim where law purportedly providing safe harbor "does not expressly permit making false representations"); *Verdiner v. Pep Boys*, No. B165747, 2004 WL 1146705, at *8 (Cal. Ct. App. May 24, 2004) (statute outlining procedures for car mechanics to provide estimates does not provide safe harbor for mechanic to make "materially misleading statements as to labor charges"). Likewise, here, regardless of whether EFTA authorizes Target's transaction processes, it does not

OPPOSITION TO MOTION TO DISMISS
3:16-CV-01678

provide it with a safe harbor against allegations that its marketing of the Target Debit Card confuses and misleads consumers.

Stated differently, a defendant cannot claim a safe harbor where a regulation does not affirmatively permit the conduct the complaint actually challenges. For example, in *Davis v. HSBC Bank Nevada*, 691 F.3d 1152 (9th Cir. 2012), a case Target unavailingly relies on, a consumer saw an advertisement for a credit card that failed to disclose the annual fee. The defendant argued, similar to Target here, that it was protected by a safe harbor under Regulation Z, which governs the advertising of finance charges. *Id.*[8] In refusing to apply a safe harbor the Court stated, "we cannot conclude that some provision affirmatively permits the absence of the annual fee disclosure from the advertisements." *See Davis*, 691 F.3d at 1167. Here, like in *Davis*, the regulations Target relies on for a safe harbor do not affirmatively permit, or even discuss, how one may market the provision of ACH transaction services—and certainly do not authorize Target to market those services using a misleading moniker like "debit card."[9]

Target misses the point entirely when it argues that Regulation E and the EFTA specifically authorize transactions through the Automated Clearinghouse Network. Plaintiff does not argue Target was barred from performing ACH debits; only that it was barred from misrepresenting the characteristics of its "debit card." Indeed, the

---

[8] The court did determine that the safe harbor applied to disclosure documents the plaintiff received because TILA and Regulation Z specifically authorized how disclosure documents were to be drafted. *Id.* at 1164-67. Here, Regulation Z and the EFTA do authorize ACH transactions, but do not address whether corporate players can advertise these transactions as typical "debit card" transactions.

[9] *See also, e.g., Holt v. Foodstate, Inc.*, No. 3:15-cv-00078-L-JMA 2016 WL 4625550, at *3 (S.D. Cal. Sept. 6, 2016) (no safe harbor applies where defendant cannot cite a law that specifically permits conduct); *Hofmann v. Fifth Generation, Inc.*, No. 14-cv-2569 JM (JLB), 2015 WL 5440330, at *7 (S.D. Cal. Mar. 18, 2015) (refusing to apply a safe harbor because no regulation specifically authorized the use of "homemade" on the vodka's label); *Torres v. JC Penney Corp.*, No. 12-cv-01105-JST, 2013 WL 1915681, at *2 (N.D. Cal. May 8, 2013) ("Defendants fail to show that any of the provisions they cite contains a safe harbor that clearly permits them to fail to disclose the presence of rhodium on the surface of the jewelry they sell.").

provisions on which Target relies only authorize and govern the mechanics of transactions made over the ACH. *See* 12 C.F.R. § 205.14(a). They nowhere discuss or authorize how those mechanics (and the resulting fee implications) are described to consumers in marketing materials or contracts.

The cases Target cites highlight its flawed interpretation of Plaintiff's claims. For example, in *Alvarez v. Chevron Corp.*, 656 F.3d 925, 928 (9th Cir. 2011), the plaintiffs sued gasoline companies for failing to disclose that gasoline pumps would dispense a small amount of lower grade fuel before dispensing the type of fuel that was advertised. The *Alvarez* defendants successfully asserted a safe harbor doctrine defense arguing that because the design of the gasoline pumps was explicitly authorized by the government, the court could not impose a stricter standard for dispensing fuel than the government had already approved. *Id.* at 933. Here, unlike in *Alvarez*, the government has not created a definition of "debit card" that Plaintiff attempts to second-guess. Rather, Target made affirmative misrepresentations and omissions to exploit consumers' preexisting understanding of the unregulated term.

## 2. Plaintiff's Fraudulent UCL Claim Is Properly Pleaded.

### i.    Plaintiff Has Standing to Assert His UCL Claims

To have standing to sue under the UCL or CLRA together in the same complaint, Plaintiff must allege that (1) he actually relied on the alleged misrepresentation; and (2) he suffered an economic injury. *See In re Ferrero Litig.*, 794 F. Supp. 2d 1107, 1111–12 (S.D. Cal. 2011) (citing *Kwikset*, 51 Cal. 4th at 326–27). Target challenges the reliance element only, which requires "[p]leading that one would not have otherwise purchased the product but for the misleading advertising." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107, n. 5 (2013).

