UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WALTERS,<br><br>                      Plaintiff,<br><br>v.<br><br>TARGET CORP.,<br><br>                      Defendant. | Case No.: 3:16-cv-01678-L-MDD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION [Doc. 30] FOR RECONSIDERATION** |

      Pending before the Court is Defendant Target Corp's ("Target") motion for reconsideration of this Court's partial denial [Doc. 13] of Target's motion [Doc. 8] to dismiss. Pursuant to Civil Local Rule 7.1(d), the Court decides the matter on the papers submitted and without oral argument. For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Target's motion for reconsideration.

//

//

//

//

//

//

//

1

## I. BACKGROUND

This case is a putative class action stemming from Target's issuance of a product called a Target Debit Card ("TDC"). The TDC is a card that links to a cardholder's deposit bank account ("deposit account"). By swiping a TDC, a cardholder can purchase merchandise from target at a five percent discount. Target, in turn, withdraws funds from the linked deposit account to cover any purchases made with the TDC. To become a TDC Cardholder, a customer must sign an agreement with Target that articulates various terms and conditions. ("The Agreement" [Doc. 8-3].)

In the Agreement, in advertising, through customer / cashier interactions, and by the name of the card itself, Target markets the TDC as a "debit card." Plaintiff James Walters ("Plaintiff") –a Target Customer that held a TDC–alleges that an inherent feature of a debit card is immediate processing of a transaction by either seizing[1] deposit account funds or declining a transaction. Because of this immediate processing feature, Plaintiff alleges it is impossible for a true debit card transaction to directly trigger overdraft or non-sufficient funds fees ("NSF Fees") by spending more than available funds.

The TDC, by contrast, does not thus process transactions immediately. Rather, there is a severe lag in time, often up to ten days, separating the use of a TDC from the processing of the transaction. This delayed transaction occurs over the Automated Clearinghouse ("ACH") network, a processing network that typical debit cards do not utilize.

By marketing the TDC as a "debit card", Plaintiff alleges Target misleads cardholders into believing it will process transactions immediately. As a result, many TDC customers whose deposit accounts have adequate funds at time of transaction will no longer have adequate funds several days later when the ACH transaction ultimately

---

[1] The seizure, or "hold" of deposit account funds sufficient to cover the transaction occurs immediately with a normal debit card. The actual transfer of the held deposit account funds to the payee can occur later. (FAC ¶¶ 25–26.)

processes. Per the Agreement, this resulting inadequacy of funds triggers Returned Payment Fees ("RPFs") to Target. It also triggers overdraft or NSF fees to a customer's depository bank. Plaintiff alleges that Target's practice of misrepresenting the TDC as a debit card is intentional, aimed at (1) generating RPF fees and (2) saving on ACH transaction fees by grouping transactions together over several days and processing them en masse.

On August 15, 2016, Plaintiff filed a first amended putative class action complaint alleging (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; (4) unconscionability; (5) conversion; (6) violation of California Business and Professions Code § 17200 et seq. ("UCL"); and (7) violation of California Civil Code § 1750 ("CLRA"). (See FAC [Doc. 3].) Target filed a motion to dismiss all claims against it. (MTD [Doc. 8].) The Court granted Target's motion in part, dismissing all but the breach of the implied covenant of good faith and fair dealing claim, the UCL claim, and the CLRA claim. (MTD Order [Doc. 13].) Target seeks reconsideration of the Court's partial denial of its motion to dismiss. (Mot. [Doc. 30].) Plaintiff opposes. (Opp'n [Doc. 31].)

## II. LEGAL STANDARD

A district court has the power to reconsider and amend a previous order. See Fed. R. Civ P. 59(e). However, a district court generally should not grant a motion for reconsideration unless (1) the moving party presents newly discovered evidence, (2) there is an intervening change in the controlling law or (3) the original ruling was clearly erroneous. *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999).

