JEFFREY KALIEL (SBN 238293)
SOPHIA GOREN GOLD (SBN 307971)
**KALIEL PLLC**
1875 Connecticut Ave. NW, 10th Floor
Washington, DC  20009
Phone: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

JEFFREY OSTROW (admitted *pro hac vice*)
JOSHUA R. LEVINE(admitted *pro hac vice*)
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd, 5th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
*ostron@kolawyers.com*
*levine@kolawyers.com*

***Counsel for Plaintiff and the Proposed Class***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WALTERS, *on Behalf of Himself and Those Similarly Situated*       )<br>                                                  )<br>                        Plaintiff,       )<br>                                                  )<br>        vs.                                       )<br>                                                  )<br>TARGET CORP.,                             )<br>                        Defendant.       )<br>                                                  )<br>                                                  )<br>                                                  ) | CASE NO. 3:16-CV-01678-L-MDD<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

I.    INTRODUCTION .................................................................................... 1

II.   FACTUAL BACKGROUND ..................................................................... 3

      A.    True Debit Card Processing ......................................................... 3

      B.    The TDC Is Not Like Other Debit Cards ..................................... 3

      C.    If a TDC Transaction Is Returned Unpaid, Target Resubmits the
            Transaction Without Notifying Consumers – Causing More NSF Fees . 5

      D.    The TDC Was Formerly Called the Target Check Card, But
            Consumer Interest Was Weak, So Target Changed the Name to
            Target Debit Card ....................................................................... 6

      E.    TDC Marketing Is Consistent From 2012 Forward and it
            Consistently Touts "5% Off" Without Notifying Consumers that
            the TDC is Materially Different from Other Debit Cards ...................... 7

      F.    The TDC Agreement *Misrepresents* the True Nature of the Card and
            *Omits and Conceals* Material Facts About It ..................................... 7

      G.    Target's Choice to Process Transactions on the ACH Network
            Came with Attendant Delay ...................................................... 10

      H.    Materiality:  Target Knew Its Unique "Debit Card,"
            but Target Never Disclosed the TDC's Extreme Risk to Consumers ... 10

      I.    Plaintiff Walters was Deceived and Suffered Harm ............................... 11

III.  ARGUMENT ......................................................................................... 12

      A.    Legal Standard ......................................................................... 12

      B.    The Putative Classes Satisfy the Requirements of Rule 23(a) ................ 13

            1.    Numerosity. ..................................................................... 14

            2.    Commonality .................................................................. 14

            3.    Typicality ........................................................................ 16

        4.      Adequacy.................................................................. 16

   C.   The Putative Classes Satisfy the Requirements of Rule 23(b)(3)............. 17

        1.      Predominance.......................................................... 17

                a.      The Nationwide Breach of the Implied Covenant of
                        Good Faith and Fair Dealing Class......................... 17

                b.      The California Consumer Protection Act Subclasses.......... 19

                c.      Damages Are Amenable to Calculation on a
                        Classwide Basis .......................................... 22

                d.      Alternatively This Court Should Certify a Class Under
                        Rule 23(c)(4) ............................................ 23

        2.      Superiority............................................................ 24

        3.      Ascertainability....................................................... 24

   D.   The California (b)(2) Class Satisfies the Requirements of
        Rule 23(b)(2)........................................................... 24

IV.  CONCLUSION................................................................ 25

# TABLE OF AUTHORITIES

*Abdullah v. U.S. Sec. Assocs., Inc.,*
   731 F.3d 952 (9th Cir. 2013) ........................................................... 15

*Alvarez v. Hill,*
   518 F.3d 1152 (9th Cir. 2008) ......................................................... 19

*Am. Online, Inc. v. Superior Court,*
   90 Cal. App. 4th 1, 108 Cal. Rptr. 2d 699, 712 (2001) ...................... 21

*Am. Timber & Trading Co. v. First Nat. Bank of Oregon,*
   690 F.2d 781 (9th Cir. 1982) ........................................................... 19

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997) ....................................................................... 18

*Aral v. Earthlink, Inc.,*
   134 Cal. App. 4th 544, 36 Cal. Rptr. 3d 229, 244 (2005) ................. 21

*AT&T Mobility LLC v. Concepcion,*
   563 U.S. 333 (2011) ....................................................................... 21

*Briseno v. Conagra Foods, Inc.,*
   844 F.3d 1121 (9th Cir. 2017) ................................................... 24, 25

*Chavez. v. Blue Sky Nat. Beverage Co.,*
   268 F.R.D. 365 (N.D. Cal. 2010) .................................................... 23

*Clay v. Cytosport, Inc.,*
   No. 3:15-cv-00165-L- AGS, 2018 U.S. Dist. LEXIS 153124
   (S.D. Cal. Sep. 7, 2018) ..................................................... 15, 23, 25

*Comcast Corp. v. Behrend,*
   133 S.Ct. 1426, 185 L. Ed. 2d 515 (2013) ....................................... 24

*Ellis v. Costco Wholesale Corp.,*
   657 F.3d 970 (9th Cir. 2011) ..................................................... 13, 17

*Ellis v. Costco Wholesale Corp.,*
   285 F.R.D. 492 (N.D. Cal. 2012) .................................................... 25

*Ellsworth v. U.S. Bank, N.A.,*
   No. C 12-02506 LB, 2014 WL 2734953 (N.D. Cal. June 13, 2014) .......... 16

*Farrell v. OpenTable, Inc.,*
   No. C 11-1785 SI, 2012 WL 1379661 (N.D. Cal. Jan. 30, 2012) ................. 17

*Garrett v. Bankwest, Inc.*,
    459 N.W.2d 833 (S.D. 1990) ........................................................................ 18

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .................................................................... 16

*In re Chase Bank USA, N.A. CHECK LOAN Contract Litig.*,
    274 F.R.D. 286 (N.D. Cal. 2011) ......................................................... 16, 19

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) .............................................................................. 22

*Johns v. Bayer Corp.*,
    280 F.R.D. 551 (S.D. Cal. 2012) ............................................................ 23

*Johnson v. Cal.*,
    543 U.S. 499 (2005) .................................................................................. 5

*Korolshteyn v. Costco Wholesale Corp.*,
    No. 3:15-CV-709-CAB-RBB, 2017 WL 1020391 (S.D. Cal. Mar. 16, 2017) ........ 16, 23

*Korolshteyn v. Costco Wholesale Corp.*,
    No. 3:15-CV-709-CAB-RBB, 2017 WL 5973547 (S.D. Cal. Mar. 31, 2017) ............. 16

*Kwikset Corp. v. Superior Court*,
    246 P.3d 877 (Cal. 2011) .......................................................................... 22

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ............................................................... 23, 24

*Lloyd v. Navy Fed. Credit Union*,
    No. 17-cv-1280-BAS-RBB, 2018 U.S. Dist. LEXIS 62404
    (S.D. Cal. Apr. 12, 2018) ........................................................................ 20