Here, Plaintiff alleges that Target's representation of the Target Debit Card as a "debit card" created the false impression for him that the card would actually operate like a true debit card. FAC ¶¶ 5-17, 35-69. Plaintiff further alleges that he would not

OPPOSITION TO MOTION TO DISMISS
3:16-CV-01678

have signed up for the Target Debit Card but for Target's misrepresentations that the card would operate like a typical debit card—and would not have accepted the risk of a double- or triple-fee penalty for a supposed overdraft event. *Id.* ¶ 53. These allegations are sufficient to establish Plaintiff's standing to pursue his claims. *See Duran v. Hampton Creek*, No. 3:15-cv-05497-LB, 2016 WL 1191685, at *4 (N.D. Cal. Mar. 28, 2016) (reliance was sufficiently plead by a plaintiff that alleged if he knew the product label and name was inaccurate, he would not have made the purchase); *Hesano v. Iovate Health Scis., Inc.*, No. 13cv1960-WQH-JMA, 2014 WL 197719, at *4 (S.D. Cal. Jan. 15, 2014) (plaintiff adequately alleged reliance upon specific representations on the product label); *Delacruz v. Cytosport, Inc.*, No. C11-3532-CW, 2012 WL 1215243, at *8 (N.D. Cal. Apr. 11, 2012) (holding that allegations that plaintiff "read and relied on the misleading label on the [product] containers, resulting in her economic harm" is adequate to allege reliance).

Target argues that Plaintiff did not actually allege the specific documents he read, but there is no dispute that Plaintiff relied on the representations on the face of the Target Debit Card to assume that it was, in fact, a debit card, when, in reality, it is not. FAC, ¶¶ 14, 23, 72, 152. Target cannot avoid liability because Plaintiff did not read certain fine print disclosures (especially where they do not permit Target's conduct), when Plaintiff plainly relied on the "DEBIT" representation on the front of the card.

### ii.     Target's Debit Card Misleads Reasonable Consumers and Target Had a Duty to Disclose

Target argues incorrectly that Plaintiff' UCL allegations are insufficient because no reasonable consumer would believe the Target Debit Card would operate like a typical debit card. Mot. at 20. Dismissal on this basis would be inappropriate under California and Ninth Circuit precedent. Whether a practice will deceive a reasonable consumer is a question of fact inappropriate for decision on the pleadings. *Gerber Prods. Co.*, 552 F.3d at 937–38 ("whether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer."). *Id.* at 938–39 (internal

annotations omitted); *see also Linear Technology Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134–35 (2007) ("Whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires consideration and weighing of evidence from both sides and which usually cannot be made on demurrer." (quotation omitted)).

Plaintiff has pleaded that a reasonable consumer would reach the same conclusion he did: "Consumers similar to Plaintiff expect debit cards to result in an immediate withdrawal from their checking accounts" and "Target bolsters and exploits these consumer perceptions" even though "consumers simply do not understand Target's unconventional and unprecedented method of processing 'debit cards' transactions will result in overdrawn accounts and crippling fees." FAC ¶¶ 5, 7, 11. Plaintiff's belief that his Target Debit Card would operate like a typical debit card is reflective of judicial interpretations of reasonable consumers' expectations regarding the operation of debit cards. *See, e.g.*, *Fridman v. NYCB Mortg. Co.*, 780 F.3d 773, 782 (7th Cir. 2015) ("the debit card also produces an immediate transfer, unlike the delay built into the ACH system"); *Pope v. EZ Card & Kiosk LLC*, No. 15-61046-CIV-MARRA, 2015 WL 5308852, at *4, n.2 (S.D. Fla. Sept. 11, 2015) (finding that unlike checks, debit cards give consumers immediate access to funds); *Cowger v. Cherry Hill Mitsubishi, Inc.*, No. A-3408-09T4, 2011 WL 848133, at *4 (N.J. Super. Ct. App. Div. Mar. 14, 2011) (debit cards give an individual immediate access to funds). Thus, Target had a duty to disclose that the Target Debit Card was not a debit card and that consumers like Plaintiff would be subject to crippling penalties. *Herron v. Best Buy Co.*, 924 F. Supp. 2d 1161, 1177 (E.D. Cal. 2013) (duty to disclose arises when "the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead").