## III. UCL AND CLRA CLAIMS

Plaintiff's UCL and CLRA claims both allege Target misrepresented the true nature of the TDC by labeling and marketing it as a "debit card." To succeed, these claims require a showing that Target made an actionable misrepresentation by marketing

and labeling the TDC as a "debit card". In its previous order, the Court held that Plaintiff adequately alleged Target thus made an actionable misrepresentation. Target presents two arguments as to why it believes this ruling was clear error. First, Target argues that "the TDC is a 'debit card' as a matter of federal law." (Mot. 3:1–2.) Target does not cite to any federal law that specifically discusses the TDC. Rather, Target cites to Regulation E, which, among other things, regulates the provision of electronic funds transfer ("EFT") services. Regulation E contemplates that companies like Target who do not hold a customer's deposit account can provide EFT services that access the customer's deposit account. 12 C.F.R. §1005.14. Regulation E further provides that such non-deposit account holding companies can provide these EFT services by issuing "a debit card (or other access device) that the consumer can use to access the consumer's account held by a financial institution." Because Regulation E thus authorizes Target to issue a debit card, Target seems to argue that Regulation E explicitly defines the TDC as a debit card.

This argument lacks merit. Regulation E plainly does not attempt to define the term "debit card." It simply lists provision of a debit card as one mechanism among others that a non-deposit account holding company like Target can use to provide EFT services linked to a customer's deposit account. Regulation E therefore provides no basis by which to conclude the TDC is a debit card as opposed to another variety of deposit account access device. Given this lack of any controlling legal definition for the term "debit card", this Court must construe as true at the pleading stage Plaintiff's plausible allegation that an indispensable defining feature of all debit cards is immediate transaction processing. *See Bell Atlantic v. Twombly*, 550 U.S. 544, 547 (2007). Because the TDC does not feature immediate processing, it follows that the TDC is not a debit card.

Next, Target rehashes the argument that a reasonable consumer would not be misled by the term "debit card" because the Agreement explains the TDC does not function in the manner Plaintiff alleges a normal debit card functions. In dismissing the breach of contract claim, the Court did hold that the Agreement explains that the TDC

4

3:16-cv-01678-L-MDD

and labeling the TDC as a "debit card". In its previous order, the Court held that Plaintiff adequately alleged Target thus made an actionable misrepresentation. Target presents two arguments as to why it believes this ruling was clear error. First, Target argues that "the TDC is a 'debit card' as a matter of federal law." (Mot. 3:1–2.) Target does not cite to any federal law that specifically discusses the TDC. Rather, Target cites to Regulation E, which, among other things, regulates the provision of electronic funds transfer ("EFT") services. Regulation E contemplates that companies like Target who do not hold a customer's deposit account can provide EFT services that access the customer's deposit account. 12 C.F.R. §1005.14. Regulation E further provides that such non-deposit account holding companies can provide these EFT services by issuing "a debit card (or other access device) that the consumer can use to access the consumer's account held by a financial institution." Because Regulation E thus authorizes Target to issue a debit card, Target seems to argue that Regulation E explicitly defines the TDC as a debit card.

This argument lacks merit. Regulation E plainly does not attempt to define the term "debit card." It simply lists provision of a debit card as one mechanism among others that a non-deposit account holding company like Target can use to provide EFT services linked to a customer's deposit account. Regulation E therefore provides no basis by which to conclude the TDC is a debit card as opposed to another variety of deposit account access device. Given this lack of any controlling legal definition for the term "debit card", this Court must construe as true at the pleading stage Plaintiff's plausible allegation that an indispensable defining feature of all debit cards is immediate transaction processing. *See Bell Atlantic v. Twombly*, 550 U.S. 544, 547 (2007). Because the TDC does not feature immediate processing, it follows that the TDC is not a debit card.

Next, Target rehashes the argument that a reasonable consumer would not be misled by the term "debit card" because the Agreement explains the TDC does not function in the manner Plaintiff alleges a normal debit card functions. In dismissing the breach of contract claim, the Court did hold that the Agreement explains that the TDC

does not function the way Plaintiff alleges a typical debit card functions. Target urges the Court to impute to Plaintiff any knowledge he would have gained from reading the Agreement. As a matter of contract law, it is true that a person who signs a contract is presumed to have read and understood its clear language. From this, it simply does not follow that one can affirmatively misrepresent the nature of a product and then use fine print in a contract to immunize it from consumer protection law claims. *See Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938–39 (9th Cir. 2008) (reasonable consumers are not required to look past misleading labels to clarifying fine print).[2]

Furthermore, whether a representation would mislead a reasonable consumer is rarely a question suitable for determination on a motion to dismiss. *Williams*, 552 F.3d at 938–39. It may be true that, prior to incurring RPF or NSF charges, a reasonable consumer would read the several pages of fine print contained on the Agreement and thus learn that the TDC is not actually what Plaintiff alleges Target affirmatively misrepresents the TDC as being: a debit card that process transactions immediately. That said, a reasonable jury could conclude otherwise. Accordingly, the Court **DENIES** Target's motion for reconsideration as to the UCL and CLRA claims.