*Martinez v. Wells Fargo Bank, N.A.*
    (In re Checking Account Overdraft Litig.), 307 F.R.D. 630 (S.D. Fla. 2015) ............ 15

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ..................................................................... 15

*Nedlloyd Lines B.V. v. Superior Court*,
    3 Cal. 4th 459, 834 P.2d 1148, 1148 (1992) ......................................... 20

*Nunez v. BAE Sys. San Diego Ship Repair Inc.*,
    292 F. Supp. 3d 1018 (S.D. Cal. 2017) ................................................ 14

*O'Shea v. Am. Solar Sol., Inc.*,
    318 F.R.D. 633 (S.D. Cal. 2017) ............................................. 16, 18, 23, 25

*Schwartz v. Citibank*
  (S. Dakota), N.A., 50 F. App'x 832 (9th Cir. 2002) ........................................ 17

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) ................................................................. 20, 21

*Tait v. BSH Home Appliances Corp.*,
  289 F.R.D. 466 (C.D. Cal. 2012) ............................................................. 15, 21

*Theiss v. County of Snohomish*,
  No. 12–1880, 2013 WL 2319397 (W.D. Wash. May 28, 2013) .................................. 19

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996) ....................................................................... 24

*Wash. Mut. Bank v. Superior Court*,
  24 Cal. 4th 906, 103 Cal. Rptr. 2d 320, 331, 15 P.3d 1071, 1081 (2001) ................... 20

*West v. California Servs. Bureau, Inc.*,
  323 F.R.D. 295 (N.D. Cal. 2017) ................................................................. 25

*Wolin v. Jaguar Land Rover North America, LLC*,
  617 F.3d 1168 (9th Cir. 2010) ............................................................... 15, 24

74 Fed. Reg. 59033-01, 59036 (Nov. 17, 2009) ....................................................... 3

Cal. Civ. Code § 1719 ............................................................................ 5

Cal. Civ. Code § 1751 ........................................................................... 21

Fed. R. Civ. P. 23 .......................................................................... *passim*

S.D. Codified Laws § 37-24-6 ................................................................... 21

S.D. Codified Laws § 37-24-31 ................................................................. 21

## I.   INTRODUCTION

The deceptively named "Target Debit Card" ("TDC") processes transactions unlike virtually every other debit card in the country. Target omits and misrepresents the risks of using the TDC, resulting in Plaintiff and reasonable consumers' surprise that use of the card can cause massive fee penalties from *both* Target and their banking institutions when the checking account to which the TDC is linked has insufficient funds.  While a true "debit card" immediately approves or denies transactions based on available account balance; immediately withdraws or holds funds for approved purchases; and has no fee penalties for declined insufficient funds transactions, the TDC has none of those intrinsic properties.  Indeed, the TDC does not even *attempt* funds deduction or notify consumers' banks for two to seven days after a purchase.  The practical impact of that tardiness is severe: consumers expecting the TDC to function like other debit cards are instead pummeled with two, three, or even four separate fees on the same Target purchase. These fees are literally impossible for consumers to incur with a true "debit card."

Target misrepresents the nature of TDC by the product's very name, and through marketing materials and card agreements that a) fail to correct reasonable understandings of the name and b) misrepresent the actual functioning of the card.  Target omits and conceals material facts about the TDC, never once informing consumers in *any* disclosure that: a) use of the card can result in two, three, or four fees in the event of an insufficient funds transaction—up to *$150 in fees*; and b) ████████████████████████████ ███████████████████████████████████████████████████████.

The exorbitant and unconscionable double, triple, and quadruple-fee penalties just described are not isolated occurrences.  ██████████████████████████████████ ████████████████████████ so-called Returned Payment Fees ("RPFs") from Target on TDC purchases that were returned as unpaid,[1] and ███████████████████████████ ████████████████████

---

█████████████████████████████████████████████████████████
████████████████████

1　██████████████████████████████████████████████ *See*

2　*Exhibits A-C to Target's Responses to Plaintiff's Second Amended First Set of Interrogatories,* attached

3　as Exhibit 1. Nearly a quarter of these fees were assessed on California consumers alone.

4　*Id.* These unconscionable fee penalties were never adequately disclosed, and would have

5　been impossible had the TDC functioned like a debit card. Had they known of the

6　potential for these penalties, reasonable consumers like Plaintiff would never have signed

7　up for or used the TDC.

8　　　　For nearly a decade, Target has touted the TDC as a "debit card." Up until 2010,

9　the card had been named the Target Check Card, but Target changed the name of the card

10　to "Target Debit Card" ████████████████████████████████

11　████████████████████████████████████████████

12　██████████████████████." *See Excerpts of Deposition of Heather Shetka*, attached as

13　Exhibit 2 at 21-23. In addition, "████████████████████████████████

14　██████████████████████ *Id.*, at 19:8-25 (emphasis added).

15　　　　But the name change did the opposite. Target was well aware that consumers

16　reasonably understood a "debit card" would work like the other "debit cards" in the

17　marketplace and that its "debit card" was widely misunderstood—and did nothing to

18　correct that known misperception. As one Target employee wrote, referring to Target's

19　2010 decision to change the card's name from Target Check Card to Target Debit Card,

20　████████████████████████████████████████████

21　██████████████████ *See internal email,* attached as Exhibit 3 (emphasis added).

22　――――――――――――――――――

23　[2] This number is an approximation. ████████████████████

24　████████████████████████████████████████████

25　████████████████████████████████████████████

26　████████████████████████████ The average NSF Fee charged
by U.S. banks when ACH transactions are returned for insufficient funds is at least $31per

27　NSF Fee, according to the CFPB. Consumer Fin. Prot. Bureau, Study of Overdraft
Programs: A White Paper of Initial Data Findings 47 (June 2013) ("CFPB Study"),

28　http://bit.ly/1NvT3Nv, at 17.

1 This email alone confirms Plaintiff's theory of the case. As discussed herein, this case easily

2 meets the requirements for class certification.

3 **II.   FACTUAL BACKGROUND**

4 **A.   True Debit Card Processing**

5 With bank debit cards, when a consumer makes a purchase, her bank "receives an

6 instantaneous request to authorize the transaction" from the merchant. CFPB Study at 42;

7 *see also Declaration of Arthur Olsen,* attached as Exhibit 4 at ¶ 13. If the charge does not

8 exceed the consumer's balance, the bank immediately authorizes the transaction and places

9 a "hold" on the funds. *Id.* If the charge exceeds the account's balance at the time the

10 authorization request comes in, the bank may either accept or reject the merchant's request

11 for authorization. *Id.* If it accepts the charge, the bank may only charge a fee for overdraft

12 transactions if a consumer provides her "affirmative consent." Electronic Fund Transfers,

13 74 Fed. Reg. 59033-01, 59036 (Nov. 17, 2009). If the bank rejects the charge, the

14 transaction is declined, and the account balance is not decremented. With bank-issued

15 debit cards, *there are no fees when transactions are rejected. Id.*; *see also Ex 4* at ¶ 13.