Here, like the defendant in *Williams*, 552 F.3d at 936, 939, Target preys upon preconceived notions of what a debit card is. Like a food label that represents

something about the product on the front label, only to purportedly disclose its true nature on the side or back, *see id.* at 936, 939, Target calls the card a "debit" card on its face—triggering consumers' understanding of a typical debit card—but then argues that a reasonable consumer is capable of interpreting the fine print to understand that the card is nothing like every other debit card on the market. This defense is meritless, especially at this stage of the litigation. *See Duran*, 2016 WL 1191685, at *5 (denying motion to dismiss claims regarding a product called "Just Mayo" that contains, despite representations on the nutrition label that supposedly indicate no that the product was not actually mayonnaise); *Reed v. Dynamic Pet Prods.*, No. 15cv0987-WQH-DHB, 2015 WL 4742202, at * 5 (S.D. Cal. July 30, 2015) (whether a reasonable consumer would be misled after reading a label is a question of fact); *Aguiar v. Merisant Co.*, No. 14-00670-RGK-AGRx, 2014 WL 6492220, at *7 (C.D. Cal. Mar. 24, 2014) ("*Williams* instructs that whether disclosures on the back of a product's packaging mitigate allegedly misleading representations on the front of a product's packaging is primarily a question of fact."). Further, here, unlike in *Williams*, the language Target argues guides the reasonable consumer's understanding of the Target Debit Card is anything but clear. In reality the account disclosures are ambiguous at best and intentionally misrepresent how Target Debit Card transactions will be processed. FAC ¶¶ 51-69; *see* Section B *supra*.

Finally, Target is both wrong and misses the point when it argues that Plaintiff has not alleged any actionable misrepresentation. Mot. at 20-21. Throughout his complaint, Plaintiff alleged facts that reasonably caused him and other consumers to believe that the Target Debit Card is, indeed, a "debit" card, when, in fact, it is not. Target cannot claim with a straight face that Plaintiff did not rely on the term "debit" when it was emblazoned on the face of the card, in addition to the account agreements attached to both Plaintiff's initial complaint and Target's Motion. In any event, where, as here, Plaintiff has illustrated that Target's overarching scheme was to pass the Target

OPPOSITION TO MOTION TO DISMISS
3:16-CV-01678

Debit Card off as an actual debit card, there is no need to highlight a single deceptive representation as the "smoking gun." *Morgan v. AT & T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1241-47 (2009) ("[Plaintiffs'] claim not based upon their reliance on specific representations they assert were false, rather on overall marketing in conjunction with sale of phone."). Likewise, here, *even if* Plaintiff has not identified any specific misrepresentations (he has), his claim still survives based on his allegations that Target misled him and the class into believing they were using a true debit card.[10]

### iii.        Plaintiff's Allegations Satisfy Rule 9(b)

Although, as discussed below, the FAC passes muster under Rule 9(b), many or all of Plaintiff's UCL claims need not satisfy Rule 9(b).[11] Plaintiff has pled claims for violations of the UCL and CLRA for "fraudulent" business practices—not common law fraud. Under the UCL, a "fraudulent" business practice "is one which is likely to deceive the public" and does not require actual falsity or fraud. *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1103 (9th Cir. 2003) ("[F]raud is not an essential element of the California statutes [UCL and CLRA] on which plaintiff relies."). Indeed, "fraudulent" claims predicated on deceptive conduct only constitute actual fraud claims when the elements of common law fraud have been pled. *Johns v. Bayer Corp.*, No. 09CV1935 DMS (JMA), 2010 U.S. Dist. LEXIS 10926, at *14 (S.D. Cal. Feb. 9, 2010) (holding that false advertising claims under the UCL and CLRA were not "grounded in fraud" and therefore, Rule 9 did not apply because plaintiff did not allege all the elements of fraud, namely, knowledge of falsity or intent to induce reliance). Unless a "fraudulent"

---

[10] Target's reliance on *Ebner v. Fresh, Inc.*, 818 F.3d 799 (9th Cir. 2016), Mot. at. 21, is misplaced. In that case, the plaintiff alleged that a product's container made it appear as if it contained a larger quantity of the product that it, in fact, contained. *Id.* at 803. However, the front label of the product did display the accurate weight, and there was no written misrepresentation on the product. *Id.* at 807.

[11] Indeed, Target implicitly acknowledges that Rule 9(b) does not apply to all of Plaintiff's statutory claims when it argues only that Plaintiff's "fraudulent" UCL claim is insufficient. Mot. at 20.

business practice claim is specifically predicated on common law fraud, the principles of Rule 8(a) notice pleading apply. *See In re Mattel, Inc.*, *Toy Lead Paint Prods. Liab. Litig.*, 588 F. Supp. 2d 1111, 1118 (C.D. Cal. 2008).