### IV.    IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

In ruling on Target's motion to dismiss, the Court declined to dismiss Plaintiff's breach of the implied covenant of good faith and fair dealing claim ("bad faith claim") because "a reasonable jury could conclude that Target exercised its discretion in bad faith by *always* delaying EFT's and charging maximum RPF's when [the Agreement] said only that [Target] *may* engage in such practices. Target contends that this ruling was clear error because the Agreement expressly permits such practices. Target's argument is partially correct.

---

[2] Target cites no binding authority to the contrary. The Court notes that *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152 (9th Cir. 2012) did not involve an affirmative misrepresentation.

Here, the Agreement explicitly gives Target discretion to delay EFT's several days and to charge RPF's of up to a maximum value of $40. (Agreement §§1, 6.) Where a party to a contract has discretion, a duty arises to exercise that discretion in good faith. *Peak-Las Positas Partners v. Bollag*, 172 Cal. App. 4th 101, 106 (2009) (internal citations and quotation marks omitted). That said, a court cannot use the covenant of good faith to create implied terms that vary express contractual terms. *Carma Developers (Cal.), Inc., v. Marathon Development California, Inc.*, 2 Cal. 4th 342, 374 (1992). Thus, Target argues, because the express terms of the Agreement give Target full discretion to delay EFT's by several days and charge RPFs of up to $40, it cannot be held liable for doing exactly that.

As to the RPF fees, the Court agrees with Target and, pursuant to Fed. R. Civ. P. 54(b), modifies its previous order such that the bad faith claim is dismissed as to the dollar amount charged as RPF fees. Section 6 of the Agreement expressly sets the upper limit as to how much Target can charge as RPFs. Therefore, Target cannot be held to answer for bad faith in charging at or below that expressly stated dollar amount. As to the EFT processing allegations, the Agreement does not use the same level of precision in defining the amount of time Target can delay in processing the EFTs. The Agreement simply states "[y]ou agree that any EFT may occur several business days after your transaction(s) have occurred and after the date shown on your transaction receipt(s). (Agreement §1.)

This begs the question of what the parties meant by the term "several business days". It is not clear that the parties expressly intended that "several business days" was to contemplate any delay at all, regardless of how long, or whether it was intended to contemplate the up to ten days' delay of which Plaintiff complains, or something less. Because the Agreement thus does not seem to expressly and unequivocally bestow upon Target the right to delay EFTs in an unbridled fashion, the Court finds it proper to apply the implied covenant of good faith and fair dealing such to require that any delay be

reasonable.[3] *See Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 806 (1995) (reasoning it is proper to use the implied covenant to interpret an ambiguous discretionary power conferred by contract). Accordingly, the Court will not dismiss the bad faith claim as to the allegations of unreasonable delay in EFT processing. However, the Court dismisses all other allegations under Plaintiff's bad faith claim because they run directly against the express and unambiguous language of the Agreement.

## V. CONCLUSION & ORDER

For the foregoing reasons the Court **GRANTS IN PART** and **DENIES IN PART** Target's motion as follows:

- Plaintiff's UCL and CLRA claims may proceed.
- Plaintiff's breach of the implied covenant of good faith and fair dealing claims may proceed, but only as to the alleged delay in EFT processing.
- All other claims are dismissed.

**IT IS SO ORDERED.**

Dated: October 18, 2017

_____
Hon. M. James Lorenz
United States District Judge

---

[3] Given the generally accepted definition of "several" as "more than two but fewer than many", any delay of three days or less cannot sustain a claim for breach of the implied covenant of good faith and fair dealing. See https://www.merriam-webster.com/dictionary/several.