16 **B.   The TDC Is Not Like Other Debit Cards**

17 The TDC lacks the indicia of a true debit card. There is no immediate authorization

18 or rejection based on an account's available balance, nor—in the case of authorized

19 transactions—a hold on funds needed to pay the transactions when they settle. Indeed,

20 according to a Target document, ████████████████████████████████████

21 ████████████████████████████████████████████████████████████████

22 ████████ *See TDC Transaction and Payment Procedure,* attached as Exhibit 5*; see also Deposition*

23 *Excerpts of Ali Ashraf,* attached as Exhibit 6 at 23-25. ███████████████████

24 ████████████████████████████████████████████████████████████████

25 ██████████████ When a debit card transaction is declined for insufficient funds, there is no

26 fee assessed to the consumer; when a TDC transaction is declined, there are up to four.

27 Unlike a true debit card where transactions drawn on insufficient funds are declined at the

28 point of sale, unless a consumer expressly asks that overdrafts be approved, with the TDC,

1  Target simply approves virtually every TDC transaction attempted by consumers.  *See* Ex

2  6 at 17:22-24; *see also Target Debit Card & Paper Check Strategy Update,* attached as Exhibit 7*;*

3  *Target Debit Card Performance by Year,* attached as Exhibit 8 (internal presentation touting

4  that, ████████████████████████████████[3]  In sum, the TDC

5  operates differently from a bank issued card. *See July 19, 2018 Deposition excerpts of Kristen*

6  *Cook, attached as Exhibit 9* at 66:8-9 ████████████████████████████

7  ███████████████████).

8       Here's how the TDC always works.  When a consumer attempts to use a TDC to

9  make a purchase, ███████████████████████████████████████

10 ████████████████████████.  *See April 6, 2018 Deposition excerpts of*

11 *Kristen Cook, attached as Exhibit 10*  at 42-50. ██████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 Ex 9 at 21:13-19, 32:5-23. ████████████████████████

15 ████████████████████████████████████████████████

16 ██████████ *Id.* at 32.  At this point, no funds have been moved from the consumer's

17 checking account and the consumer's bank has not yet been notified the transaction even

18 exists.

19       ████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ██████████████████████ ████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████. See *ODFI Declaration of*

25 *Wells Fargo, attached as* Exhibit 11. ████████████████████

26 ████████████████████████████████████████████████

27 ─────────────────

[3] ████████████████████████████████████████████████

28 ████████████████████████████████ *See* Ex. 6 at 113-14.



1 ███████████████  *See Exhibit A to Ex 11.; Excerpts of Deposition of Aaron Johnson,*

2 attached as Exhibit 12 at 29:12-14.  █████████████████████

3 ████████████████████████████████████████████

4 ████████████  *See* Ex. 11. ██████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████  *Id.*  (March 5, 2016 entry).

7 ████████████████████████████████████████████

8 ████████████████████████████  *Id.*

9 ██████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ███████████████████████████.[4]  There is no possible

15 way any of this delay can happen with a true debit card, where funds are held and set aside

16 immediately—or transactions are rejected immediately for insufficient funds.  Not even

17 Target believes the TDC is a true debit card. When asked whether the TDC is a "debit

18 card," Target's  Rule  30(b)(6)  ████████████████████████████

19 ████████████████" Ex. 9 at 66:23-25; *Ex. 10* at 16:21-22. But the TDC was not

20 marketed as a ████████████████  It was falsely marketed as a "debit card."

**C.   If a TDC Transaction Is Returned Unpaid, Target Resubmits the Transaction Without Notifying Consumers—Causing More NSF Fees**

22 If a TDC transaction is returned for insufficient funds by the consumer's bank,

23 Target immediately assesses an RPF of between $20-$40, depending on the state in which

24 the transaction was made.  These varying RPF amounts are actually set by state law for

25

---

26 [4] As discussed below, these cut-off times are *never* disclosed to consumers in the TDC

27 agreement or at the point of sale.  If they were, reasonable consumers could take them

28 into account when deciding what payment method to use.

bounced paper checks—as clear an indication as any that even Target knows the TDC is more like a paper check than any other form of payment. *See, e.g.,* Cal. Civ. Code § 1719; s*ee also TDC Agreement attached as Exhibit 13* at p 3. Target has designed a ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████ *Ex. 10* at 91-93. ████████████████

███████████████████████████████████████████████████████

███████ *Ex. 9* at 54:16—55:16. █████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████.

**D.     The TDC Was Formerly Called the Target Check Card, But Consumer Interest Was Weak, So Target Changed the Name to Target Debit Card.**

Until 2010, the Target Debit Card was named the Target Check Card—a name that is somewhat less deceptive, ███████████████████████████████████

████████████████████ Ex. 10 at 153:13-25–154:1-25; *See also* Ex. 5 at p. 1 ██████

███████████████████████████████████████████████████████

█████████████████████████████████████ (emphasis added); Ex. 3 (████████

███████████████████████████████████████████████████████

███████) (emphasis added).

If the card was actually like a check in some respects, why change the name to "Target Debit Card?" ██████████████████████████████████████████

████████████████████████████████████ *See* Ex. 2 at 15-16, 21-23; 82-83. Of course, if consumers are "familiar" with a name (debit card), they reasonably expect products with identical names to share the essential characteristics of the product they are familiar with.  But the TDC does not share those familiar characteristics of a debit card, as discussed above, and changing the name to the "Target Debit Card" was deceptive.

**E.    TDC Marketing is Consistent From 2012 Forward and it Consistently Touts "5% Off" Without Notifying Consumers that the TDC is Materially Different from Other Debit Cards**

At all times from 2012 to the present, Target referred to the card as the "Target Debit Card," in marketing materials and in consumer interactions with store employees. *See* Ex. 13;*TDC Marketing Materials, attached as Exhibit 14*. At all times over the past six years, the card itself was emblazoned with the word "debit" on it. Ex. 2 at 86:7-11.  In marketing the TDC in-store and elsewhere, ███████████████████████████████████ ██████████████████████ Ex. 2 at 12:1-11. ████████████████████████████████ █████████████████████████████████████████████████████████████ █████████████████████████ Ex. 2 at 64:16-19 ("█████████████████████ █████████████████████████████████████████████████████████████ ██████████████████); Ex. 2 at 29:13-14 █████████████████████████ █████████████████████████████████████████████████ Ex. 2 at 93-94 ("█████████████████████████████████████████████████████████████ █████████████████████"). Target also prominently featured in-store signage touting the TDC throughout the last five years.  *Ex. 2* at 56:5—57:21.)  As with the cashier interactions, the focus was always on TDC benefits and never about the true nature or risks of the card. *Ex. 2* at 90:11—91:5 . Indeed, it made a conscious choice to omit material information about how payments are processed. *See* Ex. 2 at 81:14—82:22.