Regardless, Target incorrectly argues that Plaintiff failed to "meet the more stringent requirements imposed by Rule 9(b)." Mot. at 19. However, the FAC's core factual allegations are quite simple: Plaintiff signed up for and used the Target Debit Card because "[c]onsumers similar to Plaintiff expect debit cards to result in an immediate withdrawal from their checking accounts," and Plaintiff was harmed because "Target's unconventional and unprecedented method of processing 'debit cards' transactions" resulted in NSF fees and RPFs not seen with ordinary debit cards. FAC, ¶¶ 5, 7, 11. Target cannot claim any confusion about Plaintiff's clear, detailed allegations.) And the FAC thoroughly identifies the "who," "what," "when," "where," and "why" that is required of claims sounding in common law fraud. Who: FAC, ¶¶ 1, 4 18. What: FAC, ¶¶ 1-17, 28-39, 51-69. When: FAC, ¶¶ 1, 102. Where: FAC, ¶¶ 18, 20, 102. Why: FAC, ¶¶ 5, 7, 53.[12] Plaintiff's allegations meet the heightened pleading requirements of Rule 9(b).

### 3. Plaintiff's Unlawful UCL Claim And CLRA Claim Are Properly Pleaded.

Plaintiff's "unlawful" UCL claim is also properly pleaded. A practice is "unlawful" under the UCL when it violates any other substantive state or federal law. *Cel-Tech Commc'ns, Inc.*, 20 Cal. 4th at 180. Here, Plaintiff has alleged that the Target Debit Card violates the CLRA, Cal. Civil Code §§ 1770(a)(5), (14) and (1) because Target represented that the Target Debit Card has nonexistent characteristics. FAC ¶¶ 155-158. As to each prong of the UCL, Target makes no serious argument that these

---

[12] The cases dismissing claims on Rule 9(b) grounds on which Target relies provide it with no support. As Target acknowledges, in both *Chavez v. Nestle USA, Inc.*, No. CV 09-9192-GW(CWx), 2011 WL 1056797 (C.D. Cal. Jan. 10, 2011), and *Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840 (N.D. Cal. 2010), the plaintiffs in those cases did not identify any misrepresentations they saw. Mot. at 19-20. Here, the crux of Plaintiff's allegations are that Plaintiff relied on the misleading "DEBIT" card representation. FAC ¶¶ 34-39.

OPPOSITION TO MOTION TO DISMISS
3:16-CV-01678

1  allegations are insufficient under Rule 8.

2      Likewise, Plaintiff has adequately pleaded all the elements of his claim under the

3  CLRA. The CLRA prohibits 24 specific practices in transactions involving the sale or

4  lease of goods and services to consumers. Cal. Civil Code § 1770. While a plaintiff

5  must ultimately show that he actually relied on CLRA-prohibited conduct to his

6  detriment, reliance may be presumed when the misrepresentation is "material." *In re*

7  *Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009). As discussed above, and similar

8  to Plaintiff's UCL claim, the FAC, at this stage of the litigation, identifies material

9  misrepresentations and, therefore, sufficiently states a claim under the CLRA. *See*

10 Section 2.i.

11     **E. PLAINTIFF PROPERLY ALLEGES UNJUST ENRICHMENT**

12     Target premises its argument regarding Plaintiff's unjust enrichment claim on the

13 notion that an unjust enrichment claim cannot stand where there exists a valid,

14 enforceable contract between the parties. Regardless of whether Plaintiff can ultimately

15 *recover* under both theories, it remains permissible for Plaintiff to *plead* contract and

16 unjust enrichment theories in the alternative, and dismissal is improper at the motion to

17 dismiss stage. *See, e.g.*, *Minnesota Life Ins. Co. v. Philpot*, No. 11cv00812 BTM

18 (POR), 2013 WL 100947, at *5 (S.D. Cal. Jan. 7, 2013) ("Under California law, it is

19 well-established that a plaintiff may proceed to trial upon inconsistent causes of action. .

20 . . Thus, even though Plaintiff may not recover under both a contract and quasi-contract

21 theory, it is entitled to plead unjust enrichment in the alternative.").[13]

22     In any event, Plaintiff states a valid unjust enrichment claim. Target received a

23

24

25

[13] The same holds true under South Dakota law. The state decisions Target references
for the proposition that unjust enrichment is unavailability when a contractual remedy
26 exist were decided at a far later juncture in the case, after discovery had taken place. *See*
*Johnson v. Larson*, 2010 S.D. 20, ¶¶ 7-9 (2010) (evaluating jury verdict on unjust
27 enrichment claims); *Burch v. Bricker*, 2006 S.D. 101, ¶¶ 1, 4 (2006) (summary
28 judgment).

benefit in the form of the improper RPFs, was aware of the benefit, and has retained it.[14]