**F.    The TDC Agreement Misrepresents the True Nature of the Card and Omits and Conceals Material Facts About It**

In its fine print form contracts, Target never plainly and clearly says what it so obviously true:  (a) use of the card can result in RPF fees <u>and</u> *up to three NSF Fees* from a bank on a single transaction (or $70-$150 in fees for even a small transaction); (b) the card uses the ACH network, not the networks that bank-issued debit cards use; (c) the card functions unlike virtually all other debit cards; and (d) the card does not authorize or reject transactions based on account balances. *None of these material facts are disclosed in the Agreement.*

1    Indeed, the agreement makes no reference to NSF Fees whatsoever, or that a

2 consumer can be liable for repeated NSF fees each time Target attempts unsuccessfully to

3 debit an account.  Had these disclosures been made clearly, reasonable consumers would

4 not have risked this jeopardy by using a TDC. Moreover, Target never discloses that the

5 TDC operates on an entirely different network (the ACH Network) than all other bank-

6 issued debit cards, which operate on the Visa or Mastercard networks. *See* Olsen Decl. ¶

7 14. This total failure to inform consumers that TDC uses a different network is crucial: on

8 the networks used by bank-issued debit cards, an instant rejection or approval

9 determination is made, and a transaction declination for insufficient funds is totally fee-

10 free. ██████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████. Ex. 12 at 102-05.   Moreover, Target's repeated

13 resubmission of declined transactions *would be impossible* on the debit card networks.

14    The failure to specify that processing TDC transactions occurs on the ACH

15 network means the contract is reasonably understood as describing the operation of a

16 normal debit card, not Target's unique, ACH-based one. For example, the Agreement

17 states that "[y]ou agree that any EFT may occur several business days after your

18 transaction(s) have occurred and after the date shown on your transaction receipt(s)." Ex.

19 13. But *that is also the case for true debit cards and the "electronic funds transfers" they effectuate as well,*

20 as described above, since authorization and settlement occur several days apart for normal

21 debit card transactions—with the important difference that true debit card transactions

22 feature immediate funds deduction or hold if approved. As another example, the TDC

23 Agreement contains the promise that "[w]hen you use your Card, *you will be limited by the*

24 *amount of funds in your Deposit Account*…as of the date the Depository Bank receives and

25 processes an EFT." Ex. 13. Such a "limitation"—which is best understood as a promise

26 to decline transactions that exceed account balance when the card is "used"—is only

27 possible on the debit card networks, not on the ACH network.  And on the debit card

28 networks, a bank "receives and processes" a debit card transaction immediately.

Target also promises that the TDC will be *even more strict than a normal debit card* in terms of rejecting transactions for which there are insufficient funds at the time of purchase: "You agree that the dollar amount limitation on your Card may be less than the dollar amount of available funds in your Deposit Account and that such dollar amount and transaction limitations may change from time to time without any notice to you." *Id.* But again, Target does nothing to ensure that insufficient funds transactions are rejected—thus luring consumers into the double penalty of RPF *and* NSF fees.

And there is a third crucial promise in the TDC Agreement: "if you use this Card to make a purchase that exceeds the balance in the deposit account that you linked to this Card, that account may become overdrawn even if you chose not to allow overdrafts with respect to a debit card issued by your Depository Bank, and you may incur associated overdraft fees." But while the contract states that consumers may be charged "overdraft fees" by their bank if they overdraw their consumer checking account, *it never discloses that consumers will receive the totally different NSF Fees from their bank for declined transactions.* Far from distinguishing the TDC from a true debit card, these three promises do the opposite.

As Target knows and reasonable consumers understand, "overdraft fees" are fees charged when a bank pays a transaction into an insufficient balance, while "NSF" or "insufficient funds fees" are charged when a transaction is rejected. As the CFPB Study points out, true debit cards only incur overdraft fees (and even then, only when a consumer specifically authorizes them); they do not get NSF Fees. The TDC was different: it could also incur NSF Fees—something literally impossible with other debit cards—but the Agreement never once discloses that possibility. By disclosing only the possibility of "overdraft fees," the TDC Agreement makes an implicit promise that transactions will be processed in the same way as true debit card transactions, for which only overdraft fees (and not NSF Fees) are possible.

Moreover, the TDC Agreement obfuscates the true processing decisions Target had already made. For example, the Agreement states, "We *may* resubmit an EFT one or more times if the Depository Bank has not sent funds equal to the total previously requested

EFT amount." This language suggests Target "may" resubmit transactions where there is some sort of bank error or an accidental transfer of an incorrect amount of money.  This provision does not even cover the total rejection on an entire transaction for insufficient funds.  In fact, it was Target's systematic practice to always resubmit a transaction <u>twice</u> after an initial rejection for insufficient funds, until paid.  At every possible turn, the Agreement shrouds the differences between the TDC and bank-issued debit cards..

**G.    Target's Choice to Process Transactions on the ACH Network Came with Attendant Delay**

Target could have chosen to at least simulate certain functions of true debit cards by making decisions that would have increased the speed with which all or some TDC transactions were processed.  At every step, it failed to do so.  As discussed above, it

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████ *Ex. 9* at 21:20-25–22:1-10. In short, █████████████████████████████████████████████

███████████████████████████, Target build a processing system with unnecessary delay.

**H.    Materiality:  Target Knew Consumers Misunderstood Its "Debit Card," but Target Never Disclosed the TDC's Extreme Risk to Consumers**

███████████████████████████████████████████

█████████████████████████████████████████████

████████████. *See RedCard Message Research,* attached as Exhibit 15 at 23; *Email from Andrea Goldstein,* attached as Exhibit 16.  Target knew consumers misunderstood how TDC transactions were processed:

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████

*See Ex. 3* (emphasis added). As another example, Target interviewed its customers about

their perception of the TDC. ████████████████████████████████

████████████████████████ *See Email Summarizing Customer Interviews*, attached as Exhibit 17 at 11.  Internal documents describe a high number of RPFs on certain accounts ████ ████████████████████████████████████ *See TDC Reimbursement Letter,* attached as Exhibit 18. Another document states that ██████████████████████ ████████████████████████████████████████ ███████████████████████████████ *See TDC NSF Closure Proposal,* attached as Exhibit 19. (emphasis added). Target did nothing to clear up these "misunderstandings," and did not disclose these extreme risks.

Target nonchalantly admits that consumer misunderstanding exists.  Ex. 9 at 90:15—91:3 ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████ ██████████████ ████ ██ ██ ██ ██ █ █ █ ███████████ █ ██ ████████ *See NSF Closure-Direct Reports Updated Presentation*, attached as Exhibit 20; (emphasis added); See also Ex. 2 at 61:1-18; *Ex. 9* at 90:15—91:3.

Consumers believed the TDC worked like a true debit card, but Target never attempted to cure those misunderstandings in any marketing materials or in the product name itself—by conscious choice.  Doing so simply wasn't enticing or interesting for consumers, and didn't lead to increased TDC sign-ups, as discussed above. ████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ " *Ex. 2 at* 88:8-11 (emphasis added). Yet, as discussed above, Target in fact was aware that "misunderstanding" how the product worked leads directly to RPF and NSF Fees.