**F. PLAINTIFF PROPERLY ALLEGES UNCONSCIONABILITY**

Target argues that there is no cause of action for unconscionability under South Dakota law. Although unconscionability is typically a defense to a contract (rather than an affirmative cause of action), courts allow unconscionability claims to proceed as an affirmative claim in cases like this one where the defense of unconscionability can never be raised by a plaintiff because the defendant does not need to take any action to enforce a contract, but simply atomically withdraw funds from an aggrieved plaintiff. *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1318-19 (S.D. Fla. 2010) (rejecting motion to dismiss unconscionability claim because "***the bank is never required to file suit because it is already in possession of the customer's money***, and simply collects the fee by debiting the customer's account. ***Thus, the customer never has the opportunity to raise unconscionability as a defense for nonpayment. The only opportunity to do so is through a lawsuit filed by the customer, after payment has been made.***"); *see also Eva v. Midwest Nat'l Mortg. Banc, Inc.*, 143 F. Supp. 2d 862, 895 (N.D. Ohio 2001) (allowing a plaintiff to bring an unconscionability claim as an affirmative claim).

**G. PLAINTIFF PROPERLY ALLEGES CONVERSION**

Finally, Plaintiff has adequately stated a claim for conversion.[15] The entirety of

---

[14] The answer to this question is the same whether decided under California or South Dakota law. The only difference between California and South Dakota law (as set forth in Target's Motion, at 13) is that California law does not require that the recipient be "cognizant" of the benefit unjustly received. *See Travelers Cas. Ins. Co. of Am. v. Hirsh*, ___ F.3d ____, 2016 WL 4120689, at *2 (3d Cir. Aug. 3, 2016) (describing elements of unjust enrichment claims as "receipt of a benefit and unjust retention of the benefit at the expense of another") (quoting *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 91 (2000)).

[15] The analysis of Plaintiff's conversion claim is similar whether under California or South Dakota law. The law of both states requires a showing that the defendant wrongfully dispossessed the plaintiff of something in which s/he had a right of possession or ownership.

OPPOSITION TO MOTION TO DISMISS
3:16-CV-01678

Target's argument rests on the flawed premise that Plaintiff "consented" to Target's wrongful taking of the RPFs. Mot. at 15-16. Target cites a provision of the Debit Card Agreement to suggest that Target is entitled to charge an RPF "for any reason." Doc. 8-3, at 23. *Id.* at 15; Debit Card Agreement § 6. But the full clause of that section states "[i]f the Depository Bank returns an EFT unpaid for any reason . . . ," before setting forth the schedule of fees for RPFs. *Id.* Clearly, nothing in either that clause or the Debit Card Agreement as a whole allows Target to assess an RPF "for any reason." Indeed, for all of the reasons discussed above, Target has no right to charge RPF for purchases that would not have incurred an overdraft fee if the Target *Debit Card* was, in fact, a debit card.

The cases referenced in Target's Motion do not support its position. Indeed, in *Chem-Age Indus., Inc. v. Glover*, the Supreme Court of South Dakota actually *reversed* a grant of summary judgment on the Plaintiffs' conversion claim. 2002 S.D. 122, ¶¶ 20-23 (2002). In the only other decision Target cites for its "consent" argument, a 1936 decision, the complaint explicitly alleged that the plaintiff and defendant "*agreed*" to use the allegedly converted bonds for a certain purpose. *Biesmann v. Black Hills United Min. Co.*, 64 S.D. 82, 264 N.W. 518, 521 (S.D. 1936). As discussed above, Plaintiff did not explicitly agree to be wrongfully charged RPFs, and, try as Target might, nothing in the Debit Card Agreement indicates otherwise.

## IV.   CONCLUSION

For all the reasons discussed herein, the Court should deny Target's Motion in its entirety. Plaintiff requests that the Court order oral argument on Target's Motion and estimates the time required for oral argument to be approximately 45 minutes. Further, should the Court be inclined to dismiss any portion of the FAC, Plaintiff requests leave to amend the complaint pursuant to Fed. R. Civ. P. 15(a)(2).

Dated: October 24, 2016                    TYCKO & ZAVAREEI LLP

                                    By:  /s/ Jeffrey Kaliel
                                         JEFFREY KALIEL (CA 238293)
                                         **TYCKO & ZAVAREEI, LLP**
                                         1828 L Street, N.W., Suite 1000
                                         Washington, D.C. 20036
                                         Telephone: (202) 973-0900
                                         Facsimile: (202) 973-0950
                                         *jkaliel@tzlegal.com*

OPPOSITION TO MOTION TO DISMISS
3:16-CV-01678