## I.   Plaintiff Walters was Deceived and Suffered Harm

1  Plaintiff testified repeatedly that he relied on the name of card to form his
2  understanding of how it worked. *See Deposition Excerpts of James Walters*, attached as Exhibit
3  21 at 29:11-13; 33: 9-12; 34: 9-16; 59: 11-13; 91: 23-25. He also testified repeatedly that he
4  would not have signed up for the TDC if he was adequately informed of its true nature.
5  *Id.*, 94: 14-17 ("Q.  Would you have signed up for the Target debit card if you knew that
6  it does not instantly process transactions as you've described earlier? A. No."); s*ee also id.*
7  at 102: 24-25 ("If I'm being sold a debit card, I expect it to act like a debit card."). Walters
8  was clear he would not have used the TDC if he had been warned of the dire fee
9  consequences. *Id.*, 241: 18-25–242: 1-2.

10  Plaintiff was harmed by the deception and omission. For example, on ▉▉▉▉▉▉
11  ▉▉▉, Plaintiff made a purchase with his ▉▉▉▉▉▉▉▉▉▉▉▉▉ *See Walters TDC*
12  *Transaction Report*, attached as Exhibit 22; s*ee also Walters TDC Statements*, attached as Exhibit
13  23. The transaction did not hit Plaintiff's account ▉▉▉▉▉▉▉▉▉, at which point
14  he was charged a ▉▉▉▉▉▉▉▉▉▉▉▉▉▉. *See Walters Redacted*
15  *Bank Statements*, attached as Exhibit 24*; see also Ex. 1 Response to Interrogatory No. 3*. Target
16  attempted to process the same transaction again on ▉▉▉▉▉▉▉▉. Likewise, on
17  ▉▉▉▉▉▉▉ Plaintiff made a purchase with his ▉▉▉▉▉▉▉▉▉. Exs.1,
18  22, 23. The transaction did not hit Plaintiff's account until ▉▉▉▉▉▉, at which point
19  he was assessed a ▉▉▉▉▉▉▉▉▉▉▉. Ex. *Ex.1,* 24. Target
20  resubmitted the transaction on ▉▉▉▉▉▉, at which point Plaintiff was assessed *another*
21  ▉▉▉▉▉. *Ex. 24*. The transaction ultimately did not clear Plaintiff's account until
22  ▉▉▉▉▉. *Ex. 24* at 13. ▉▉▉▉▉▉▉▉▉ NSF Fees by his bank as a
23  result of the TDC transaction, on ▉▉▉▉▉▉▉▉.

24  ## III.   ARGUMENT

25  ## A.   Legal Standard

26  Class certification is proper if: (1) the class is so numerous that joinder of all
27  members is impracticable, (2) there are questions of law or fact common to the class, (3)
28  the claims or defenses of the representative parties are typical of the claims or defenses of

the class and, (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). To certify a (b)(3) class, "questions of law or fact common to class members [must] predominate over any questions affecting only individual members" and a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To certify a (b)(2) class, "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Class certification is not the time to test the merits of the case. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011).

**B.    The Putative Classes Satisfy the Requirements of Rule 23(a).**

Plaintiff moves for certification of the following classes and subclasses:[5]

**Damages Classes under Fed. R. Civ. P. 23(b)(3):**

> <u>Nationwide breach of the covenant of good faith and fair dealing class</u>: All consumers in the United States who, within the applicable statute of limitations, incurred RPFs and/or NSFs in connection with their TDC, that were not refunded or waived (the "Nationwide Class").

> <u>California consumer protection subclass</u>: All consumers in California who, within the applicable statute of limitations, incurred RPFs and/or NSF Fees in connection with their TDC, that were not refunded or waived (the "California Subclass").

**Declaratory and Injunctive Relief Class under Fed. R. Civ. P. 23(b)(2):**

> <u>California equitable relief subclass:</u> All consumers in California who, within the applicable statute of limitations, had a TDC account (the "California (b)(2) Class").

As discussed below, the proposed classes satisfy the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3). However, in the alternative, Plaintiff moves for

---

[5] Excluded from the Class is Defendant, any entities in which it has a controlling interest, any of its parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, and the presiding judge(s) in this case, their staff, and his, her, or their immediate family.

certification of these classes under Fed. R. Civ. P. 23(c)(4).  Plaintiff also moves to be appointed representative of the Classes, and for the appointment of the following firms as class counsel pursuant to Rule 23(g): Kaliel PLLC and Kopelowitz Ostrow Ferguson Weiselberg Gilbert.

### 1. Numerosity

A putative class is certifiable under Rule 23(a)(1) if it "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[C]ourts generally find that the numerosity factor is satisfied if the class comprises 40 or more members[.]" *Nunez v. BAE Sys. San Diego Ship Repair Inc.,* 292 F. Supp. 3d 1018, 1032 (S.D. Cal. 2017). This case easily satisfies numerosity. According to Target's verified interrogatory responses, over ███████████████████████ RPFs.  *See Ex. 1.*

### 2. Commonality

Commonality is satisfied if "there are common questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement guarantees that class members' claims "are sufficiently parallel to insure a vigorous and full presentation of all claims for relief." *Wolin v. Jaguar Land Rover North America, LLC,* 617 F.3d 1168, 1172 (9th Cir. 2010) (internal quotation marks omitted). Commonality "does not, however, mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." *Abdullah v. U.S. Sec. Assocs., Inc.,* 731 F.3d 952, 957 (9th Cir. 2013) *cert denied,* 135 S. Ct. 53 (2014) (emphasis and internal quotation marks omitted). Indeed, commonality is a "limited burden." *Mazza v. Am. Honda Motor Co.,* 666 F.3d 581, 589 (9th Cir. 2012).

Commonality is easily satisfied in cases like this one where uniform legal determinations will be made on common contract documents and marketing representations. With respect to Plaintiff's implied covenant claim, which pursuant to the TDC Agreement is governed by South Dakota law for all cardholders, courts routinely certify such claims.  *See, e.g.,* *Martinez v. Wells Fargo Bank, N.A. (In re Checking Account Overdraft Litig.),* 307 F.R.D. 630, 642 (S.D. Fla. 2015) (certifying good faith and fair dealing

14

class under South Dakota law in MDL).  Since the same contract terms govern the class, the Court will make one common determination as to whether the covenant was breached.

With respect to Plaintiff's California statutory claims, "[d]istrict courts in California routinely certify consumer class actions arising from alleged violations of the CLRA . . . and UCL." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012); *see also Clay v. Cytosport, Inc.*, No. 3:15-cv-00165-L- AGS, 2018 U.S. Dist. LEXIS 153124, at *18 (S.D. Cal. Sep. 7, 2018) (Lorenz, J.) (holding that UCL and CLRA claims are subject to class-wide proof because "it is necessary only to show that members of the public are likely to be deceived") (citations omitted).

The classes satisfy commonality. There is no dispute that all class members were exposed to the same, alleged misrepresentation: the name of the product. *See Korolshteyn v. Costco Wholesale Corp.,* No. 3:15-CV-709-CAB-RBB, 2017 WL 1020391, at *6 (S.D. Cal. Mar. 16, 2017), *reconsideration denied,* No. 3:15-CV-709-CAB-RBB, 2017 WL 5973547 (S.D. Cal. Mar. 31, 2017) ("By definition, class members were exposed to these labeling claims, creating a 'common core of salient facts."). Likewise, there is no dispute that the same TDC form contracts applied to all class members, as did Target's uniform TDC transaction processing practices. *Ellsworth v. U.S. Bank, N.A.*, No. C 12-02506 LB, 2014 WL 2734953, at *20 (N.D. Cal. June 13, 2014) ("[C]ourts routinely certify class actions regarding breaches of form contracts . . . [C]ommon questions predominate when, as here, they involve form contracts and standardized policies and practices applied on a routine basis to all customers by a bank."); *In re Chase Bank USA, N.A. CHECK LOAN Contract Litig.,* 274 F.R.D. 286, 291 (N.D. Cal. 2011) (whether bank breached the implied covenant of good faith and fair dealing was a question common to the class). Thus, there are numerous common questions stemming from this common factual predicate including:

- Whether Target's advertising and marketing of the TDC, including its use of the name "debit card," omits and misrepresents material facts relating to how TDC transactions are processed;
- Whether Target's advertising and marketing of the TDC, including its use of the name "debit card," is likely to deceive reasonable consumers;

- Whether Target breached the covenant of good faith and fair dealing with respect to the way it processed TDC transactions; and
- Whether Plaintiff and class members were harmed by Target's conduct, and if so, in what amount;

Accordingly, commonality is satisfied here.

### 3.   Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *O'Shea v. Am. Solar Sol., Inc.,* 318 F.R.D. 633, 637 (S.D. Cal. 2017) (quoting *Hanlon*, 150 F.3d at 1020).

Plaintiff's claims here arise out of the same course of conduct and are based on the same legal theories as those of the absent class members. Plaintiff and members of the Classes were subjected to common misleading advertising regarding the TDC (most notably, the name of the card) and were governed by a common and materially uniform account agreement with a common omissions and misrepresentations. And as discussed below, Plaintiff and the Classes seek redress via common legal claims for breach of the duty of good faith and fair dealing under South Dakota law, and, with respect to the California subclasses, under the CLRA and UCL.[6]

### 4.   Adequacy

Class certification is appropriate if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Ninth Circuit employs a two-part test to determine if representation meets this standard: "1) do the named plaintiffs and counsel have any conflicts of interest with other class members and 2) will the named plaintiffs and counsel prosecute the action vigorously on behalf of the

---

[6] The fact that Plaintiff's damages may differ from other class members' damages is of no consequence given that the damages stem from the same course of conduct. *See Schwartz v. Citibank (S. Dakota), N.A.,* 50 F. App'x 832, 835 (9th Cir. 2002); *Farrell v. OpenTable, Inc.,* No. C 11-1785 SI, 2012 WL 1379661, at *3 (N.D. Cal. Jan. 30, 2012).

class?" *Ellis*, 657 F.3d at 985 (internal quotation omitted).

Plaintiff in this case easily meets both factors. First, the named Plaintiff and counsel do not have any conflicts of interest with other class members. Second, Plaintiff and counsel have, and will continue to, vigorously prosecute this action on behalf of the Classes. Plaintiff has responded to discovery, sat for a deposition, kept apprised of the litigation, and will testify at trial if necessary. Ex. 21 at 225. By any measure, he is an adequate class representative. Moreover, counsel is highly experienced in consumer fraud and complex class action litigation. *See Declarations of Counsel, attached as Exhibit 25.*

## C.    The Putative Classes Satisfy the Requirements of Rule 23(b)(3)

### 1.    Predominance

Under Rule 23(b)(3), the Plaintiff must demonstrate "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "The predominance requirement aims at ensuring class treatment is an economically efficient manner of dispute resolution." *O'Shea*, 318 F.R.D. at 638. Here, it is undoubtedly economically efficient to litigate the class members' claims in one action.

### a.    The Nationwide Breach of the Implied Covenant of Good Faith and Fair Dealing Class

Certification of the nationwide classes, under South Dakota law, involves one, predominant question: did Target breach the covenant of good faith and fair dealing when it chose transaction processing methods unlike those of true debit cards?  This question can and should be answered on a classwide basis.

South Dakota law applies to Plaintiff's and class members' breach of the covenant of good faith and fair dealing claim by virtue of the contract's choice of law clause.[7] *Ex.*

---

[7] As discussed below, the choice of law clause does not vitiate Plaintiff and California class members' CLRA and UCL claims because its application to these claims would be contrary

*13.* Under South Dakota law, to prove the breach of the covenant of good faith and fair dealing, a plaintiff must prove that the defendant, "by his lack of good faith, limited or completely prevented the aggrieved party from receiving the expected benefits of the bargain." *Garrett v. Bankwest, Inc.*, 459 N.W.2d 833, 841 (S.D. 1990). A claim under the duty of good faith and fair dealing "is allowed even though the conduct failed to violate any of the express terms of the contract agreed to by the parties." *Id.*

As the evidentiary proffer summarized, the salient evidence necessary to establish Plaintiff's implied covenant claim is common to Plaintiff and all members of the national classes. To summarize, the factfinder will determine whether the covenant of good faith and fair dealing was violated when Target abused discretion in the following respects:

- Omitting and concealing important facts about the TDC—most prominently, that up to four different fees can result; that the TDC operates on ███████████ ███████████████████████; and that the TDC can incur two, three or four NSF Fees (disclosing only the possibility of overdraft fees).
- Making misrepresentations that indicate the TDC will function like all other debit cards in terms of rejection for insufficient funds and assessment of overdraft fees (but not NSF Fees).
- Stating that Target "may" limit TDC approvals to an amount "less than the dollar amount of available funds in your Deposit Account," when in fact it had no capability to do so and almost never denied TDC transactions.
- Stating only that Target "may" re-submit returned TDC transactions for payment, ██████████████████████████████.[8]

---

to California's fundamental public policy and, in any event, is not within the scope of the choice of law provision.

[8] While the Court has dismissed Plaintiff's good faith claim to the extent it challenged the *amount* of the RPFs, the Court's Order on Target's Motion for Reconsideration does not otherwise bar Plaintiff from asserting other bases for the claim. Plaintiff's Complaint was subject to notice pleading. The Ninth Circuit has repeatedly made clear that "[n]otice pleading requires the plaintiff to set forth in his complaint claims for relief, not causes of action…or legal theories." *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) (emphasis in original); *see also Am. Timber & Trading Co. v. First Nat. Bank of Oregon*, 690 F.2d 781, 786 (9th Cir. 1982) ("A party need not plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case."). Indeed, as one court in this district recently put it: "A complaint can give fair notice of a claim even without citing to a particular source of law, provided that the factual allegations establish a plausible

The evidentiary presentation changes little if there are 100 class members or 100,000. In either instance, Plaintiff would present the *same* evidence of (1) Target's form adhesion contract, with identical terms, applicable to Plaintiff and class members; (2) the uniform manner of processing TDC transactions. *See also In re Chase Bank,* 274 F.R.D. at 291 (certifying breach of implied covenant of good faith and fair dealing class arising under Delaware law because liability could be demonstrated with common evidence).

### b.   The California Consumer Protection Act Subclasses

Like with the national classes, the California subclasses will require the factfinder to resolve one, central issue: did Target deceive consumers by labeling and marketing the TDC as a "debit card?"  Application of California law to Plaintiff's statutory claims is appropriate with respect to the California subclass. Target's choice of law provision[9] is unenforceable with respect to Plaintiff's UCL and CLRA claims.[10] When analyzing a contractual choice of law provision, the proper approach where a conflict is found is to

> determine whether the chosen state's law is contrary to a fundamental policy of California.  If there is no such conflict, the court shall enforce the parties' choice of law.  If, however, there is a fundamental conflict with California law, the court must then determine whether California has a "materially greater interest than the chosen state in the determination of the particular issue …." (Rest., § 187, subd. (2).)  If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy.

*Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 466, 834 P.2d 1148, 1148 (1992).

---

entitlement to relief. Thus, the crux of the matter is whether the complaint contains 'claims for relief, not causes of action, statutes, or legal theories.'" *Theiss v. County of Snohomish*, No. 12–1880, 2013 WL 2319397, at *5 (W.D. Wash. May 28, 2013) (citation omitted) (emphasis in original).

[9] The choice of law clause at issue is narrow in scope. It states, "This Agreement will be governed by . . . the law of South Dakota." Ex. 13. Arguably, this clause does not encompass Plaintiff's statutory claims. In any event, whether or not the clause reaches Plaintiff's statutory claims is irrelevant given that its enforcement with respect to these claims would undermine fundamental policies of the state of California.

[10] "[A] separate conflict of laws inquiry must be made with respect to each issue in the case." *Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 920, 103 Cal. Rptr. 2d 320, 331, 15 P.3d 1071, 1081 (2001).

Even if Target had a "reasonable basis" for choosing South Dakota law,[11] California law must apply to Plaintiff's UCL and CLRA claims because application of the choice of law clause with respect to these claims would be contrary to fundamental policies of California. First, both the CLRA and UCL reflect fundamental policies of the state of California, and the former provides protections which cannot be waived. Cal. Civ. Code § 1751; *Am. Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 18, 108 Cal. Rptr. 2d 699, 712 (2001); *Lloyd v. Navy Fed. Credit Union*, No. 17-cv-1280-BAS-RBB, 2018 U.S. Dist. LEXIS 62404, at *15 (S.D. Cal. Apr. 12, 2018) (noting the fundamental policies reflected in both the UCL and CLRA); *Aral v. Earthlink, Inc.*, 134 Cal. App. 4th 544, 564, 36 Cal. Rptr. 3d 229, 244 (2005) *abrogated on other grounds by AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011). Unlike the UCL and CLRA, South Dakota's consumer protection act has been described as "one of the weakest in the country."[12] Consumers bringing a claim under it must prove the deceptive conduct at issue was both "knowing and intentional." S.D. Codified Laws § 37-24-6(1). Moreover, under South Dakota's statute, consumers are entitled to only "actual damages," and are not entitled to attorneys' fees, statutory damages, or punitive damages. *See* S.D. Codified Laws § 37-24-31. In sum, application of South Dakota law to California class members' claims would violate "multiple fundamental policies of the state of California aimed at protecting California consumers." *See Lloyd*, 2018 U.S. Dist. LEXIS 62404, at *15.[13]

Under the CLRA and UCL, Plaintiff is required to demonstrate an actionable misrepresentation or omission. *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011). In CLRA class actions, "causation, on a class wide basis, may be established by materiality, meaning that if the trial court finds that material misrepresentations have been

---

[11] ███████████████████████████████████, is based in South Dakota. www.fidc.gov.

[12] *See* https://www.nclc.org/images/pdf/car_sales/UDAP_Report_Feb09.pdf

[13] California has a materially greater interest in applying its consumer protection law to protect its own consumers than South Dakota—a state in which none of the California class members reside, and which is not home to Target.

made to the entire class, an inference of reliance arises as to the class[.]" *Tait*, 289 F.R.D. at 480 (internal quotation and emphasis omitted). A misrepresentation is material if "a reasonable [consumer] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question[.]" *Stearns*, 655 F.3d at 1022 (internal quotation omitted).[14] The standard is similar under the UCL. *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009).[15]

Plaintiff's statutory claims are subject to common proof. Plaintiff will seek to prove that Target's marketing and labeling of the TDC was misleading because it did not function as an ordinary debit card and did not warn consumers of the severe fee risks of using the card—resulting in tens of millions of dollars in RPFs and NSFs from class members' linked bank accounts. Specifically, Target misrepresents the nature of TDC by the product's very name, and by issuing marketing materials and card agreements that a) fail to correct reasonable understandings of the name and b) misrepresent the actual functioning of the card. Target omits and conceals material facts about the TDC, never once informing consumers in *any* disclosure that: a) use of the card can result in multiple fees of up to *$150* for a single transaction; and b) ███████████████████████

██████████████████████████

These misrepresentations and omissions are material. A representation is material "if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action.'" *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 892 (Cal. 2011) (quotation omitted). *See also Tobacco II*, at 326-27 ("materiality is generally a question of fact"). No reasonable consumer would assume these massive fee risks by signing up for and using the TDC, had these risks been clearly disclosed. Reasonable consumers, instead, would have used the myriad other payment options at their disposal, all of which avoid these huge fee penalties. As discussed in detail in Section II.I, *supra*. Target itself was aware

---

[14] The named Plaintiff must demonstrate reliance, and Plaintiff Walters has done so. *See* Section II.I, *supra*.

[15] The UCL does not require materiality.

that consumer understanding about the functions and risks of the TDC was material, and that a misunderstanding of the truth directly led to fees from both Target and consumers' banks. *See, e.g.,* Ex. 19 (Target document stating that "[i]f guests misunderstand the Target Debit Card…they will continue to incur NSF's, resulting in a myriad of fees from their bank as well as Target."). Similarly, Plaintiff Walters testified repeatedly that the representation "debit card" was material to him, and that misrepresentations and omissions regarding dire fee penalties were material to him. Ex. 21 at241:18-25–242: 1-2 (stating he would not have used TDC if aware of double fee penalties).

As this Court recently ruled when certifying a labeling case under the CLRA, FAL, and UCL, "Whether Plaintiffs are successful in proving deceptiveness or not, the outcome of this issue affects the claims on a class-wide basis." *Clay*, 2018 U.S. Dist. LEXIS 153124, at *19 The same is true here, and class certification is appropriate. *Id.*; *see also Johns v. Bayer Corp.,* 280 F.R.D. 551, 557 (S.D. Cal. 2012) ("[T]he predominating common issues include . . . whether the [defendant's] misrepresentations were likely to deceive a reasonable consumer"); *Korolshteyn*, 2017 WL 1020391, at *6 ("[W]hether the statements on the label are material and likely to deceive a reasonable consumer will be the same for the entire class."). Common issues thus predominate.

### c.   Damages are Amenable to Calculation on a Classwide Basis

"The presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *see also O'Shea,* 318 F.R.D. at 639 (quoting the Advisory Committee Notes to Rule 23(b)(3): certification appropriate "despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class."). Although Plaintiff must demonstrate a potential method for calculating damages, "it is not necessary to show that [this] method will work with certainty at this time." *Chavez. V. Blue Sky Nat. Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010).

Here, Target maintains meticulous records of the amounts of RPFs charged to the class members during the class period in addition to the detailed transaction data that

resulted in those charges. The data includes how many RPFs were charged, whether any fees were charged for unsuccessful representment attempts, and whether fees were collected or waived. *See* Ex. 3 at ¶ 19.  Target's records will allow Plaintiff's expert to use Target's data to identify class members and systematically calculate a portion of each's individual damages: the RPFs charged by Target.  *See* Ex. 3 at ¶¶ 1, 2.

Additionally, Plaintiff will be able to use the records from Target and from class members' banks to prove the damages related to NSF Fees incurred on TDC transactions. As evidenced by the declarations of some of the largest banks in the country, banks maintain data regarding whether NSF fees were charged and whether they were paid or waived, and the NSF Fees can be tied to TDC transactions. *See Declarations from Banks on NSF Data*, attached as Exhibit 26. Furthermore, in the experience of Plaintiff's expert, all banks are in the practice of regularly maintaining such data. Ex. 3 at ¶¶ 1, 7, 20, 21. Thus, when provided with such data, Plaintiff's expert will be able to calculate the NSF fees incurred as a result of TDC transactions on a classwide basis. Ex. 3 at ¶ 20-24.

### d.    Alternatively This Court Should Certify a Class Under Rule 23(c)(4)

"Rule 23(c) enables district courts to divide classes into subclasses or certify a class as to only particular issues." *Briseno*, 844 F.3d 1121, 1128 (9th Cir. 2017) (citing Fed. R. Civ. P. 23(c)(4), (5)). In the event this Court determines that a calculation of NSF Fee damages is not feasible on a class-wide basis because it will require Plaintiff to obtain the bank records from every class member for their accounts linked to their TDC account in order to ascertain the amount of NSFs that were paid as a result of the TDC transactions, Plaintiff proposes that this Court certify a class on liability only, and allow separate determinations of damages. *See id.* at 1131; *see also Leyva v. Medline Indus.*, 716 F.3d 510, 513-14 (9th Cir. 2013) (reaffirming, after *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 185 L. Ed. 2d 515 (2013), that the need for individualized damages determinations after liability has been adjudicated does not preclude class certification)). Because common issues of law and fact predominate with respect to Target's liability, if this Court finds that damages will create

1   individualized issues, this court should certify a Rule 23(c)(4) liability class.

2   **2.   Superiority**

3   Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3)'s superiority requirement tests whether

4   "classwide litigation of common issues will reduce litigation costs and promote greater

5   efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Here, the

6   superiority requirement is clearly met. The value of each claim on an individual level is not

7   sufficient to justify the litigation expenses associated with proving the claim. Absent a class

8   action, recovery for the class members would not be economically feasible. *See Wolin,* 617

9   F.3d at 1175 ("Where recovery on an individual basis would be dwarfed by the cost of

10  litigating on an individual basis, this factor weighs in favor of class certification."); *O'Shea,*

11  318 F.R.D. at 639 ("[L]itigating all of the class members' claims on an individual basis

12  would take a substantially greater toll on limited judicial resources.").

13  **3.   Ascertainability**

14  The Ninth Circuit recently held that Rule 23 does not have an implicit standalone

15  ascertainability requirement. *Briseno*, 844 F.3d at 1128.  Even still, the class here is

16  ascertainable. Target has produced transactional data reflecting the class members'

17  transaction dates and times, the store the transaction occurred in, the linked bank account,

18  the state of residence for the class members, each incident of representment of the TDC

19  transaction, the amount of the RPFs charged, and the date the RPF was paid if it was paid

20  or the amount and date of the fee waiver if it was waived. Target's own data will be able

21  to identify each individual class member and the amount of damages to which they are

22  entitled. Ex. 3 at ¶ 20-24.; *Clay*, 2018 U.S. Dist. LEXIS 153124, at *8 ("sufficient that the

23  class be defined by an objective criterion.").

24  **D.   The California (b)(2) Class Satisfies the Requirements of Rule 23(b)(2)**

25  Finally, the proposed California (b)(2) class satisfies the requirements of 23(b)(2).

26  Rule 23(b)(2) mandates certification if "the party opposing the class has acted or refused

27  to act on grounds that apply generally to the class, so that final injunctive relief or

28  corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R.

1  Civ. P. 23(b)(2). Under Rule 23(b)(2), Plaintiff need not show predominance or superiority.

2  "District courts may certify both a 23(b)(2) class for the portion of the case concerning

3  injunctive and declaratory relief and a 23(b)(3) class for the portion of the case requesting

4  monetary damages." *West v. Cal. Servs. Bureau, Inc.,* 323 F.R.D. 295, 307 (N.D. Cal. 2017).

5     Here, Plaintiff seeks declaratory and injunctive relief under both the CLRA and

6  UCL  because Target has acted on grounds that apply generally to the class. *See generally*

7  *Ellis v. Costco Wholesale Corp.,* 285 F.R.D. 492, 536–37 (N.D. Cal. 2012).

## IV.   CONCLUSION

9     For the Foregoing reasons, Plaintiff respectfully requests that the Court certify the

10  Classes.

11  DATED: September 12, 2018          Respectfully submitted by,

12

13                 By:       */s/ Jeff Kaliel*
                                     _____

14                           JEFFREY KALIEL (SBN 238293)
                             SOPHIA GOREN GOLD (SBN 307971)
15                           **KALIEL PLLC**
                             1875 Connecticut Ave. NW, 10th Floor
16                           Washington, DC  20009
                             Phone: (202) 350-4783
17                           jkaliel@kalielpllc.com
                             sgold@kalielpllc.com
18

19                           **KOPELOWITZ OSTROW**
                             **FERGUSON WEISELBERG GILBERT**
20                           JEFF OSTROW*
                             Florida Bar No. 121452
21                           ostrow@kolawyers.com
                             JOSHUA R. LEVINE*
22                           Florida Bar No. 91807
                             levine@kolawyers.com
23                           One West Las Olas, 5th Floor
                             Fort Lauderdale, FL 33301
24                           Telephone: (954) 525-4100
                             Facsimile: (954) 525-4300
25                           (*admitted *pro hac vice*)

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION